IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.: 5:14-CR-19 |
| v. | |
| GEORGE COVARRUBAIZ | |

## UNITED STATES' RESPONSE TO DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS

The Court should deny the defendant's motion to suppress 32 kilograms of narcotics (21 kilograms of cocaine and 11 kilograms of heroin) seized by law enforcement from the defendant's vehicle on February 3, 2014. The traffic stop that led to the discovery of these drugs was based upon reasonable suspicion of wrongdoing; the Trooper observed that the defendant's vehicle had multiple defective lights. Additionally, the search of the vehicle that followed the stop also was based upon probable cause because a law enforcement canine trained to detect the scent of narcotics alerted for the presence of narcotics on the defendant's vehicle.

### FACTS

**1. Traffic Stop on December 4, 2013**

The traffic stop giving rise to this case was not the first time Virginia State Police Trooper Joseph Miller stopped the defendant on Interstate 81. Trooper Miller had previously stopped the defendant on December 4, 2013; at that time, the defendant was driving northbound on I-81 in the same 2008 blue Kenworth commercial tractor, while

pulling a flatbed trailer containing seven large empty green shipping containers. Trooper Miller stopped the defendant because his tractor trailer had multiple marker lights that were not functioning. During that stop, the defendant gave Trooper Miller a bill of lading bearing a December 2013 date, but which indicated no delivery destination address and no shipping address. When the defendant handed the bill of lading to Trooper Miller, the defendant accidentally tore the left side of the document when he removed it from his binder. Based on the unusual bill of lading, Trooper Miller called in a canine unit to conduct a free-air sniff around the vehicle. The dog alerted to the presence of narcotics, but no drugs were discovered during the search. Trooper Miller did not issue a citation for the defective lights, but instead issued a warning and allowed the defendant to continue his drive.

## 2. Traffic Stop on February 3, 2014

The traffic stop at issue in this case occurred three months later on February 3, 2014. Trooper Miller was parked and monitoring northbound traffic on Interstate 81 near mile marker 258.7. Earlier that day, Trooper Miller had received information that the defendant may be travelling northbound on I-81 carrying a large shipment of narcotics. Shortly thereafter, Trooper Miller observed the defendant's vehicle approaching his position from the south. The Trooper immediately recognized the tractor trailer from his previous encounter with the defendant. From his position in the median facing towards oncoming traffic, Trooper Miller was approximately twenty-five feet from the tractor trailer as it passed him in the left-hand northbound lane. As the defendant's vehicle passed Trooper Miller's position, Trooper Miller observed that the same marker lights still were not functioning. He also noticed that the truck appeared to be carrying the same

seven green shipping containers the defendant had been hauling in December. To confirm his observations, Trooper Miller drove beside the defendant's vehicle at a distance of less than ten feet from the tractor, and was able to visually confirm that several of the LED marker lights had multiple non-functioning diodes, and one of the round amber marker lights was not lit.

Next, Trooper Miller conducted the traffic stop on the defendant's vehicle based upon a suspected violation of Virginia traffic code, § 46.2-1003, which prohibits the use of defective equipment on motor vehicles. Without delay, Trooper Miller approached the tractor and requested the defendant's driver's license, truck and trailer registration, bill of lading and logbook. When the defendant produced these items, Trooper Miller recognized the bill of lading as the very same bill of lading the defendant had given Trooper Miller during the previous traffic stop outlined above; he recognized the tear on the side of the document as well as the items listed on it. Trooper Miller also recognized the defendant, the tractor trailer, the same defective lights, and the same seven green cargo containers from the previous stop. These facts further raised Trooper Miller's suspicions that the defendant may have been engaged in criminal conduct.

In accordance with VSP standard investigatory and safety practices, Trooper Miller asked the defendant to sit in the front passenger seat of the Trooper's patrol vehicle to speak with him further. The defendant was not placed under arrest at this time. When Trooper Miller discussed the apparent violations with the defendant and, more specifically, that he recognized the defendant from the previous traffic stop, the defendant displayed increasingly nervous behavior, and could not explain why he had the same bill of lading he had during the previous traffic stop.

While Trooper Miller was speaking with the defendant, Trooper Jerry Moore arrived on the scene with a canine trained to detect the scent of narcotics. Trooper Moore quickly walked the canine around the defendant's tractor trailer, and the canine alerted to the scent of narcotics near the driver's side door of the tractor. Law enforcement searched the tractor and discovered the 32 kilograms of narcotics hidden in the tractor's battery box and in the equipment box attached to the back of the tractor. At this time, Trooper Miller placed the defendant under arrest. The narcotics had been packaged in 32 individual kilogram-sized packages. Subsequent laboratory analysis by law enforcement confirmed that 21 of the packages contained cocaine and 11 of the packages contained heroin.

### 3. Evidence Presented During Hearing on Defendant's Motion to Suppress

The Court conducted an evidentiary hearing on July 17, 2014 on the defendant's motion to suppress. Trooper Miller testified at length about the circumstances of the traffic stop and his personal observations leading to the traffic stop. He testified that, before the stop, another law enforcement agency had alerted him to be on the lookout for the defendant's vehicle. Trooper Miller positioned his unmarked police vehicle in the median crossover facing the northbound traffic on I-81. As the defendant's vehicle passed his position, he observed that some of the defendant's marker lights on the front and driver's side of the vehicle were not functioning. This testimony was corroborated by the photographs Trooper Miller took during the stop, which were introduced as exhibits by the United States during the hearing.

Next, Trooper Miller testified that, before conducting the traffic stop, to confirm his observations he drove beside the defendant's truck and again observed that some of

the marker lights on the driver's side of the defendant's vehicle were not functioning. This testimony was corroborated by the video of the traffic stop, which the United States introduced during the hearing. See Exhibit 17. Specifically, the video camera angle that showed the inside of Trooper Miller's vehicle during the stop shows that Trooper Miller drove beside the defendant's vehicle; the video also shows that Trooper Miller turned his head to the right multiple times, and examined the non-functioning marker lights on the defendant's tractor trailer.

Trooper Miller then testified that after he conducted the stop, he asked the defendant to produce his driver's license, bill of lading, registrations and logbooks. The defendant produced the same bill of lading that he had produced during the December 2013 stop; Trooper Miller noticed the same tear on the document and the same information on it. This testimony was corroborated by the photograph of the bill of lading, which the United States introduced during the hearing. At the conclusion of the hearing, the Court expressly found Trooper Miller's testimony to be "highly credible."

## LAW

Temporary detention of an individual during a traffic stop is a seizure under the Fourth Amendment of the Constitution. *Whren v. United States*, 517 U.S. 806, 809 (1996). Observing a suspected traffic violation gives an officer reasonable suspicion to stop a vehicle for as long as it takes to perform a routine traffic stop. *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008); *see also, Whren*, 517 U.S. at 810. To support reasonable suspicion for a stop, the officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). When examining

whether an officer had reasonable suspicion for a traffic stop, courts examine the "totality of the circumstances." *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989); *See, e.g., United States v. Whitehead*, 849 F.2d 849, 862 (4th Cir. 1988).

In examining the basis of a traffic stop, courts must apply an objective test that focuses upon whether the officer had the right to stop the vehicle. *Ohio v. Robinette*, 519 U.S. 33, 38 (1996); *Whren*, 517 U.S. at 812; *see also, United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993). Even a minor traffic violation provides an objective right to stop a vehicle. *Hassan El*, 5 F.3d at 730. The Fourth Circuit Court of Appeals has explained that "[u]nder the objective test, if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity." *Id.* Courts have repeatedly and emphatically held that any subjective reasons an officer may have for stopping a vehicle are not germane when analyzing the constitutionality of a traffic stop. *See*, *id.*; *United States v. Williams*, 85 F. App'x 341, 346 (4th Cir. 2004); *United States v. Ellis*, 326 F.3d 593, 596 (4th Cir. 2003); *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996).

Furthermore, the reasonable suspicion standard does not require that a violation have actually occurred. *United States v. Arias*, 213. F.App'x. 230, 233 (4th Cir. 2007). It merely requires an officer to reasonably believe that one has, based on "an objective assessment of the facts and circumstances confronting him at the time." *Maryland v. Macon*, 472 U.S. 463, 470 (1985)

Under Virginia law, it is unlawful "for any person to use or have as equipment on a motor vehicle operated on a highway any device or equipment mentioned in § 46.2-

1002 which is defective or in unsafe condition." Va. Code Ann. § 46.2-1003 (West 1989). Section 46.2-1002 lists the types of equipment which must be approved before use, which includes "any lighting device." Va. Code Ann. § 46.2-1002 (West 1989). Therefore, if an officer reasonably suspects that equipment on a vehicle listed in § 46.2-1002 is defective under § 46.2-1003, he may stop that vehicle to investigate the suspected violation. *Commonwealth v. Daley*, 2010 WL 1752548, *3 (Va. Ct. App. May 4, 2010), ("[T]he officer had a right, and a duty, to stop the vehicle in order to confirm or dispel his suspicion that the [flaw] may render the [equipment] defective or unsafe."); *Salmon v. Commonwealth*, 1996 WL 421877, *2 (Va. Ct. App. July 30, 1996).

Unless a driver is authorized by a police officer to drive away from the place the defect is discovered to the repair shop, "[no] statute permits operation of a vehicle with defective equipment." *Reel v. Commonwealth*, 522 S.E.2d. 881, 883-84 (Va. Ct. App. 2000). "Defective" means faulty or deficient. *Otey v. Commonwealth*, 61 Va. App. 346, 350, (Va. Ct. App. 2012), ("Ordinarily, when a particular word in a statute is not defined therein, a court must give it its ordinary meaning. The plain, ordinary meaning of the term 'defective' is straightforward. A [] light is 'defective' if it is 'faulty, deficient.'"); *see also*, *Ragland v. Commonwealth*, 1997 WL 65780 *2 (Va. Ct. App. Feb. 18, 1997), ("'Defective' is commonly defined as 'falling below an accepted standard in regularity and soundness of form or structure.'").

If an officer suspects that a piece of equipment within the scope of § 46.2-1002 is defective, "it is not necessary for the Court to decide whether the [equipment] is actually defective or created an unsafe condition. The only question is whether it was reasonable for the officer to believe that it was possibly defective." *United States v. Ellington*, 396 F.

Supp. 2d 695, 701 (E.D. Va. 2005) (finding that an officer's mistake as to the size of a crack in a windshield did not render the stop illegal, as a crack of the size the officers believed this crack was could have rendered the windshield defective or unsafe."); *Daley*, 2010 WL 1752548 at *3 ("We do not determine whether defendant is guilty of driving a vehicle with a defective windshield, but only whether reasonable suspicion existed to stop defendant's vehicle for further investigation."); *Commonwealth v. Gaskins*, 2011 WL 1988372, *3 (Va. Ct. App. May 24, 2011). It may not be possible to determine if a violation of § 46.2-1003 has occurred without stopping the vehicle. *See*, *Salmon,* 1996 WL 421877 at *2 ("While in his cruiser, [Officer] Alessi could not determine the precise extent of the crack in appellant's windshield and its impact on appellant's ability to drive his vehicle."); *Myree v. Commonwealth,* 1999 WL 1126563, *2 (Va. Ct. App. Mar. 2, 1999) ("The purpose of a *Terry* stop is to confirm or dispel the officer's suspicion of unlawful activity. [The officer] stopped [the defendant] to determine whether the crack rendered the windshield defective.").

## ANALYSIS

**I. Trooper Miller had reasonable suspicion to stop the defendant because marker lights on the defendant's vehicle were not functioning, and Virginia law requires all lights on a vehicle be functional.**

Trooper Miller had reasonable suspicion to stop the defendant on February 3, 2014. As he testified under oath, Trooper Miller observed what appeared to be traffic violations when the defendant's vehicle first passed him northbound on I-81. Trooper Miller specifically observed that multiple marker lights on the driver's side of the defendant's vehicle were not working when it passed his position. To confirm his observations, Trooper Miller drove beside the defendant's vehicle and again observed the

defective lights on the vehicle. After twice observing the defective lights on the defendant's vehicle, Trooper Miller conducted the traffic stop.

Under the objective test outlined above, the totality of the circumstances shows that Trooper Miller had a reasonable suspicion that the defendant had committed traffic violations. As explained above, Sections 46.2-1002 and 46.1003 of the Virginia Criminal and Traffic Law Manual, together, prohibit the use of defective lighting equipment on motor vehicles in the Commonwealth of Virginia. Section 46.2-1003 states, "It shall be unlawful for any person to use or have as equipment on a motor vehicle operated on a highway any device or equipment mentioned in § 46.2-1002 which is defective or in unsafe condition." Section 46.2-1002 states:

> It shall be unlawful for any person to possess with intent to sell or offer for sale, either separately or as a part of the equipment of a motor vehicle, or to use or have as equipment on a motor vehicle operated on a highway any lighting device, warning device, signal device, safety glass, or other equipment for which approval is required by any provision of this chapter or any part or parts tending to change or alter the operation of such device, glass, or other equipment unless of a type that has been submitted to and approved by the Superintendent or meets or exceeds the standards and specifications of the Society of Automotive Engineers, the American National Standards Institute, Incorporated or the federal Department of Transportation. Va. Code Ann. § 46.2-1002 (West 1989)

Section 46.2-1002 broadly prohibits the use or sale of certain types of equipment, including "any lighting device," that has not been approved or does not meet certain national standards. Under Section 46.2-1002, the listed types of equipment may be approved (and therefore lawful) by the Superintendent, or another provision of the vehicle code, or satisfy relevant Department of Transportation standards. Accordingly, "any lighting device" on a vehicle must be approved by the Superintendent, or another provision in the vehicle code, or one of the listed national standards. Therefore, § 46.2-

9

1003 prohibits any defective lighting device because 42.2-1002 broadly covers any lightening device on a vehicle, since all are subject to some type of approval. *See Javier-Paz v. Commonwealth*, 2013 WL 1120830, *4 (Va. Ct. App. Mar. 19, 2013); *Daley*, 2010 WL 1752548 at *3; *Salmon,* 1996 WL 421877 at *2; *Myree*, 1999 WL 1126563 at *2; *Commonwealth v. Snyder*, 2007 WL 2301647, *2 (Va. Ct. App. Aug. 14, 2007); *Reel*, 522 S.E.2d. at 883-4; *Ellington*, 396 F.Supp.2d at 701; *United States v. McHugh*, 569 F. Supp. 2d 569, 576 (E.D. Va. 2008) *vacated on other grounds and remanded*, 349 F. App'x 824 (4th Cir. 2009).

General grammatical principles, born out by recent Supreme Court cases, suggest that in the absence of clear need for a contrary approach, a modifying clause in a statute should be applied only to the last antecedent. *United States v. Hayes*, 555 U.S. 415, 425 (2009); *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 343 (2005); *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Accordingly, the phrase "for which approval is required" in § 46.2-1002 only modifies the immediately preceding phrase "other equipment." It does not modify "any lighting device."

In *Javier-Paz v. Commonwealth*, the court observed Section 46.2-1002 in the following manner: "any lighting device, warning device, signal device . . . or other equipment for which approval is required . . .or any part or parts . . .", showing that "for which approval is required" modifies only "other equipment." *Javier-Paz v. Commonwealth*, 2013 WL 1120830 at *4. The Fourth Circuit used a similar approach in interpreting § 46.2-1002; the court overturned the holding of the district court decision, ruling that the stop was permissible, but it did not quarrel with the district court's statement that § 46.2-1002 referred to lighting, warning, and signal devices, and equipment that changes the operation of the listed devices. *McHugh*, 569 F. Supp.

2d at 576 ("[A] motor vehicle operated on a highway may not have a lighting device, warning device, or signal device—or equipment that alters the operation of those devices—unless it has been approved [by one of the appropriate governing bodies.]"). The reference to § 46.2-1002 simply refers back to all of the kinds of equipment the proper function of which is important enough to require approval by an appropriate governing body.

Similarly, when looking at the entirety of § 46.2-1002, and its purpose to delineate which types of equipment must be approved before they can be used, it makes sense to modify only "other equipment." To do otherwise would say that all devices and equipment for which approval is required must be approved, which is redundant. It would also render the entire first part of the statute unnecessary; instead of creating a list, the legislature could simply have stated something to the effect that "it is unlawful to use or sell any equipment for which approval is required that has not actually been approved." Statutes should be construed "so as to avoid rendering superfluous" any language in the statute. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991); *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51, 63 (2002); *Bailey v. United States*, 516 U.S. 137, 146 (1995).

In sum, therefore, Trooper Miller had reasonable suspicion to conduct the traffic stop because he twice observed lights on the defendant's vehicle that were not functioning, which he reasonably believed was a violation of § 46.2-1003, as outlined above.  Trooper Miller had the lawful authority to conduct a traffic stop to confirm or dispel his reasonable suspicions of that violation.

Trooper Miller testified under oath about these events, and his testimony was corroborated by physical evidence introduce during the hearing, including video and photographs.  He testified that he was able to see, from his parked vantage point only twenty-five

feet away, that some of the marker lights on the tractor were not functional. Next, Trooper Miller carefully confirmed his suspicions from the next lane, less than ten feet away from the defective lights themselves, before he conducted the stop. These defective lights were also visible in photographs taken from a similar distance and in the same conditions after the stop was conducted. The defendant has submitted no evidence whatsoever that contradicts Trooper Miller's testimony. To the contrary, all of the photo and video evidence introduced by the United States corroborates Trooper Miller's testimony. What is more, as noted above, the Court expressly found that Trooper Miller's testimony was highly credible.

## II. The Defendant's Arguments Fail

The defendant's brief appears to advance two primary arguments in support of its motion to dismiss: (1) the officer's traffic stop was unconstitutional because it was pretextual; and (2) Trooper Miller's stop for defective lighting was based upon an impermissible mistake of law because Virginia law does not require the defective lights at issue to be functional. These arguments fail, as explained below.

### A. Pretextual stops are lawful when reasonable suspicion supports the traffic stop.

The defendant insists, without legal authority, that the Court should suppress the evidence from this stop because the stop was "an illegal pretextual stop." Brief of Defendant at 13. This argument fails, of course, because the subjective intent of an officer at the time of a traffic stop is not germane to this analysis. As explained above, an officer's subjective intent is not relevant when determining whether reasonable suspicion existed to justify the stop. *Hassan El*, 5 F.3d at 730. The only question is whether the officer who conducted the stop had reasonable suspicion of a violation; if the answer is yes then the stop is Constitutional, notwithstanding the myriad subjective intentions of the officer. *Id*. As the court in *Whren* stated:

> [V]irtually everyone is guilty of violation, permitting the police to single out almost whomever they wish for a stop. But we are aware of no principle that would allow us to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement. And even if we could identify such exorbitant codes, we do not know by what standard (or what right) we would decide, as petitioners would have us do, which particular provisions are sufficiently important to merit enforcement. For the run-of-the-mine case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure. *Id.*

The Supreme Court has not retreated from this position. Therefore, the defendant's argument – that the "pretextual" nature of this stop renders it unconstitutional – must fail.

### B. The Defendant's interpretation of the statute is incorrect; all lighting devices must be operational.

The defendant argues that Virginia law only requires that a certain narrow class of lighting devices be operational and, as a result, lighting devices that fall outside of that category do not have to function properly. Specifically, he argues that Section 46.2-1002 only captures lighting devices "for which approval is required by any provision of this chapter." See Defendant's Brief at 7. He further argues that the lights that fall into this class are "headlights, tail lights, brake lights, turn signal lights or any other lights required to be in working order under Virginia law." *Id.* However, this interpretation of the statute is incorrect.

In his interpretation, the defendant mistakenly applies the modifier in Section 46.2-1002, "for which approval is required," to all of the preceding phrases. As outlined above, the phrase "for which approval is required" only modifies the phrase immediately preceding it, which is "or other equipment." Once again, Virginia case law supports this interpretation, that all lighting devices on a vehicle must be functional. *See Javier-Paz v. Commonwealth*, 2013 WL 1120830, *4 (Va. Ct. App. Mar. 19, 2013); *Daley*, 2010 WL

13

1752548 at *3; *Salmon,* 1996 WL 421877 at *2; *Myree*, 1999 WL 1126563 at *2; *Commonwealth v. Snyder*, 2007 WL 2301647, *2 (Va. Ct. App. Aug. 14, 2007); *Reel*, 522 S.E.2d. at 883-4; *Ellington*, 396 F.Supp.2d at 701; *United States v. McHugh*, 569 F. Supp. 2d 569, 576 (E.D. Va. 2008) *vacated on other grounds and remanded*, 349 F. App'x 824 (4th Cir. 2009).

The defendant cites cases in support of his interpretation of the applicable statutes, but these cases are distinguishable from the instant case. In *Gilbert*, the court analyzed an officer's stop of a car based upon defective marker lights. The court found that the stop was unconstitutional because "[n]othing in the code requires that an *ordinary automobile* be equipped with marker lights." *Commonwealth v. Gilbert*, 1998 VA App. LEXIS 474 at *7 (italics added). In this case, however, the defendant was not driving an ordinary automobile; he was driving a large tractor trailer. Section 46.2-1017 expressly requires marker lights on tractor trailers and semi-trailers.

The defendant also cites *Commonwealth v. Najera*, in which the court analyzed an officer's stop of another car based on defective front running lights. There, the Government argued that the stop was justified because "the type of lights at issue in [that] case must be approved for use under this chapter pursuant to § 46.2-1020." 68 Va. Cir. 17 at *1. However, the court invalided the stop because Section 46.2-1020 does not require approval by the Superintendent. *Najera*, therefore, is a case that addresses Section 46.2-1020 and whether that section mandates approval of front running lights. This case is different because it does not implicate Section 46.2-1020 whatsoever. Instead, the instant case focuses upon Sections 46.2-1002 and 46.2-1003.

Finally, the defendant cites *Snyder*, in which the court analyzed whether an officer's stop of a vehicle based on a broken passenger mirror and Section 46.2-1003. Importantly, the issue there was under Section 46.2-1003, "whether mirrors are 'other equipment' for which approval is required by any provision in Chapter 10 of the Virginia Code." *Id.* at 2. The court invalided the stop because "defect[s] in a mirror must be evaluated under Code § 46.2-1082, which establishes the minimum requirements for mirrors." The instant case, however, is different on multiple grounds.

The court (and the parties) in *Snyder* assumed that the Section 46.2-1002 phrase "for which approval is required" only modified "other equipment". In this case, by contrast, the defendant argues that "for which approval is required" modifies the entire list preceding the phrase (not just "other equipment"), which includes "any lighting device." Accordingly, *Snyder* does not support the defendant's argument. Moreover, *Snyder* involved a broken mirror, Section 46.2-1082, and passenger mirrors are "other equipment" under Section 46.2-1002. This case focuses upon lights and Sections 46.2-1002 and 46.2-1003. Therefore, the cases cited by the defendant are not persuasive.

### III. **Alternatively, even if the defendant's interpretation of Section 46.2-1002 is correct, Trooper Miller's stop is still valid and the Court should deny the motion to suppress.**

Alternatively, even under the defendant's misguided interpretation of the statute, Trooper Miller still had reasonable suspicion to stop the defendant's vehicle. The defendant argues that Section 46.2-1002 captures "any lighting device…for which approval is required by any provision of this chapter." Defendant's Brief at 7. The defective lights on defendant's vehicle are "marker lights," which are required, and for which approval is required, under Section 46.2-1017 of the same chapter. If necessary, the United States will offer evidence that the defective lights on the defendant's vehicle were marker lights. These lights make clear the dimensions of

15

an oversized vehicle to other drivers on the road. Because Section 46.2-1017 requires approval of marker lights, therefore, cannot be defective under Sections 46.2-1002 and 46.2-1003. Accordingly, Trooper Miller's observation of the defendant's defective marker lights gave him reasonable suspicion to stop the defendant's vehicle.

The defendant's tractor had more than the bare minimum number of marker lights required by Section 46.2-1002. However, extra required lights must still function, and if they do not, they are in violation of Section 46.2-1003 as defective. *See Otey*, 61 Va. App. at 350; *Ragland*, 1997 WL 65780 at *2. In *Otey*, the court stated:

> Code § 46.2-1003 prohibits the use on a vehicle of *any* equipment mentioned in Code § 46.2-1002 that is either unsafe or defective, whether or not this equipment exceeds the minimum requirements set forth elsewhere in the Code. Thus, the apparent intent of Code § 46.2-1003 is to compel automobile owners to repair or replace any of their vehicle's equipment that falls into a defective or unsafe condition. Appellant's attempt to harmonize Code § 46.2-1003 and Code § 46.2-1014 would have the effect of eviscerating the impact of Code § 46.2-1003 because it would create an entire class of equipment that may be legally used on a vehicle in an unsafe or defective condition simply because the requirement is in excess of the Code's minimum requirements. We decline to construe these two provisions to achieve such an unwarranted result. 61 Va. App.at 35-1, quoting *Ragland*, 1997 WL 65780 (emphasis original).

Therefore, both required marker lights and extra marker lights must function. *See also*, *Gaskins,* 2011 WL 1988372 at *2-3.

Finally, if the Court concluded that the defective lights on the defendant's vehicle were not marker lights, the stop would still be valid. As Trooper Miller testified during the hearing, he reasonably believed that the defective lights at issue were marker lights. If, however, Trooper Miller was incorrect in his factual conclusion that the defective lights were marker lights, then his mistake would be a mistake of fact, which would not invalidate the stop. As courts have held, a reasonable mistake of fact does not invalidate an otherwise reasonable stop. *McHugh*,

569 F. Supp. 2d at 576. The Fourth Circuit Court of Appeals dealt with a mistake of fact regarding after-market tail lights:

> Here, Trooper [Michael] Miller had an articulable, reasonable suspicion to believe the clear lenses on the Expedition's tail lights were not of a type approved by the Superintendent. While he may have been mistaken in believing that the clear lenses on the taillights were not of a type approved by the Superintendent, he clearly was not mistaken in his belief that Virginia law required the clear lenses to be of a type so approved. Thus, any mistake on the part of Trooper Miller involved one of fact, not law. Put another way, under the facts before him, it was reasonable for Trooper Miller to believe that a [] traffic violation may have been committed and, therefore, the stop was objectively reasonable. *Id*.

Another Fourth Circuit case, *United States v. Arias*, came to the same conclusion: "[e]ven if [the officer] was mistaken in his belief that the damage to [the defendant's] car amounted to a violation of Virginia law, this was a reasonable mistake of fact. A review of [the officer's] testimony supports the district court's conclusion that it was reasonable for [the officer] to believe that a traffic violation had been committed and therefore the stop was objectively reasonable." *United States v. Arias*, 213. F.App'x. at 233. Similarly, in *United States v. Williams*, the officer's mistaken but reasonable belief that an inoperable running light also functioned as turn signal and hazard light was sufficient to justify the stop in that case. *United States v. Williams,* 85 F. App'x at 346. In a Virginia Court of Appeals case, *Shelton v. Commonwealth*, an officer's mistaken but reasonable belief that fog lights were blue in violation of the law, even though the lenses were clear, was sufficient to justify a stop. 2005 WL 464892, *2-3 (Va. Ct. App. Mar. 1, 2005).

## CONCLUSION

The Court should deny the defendant's motion to suppress because Trooper Miller had reasonable suspicion for the traffic stop. Alternatively, even if the Court

follows the defendant's interpretation of the statute, the stop was still valid for the reasons detailed above.


Dated: August 4, 2014                               Respectfully submitted,

                                                    TIMOTHY J. HEAPHY
                                                    United States Attorney

                                                    *s/Grayson A. Hoffman*
                                                    GRAYSON A. HOFFMAN
                                                    Assistant United States Attorney
                                                    United States Attorney's Office
                                                    116 N. Main Street
                                                    Harrisonburg, VA 22802
                                                    (540) 432-6636

## **C E R T I F I C A T E**

      I hereby certify that a true and correct copy of the foregoing United States' Response to the Defendant's Motion to Suppress has been electronically filed by the court's CM/ECF system on this 8th day of August, 2014.

                                          s/Grayson A. Hoffman
                                          GRAYSON A. HOFFMAN
                                          Assistant United States Attorney