CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

AUG 28 2014

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal Action No.: 5:14cr00019 |
| v. | ) |
| | ) By: Hon. Michael F. Urbanski |
| | ) United States District Judge |
| GEORGE HENRY COVARRUBAIZ | ) |
| a/k/a *Jorge Covarrubiaz* | ) |
| a/k/a *George Henry Covarrubiaz* | ) |

## MEMORANDUM OPINION

This matter is before the court on the motion to suppress of the defendant George Henry Covarrubaiz ("Covarrubiaz"). Dkt. No. 30. Covarrubaiz argues that his stop by law enforcement was unlawful and that the fruits of the search that followed must therefore be suppressed. As set forth herein, the court requests further briefing from the parties.

### I.

The relevant facts are largely undisputed. On December 3, 2013, Virginia State Senior Trooper Joseph Miller stopped a blue Kenworth tractor hauling a flatbed trailer with seven green containers on it for defecting lighting devices. A drug dog alerted on the vehicle, but no contraband was found at the time.

On February 3, 2014, Trooper Miller received information that a vehicle matching the description of the vehicle he pulled over on December 3 could possibly be transporting a large quantity of narcotics.[1] Conditions that day were snowy, with poor visibility. While observing north-

---

[1] Importantly, the Government does not argue that Trooper Miller was directed to stop Covarrubaiz's vehicle on behalf of another law enforcement officer who independently possessed sufficient information to establish reasonable suspicion or probable cause. Cf. United States v. McRae, 336 F. App'x 301, 306-07 (4th Cir. 2009) (unpublished per curiam opinion) (holding that, under the collective knowledge doctrine, an ATF's agent's knowledge of facts establishing

bound traffic on interstate 81, Trooper Miller saw a tractor trailer that he believed to be the same vehicle that he had stopped three months prior. He testified that he observed a blue Kenworth tractor pulling a flatbed trailer with what appeared to be the exact same green containers. He further testified that he observed that certain lights were out on the front bumper of the truck – in fact, he believed that the same lights from the December stop remained defective. Specifically, Trooper Miller testified that certain round amber lights as well as certain bulbs within LED light panels were not working. Trooper Miller collectively referred to all of these lights as "marker lights." Hr'g Tr. at 20:6-14; 28:17-22.

After the vehicle passed, Trooper Miller pulled his patrol car on to the highway. He testified that he pulled up alongside the tractor trailer, looked to his right, and confirmed that there were defective amber and LED lights on the driver's side of the vehicle. Video of Trooper Miller's squad car was introduced into evidence and confirms that Trooper Miller did in fact pull alongside the tractor trailer and looked over to his right. Additionally, the United States introduced photographic evidence of the non-functioning amber and LED lights along the base of the tractor on the driver's side.

After driving alongside the tractor-trailer, Trooper Miller initiated a traffic stop. He testified that his suspicion was heightened when Covarrubaiz gave him what appeared to be the same bill of lading as the previous stop. A drug dog again altered on the vehicle and this time police discovered eleven kilograms of heroin and twenty-one kilograms of cocaine. Covarrubaiz has moved to suppress this physical evidence.[2]

---

reasonable suspicion to stop a vehicle was imputed to the police officers who were directed by the agent to conduct the stop).

[2] Covarrubaiz has challenged only the legality of the stop, not the dog sniff or the search that followed.

2

II.

The Fourth Amendment to the United States Constitution provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. "This amendment requires that arrests be made based upon probable cause." Taylor v. Waters, 81 F.3d 429, 436 (4th Cir. 1996); see also Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 460 (4th Cir. 2013) (citing Devenpeck v. Alford, 543 U.S. 146, 152 (2006)) ("[A]rrests, the most intrusive type of police-citizen encounter, must be supported by probable cause."), cert. denied, 134 S. Ct. 1541 (U.S. 2014). However, pursuant to Terry v. Ohio, 392 U.S. 1 (1968), brief investigative detentions – commonly referred to as "Terry stops" – require only reasonable articulable suspicion of criminal activity. Santos, 725 F.3d at 460 (citing Terry, 392 U.S. at 21); see also United States v. McHugh, 349 F. App'x 824, 826-27 (4th Cir. 2009) (unpublished per curiam opinion) (citing Terry, 392 U.S. at 31) ("In the context of investigatory detentions, the Supreme Court has held that, consistent with the Fourth Amendment, a police officer may conduct an investigatory stop if the officer has a reasonable suspicion that criminal activity may be afoot.").

As such, a Terry stop "does not demand certainty, only 'a minimal level of objective justification.'" United States v. Ahlstrom, 530 F. App'x 232, 237 (4th Cir. 2013) (unpublished per curiam opinion) (quoting United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008)). Thus, the United States need not prove that there was an actual violation of the law in order for the stop to be valid. Instead, "in order to justify a Terry stop, a [law enforcement] officer must simply point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." Branch, 537 F.3d at 336 (internal citations and quotation marks omitted). Moreover, "[j]udicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the

3

evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." Ahlstrom, 530 F. App'x at 237 (quoting Branch, 537 F.3d at 337).

Critically, "an officer's reasonable mistake of fact may provide the objective grounds for reasonable suspicion or probable cause required to justify a traffic stop, but an officer's mistake of law may not." United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003); see also United States v. Nicholson, 721 F.3d 1236, 1241 (10th Cir. 2013) (collecting authorities, including Chanthasouxat) ("[M]istakes of law made by an officer are objectively unreasonable.").[3] This is so because a "mistake of law cannot provide the necessary objective basis for reasonable suspicion or probable cause." United States v. Ellington, 396 F. Supp. 2d 695, 699 (E.D. Va. 2005) (citing Chanthasouxat, 342 F.3d at 1276). In contrast, if a mistake of fact is reasonable, the stop itself is objectively reasonable. See United States v. McHugh, 349 F. App'x 824, 828 (4th Cir. 2009) (unpublished per curiam opinion) ("[U]nder the *facts* before him, it was reasonable for Trooper Miller to believe that a § 46.2–1013 traffic violation may have been committed and, therefore, the stop was objectively reasonable.").

---

[3] Although the Fourth Circuit has never expressly stated in a reported decision that a mistake of law cannot justify a Terry stop, it has cited Chanthasouxat in two unpublished decisions for the proposition that "an officer's reasonable mistake of fact may provide the objective grounds for reasonable suspicion or probable cause required to justify a traffic stop, but an officer's mistake of law may not." United States v. Arias, 213 F. App'x 230, 232 (4th Cir. 2007) (unpublished per curiam opinion); United States v. Williams, 85 F. App'x 341, 347 (4th Cir. 2004) (unpublished per curiam opinion); see also United States v. McHugh, 349 F. App'x 824, 828 n.3 (4th Cir. 2009) (unpublished per curiam opinion) (assuming, without deciding, "that an officer's reasonable mistake of law may not provide the objective grounds for reasonable suspicion to justify a traffic stop"). Additionally, district courts within the Fourth Circuit have concluded that an officer's mistake of law may not justify a traffic stop. See United States v. Gore, No. 4:12-CR-00057-RBH-1, 2012 WL 1621007, *2 n.4 (D.S.C. May 9, 2012); United States v. Ellington, 396 F. Supp. 2d 695, 699 (E.D. Va. 2005). As such, the court has no trouble concluding that if Trooper Miller made a mistake of law, even if such a mistake was reasonable and in good faith, the stop was unlawful.

4

The lawfulness of Trooper Miller's stop of Covarrubaiz is of vital importance because any evidence obtained as a proximate result of an unlawful seizure must be suppressed. The Fourth Circuit has explained:

> Although "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands," United States v. Leon, 468 U.S. 897, 906 (1984), the Supreme Court adopted the exclusionary rule "to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." United States v. Calandra, 414 U.S. 338, 347 (1974). Generally, the exclusionary rule provides that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure," id., and it "reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" Segura v. United States, 468 U.S. 796, 804 (1984) (citations omitted).

United States v. DeQuasie, 373 F.3d 509, 519 (4th Cir. 2004) (alterations in original) (certain full cites added). Thus, simply put, "[i]f the court were to find that the stop of the vehicle was unlawful, the exclusionary rule would mandate suppression of all evidence seized as a proximate result of such stop." United States v. Hunnicutt, No. 1:05-MJ-00241, 2006 WL 91765, at *1 (W.D.N.C. Jan. 13, 2006).

### III.

As an initial matter, Covarrubaiz argues that Trooper Miller could not possibly have observed the defective lights on his vehicle due to his high rate of speed and the poor visibility caused by the inclement weather. Specifically, Covarrubaiz argues that:

> Trooper Miller, at most, had about a half second to see the tractor part of this tractor trailer as it passed by him in the snow. That he actually saw a few tiny bulbs out in two different locations (by the battery box and above the fuel tank) among literally hundreds of tiny bulbs on the side of the tractor is simply not believable. No human being has these powers of observation.

5

Mem. in Supp. of Mot. to Suppress, Dkt. No. 40, at 12. Covarrubaiz does not accuse Trooper Miller of mendacity, but instead asserts that that: "Trooper Miller saw what he wanted to see and not what actually was humanly observable. He is a flawed, fallible, imperfect human being just like all of us, and he acted unreasonably." Id. at 13.

While well crafted, this argument is ultimately not persuasive. First, as Covarrubaiz concedes, Trooper Miller did not rely solely on his observations of the vehicle at it approached at a high rate of speed. He pulled up alongside the vehicle and looked at the lights from a significantly closer vantage point while traveling at the same rate of speed. Second, in additional to the trooper's credible testimony, the video evidence from the trooper's patrol car confirms this. The lights would have been at approximately eye level and Trooper Miller testified that when he was alongside the vehicle it was no more than ten feet away from him. Third, Trooper Miller had just stopped this flatbed tractor-trailer with the same green containers on the bed sixty days before for lighting issues.

Finally, it is important to consider what exactly Trooper Miller was observing: lights designed to make the vehicle visible. Determining whether a light is on or off is typically easier in darker conditions than lighter ones. As such, it is not at all implausible that the absence of certain lights within the larger pattern of lights on the tractor would have been readily apparent in poor visibility conditions. The very purpose of such lights is to be seen in such conditions and the lacking of such lights on certain portions of the tractor would have been in stark contrast to the lights that were functioning.

For these reasons, the court does not find Trooper Miller's testimony that he observed defective lights to be incredible. However, this does not mean the stop was legal. The court must determine if Trooper Miller's observation of the defective lights provided a valid basis for the stop.

IV.

The United States argues that Trooper Miller plainly had reasonable articulable suspicion that Covarrubaiz was in violation of Virginia Code § 46.2-1003, which makes it illegal "to use or have as equipment on a motor vehicle operated on a highway any device or equipment mentioned in § 46.2-1002 which is defective or in unsafe condition." In turn, § 1002 provides as follows:

> It shall be unlawful for any person to possess with intent to sell or offer for sale, either separately or as a part of the equipment of a motor vehicle, or to use or have as equipment on a motor vehicle operated on a highway any lighting device, warning device, signal device, safety glass, or other equipment for which approval is required by any provision of this chapter or any part or parts tending to change or alter the operation of such device, glass, or other equipment unless of a type that has been submitted to and approved by the Superintendent or meets or exceeds the standards and specifications of the Society of Automotive Engineers, the American National Standards Institute, Incorporated or the federal Department of Transportation.

Va. Code § 46.2-1002. The United States asserts that "any lighting device" as set forth in § 1002 means just that – *any* lighting device on a motor vehicle operated on a highway within the Commonwealth must not be defective. Covarrubaiz argues that United States misreads the statute. Instead, he asserts that the statute only provides that lighting devices "for which approval is required by any provision of this chapter" cannot be defective.

None of the cases cited by the United States stand for the proposition that § 1002 covers any and all lighting devices. Instead, these cases deal with lighting devices or equipment mandated elsewhere in the relevant chapter under Virginia law. See Javier-Paz v. Com, No. 1103-12-4, 2013 WL 1120830 (Va. Ct. App. Mar. 19, 2013) (defective tail lights in violation of § 46.2-1013); Commonwealth v. Daley, No. 2759-09-1, 2010 WL 1752548 (Va. Ct. App. May 4, 2010) (cracked windshield in violation of § 46.2-1057); United States v. Ellington, 396 F. Supp. 2d 695, 701 (E.D. Va. 2005) (cracked windshield); Reel v. Commonwealth, 31 Va. App. 262, 268, 522 S.E.2d 881, 884

7

(2000) (noting that "pursuant to Virginia's statutory scheme, a vehicle bearing a rejection sticker has been determined to have defective equipment"); Salmon v. Commonwealth, No. 0193-95-2, 1996 WL 421877 (Va. Ct. App. July 30, 1996) (cracked windshield); Myree v. Commonwealth, No. 0383-98-2, 1999 WL 1126563 (Va. Ct. App. Mar. 2, 1999) (cracked windshield); see also Commonwealth v. Snyder, No. 0234-07-2, 2007 WL 2301647 (Va. Ct. App. Aug. 14, 2007) (finding a stop pursuant to § 1002 invalid because a broken passenger side mirror is not "other equipment for which approval is required").

In fact, the Virginia Court of Appeals has expressly adopted the reading advocated by Covarrubaiz. In Commonwealth v. Gilbert, the court agreed affirmed the trial court's decision that because a marker light was not required equipment for an ordinary motor vehicle, "its failure to operate did not provide a basis for [a] stop." No. 0963098-3, 1998 Va. App. LEXIS 474, at *7 (Sept. 8, 1998). The Court of Appeals set forth the applicable Virginia law as follows:

> Code § 46.2-1003 makes it "unlawful for any person to use or have as equipment on a motor vehicle operated on a highway any device or equipment mentioned in § 46.2-1002 which is *defective* or in an *unsafe condition*." Included in the equipment mentioned in Code § 46.2-1002 is "any [motor vehicle] lighting device . . . *for which approval is required by any provision of this chapter*."

Id. at *7-8 (alterations in original). The court's emphasis in Gilbert is noteworthy. Ultimately, that court concluded that "the defendant's marker lights were not lights 'for which approval is required' under Code § 46.2-1002 and were not 'unlawful' under Code § 46.2-1003 if 'defective' or 'unsafe.'" Id. at *8.

The Virginia Court of Appeals articulated the statute in the same manner – albeit without the emphasis – in Ragland v. Commonwealth, No. 1036-96-2, 1997 WL 65780 (Va. Ct. App. Feb. 18, 1997), noting that "[i]ncluded among the equipment mentioned in Code § 46.2-1002 is '. . . any lighting device . . . for which approval is required by any provision of this chapter . . . .'" Id. at *2 (alteration in original). Thus, Covarrubaiz is correct that if he was stopped for a defective lighting

8

device for which approval is not required the stop was unlawful. See Otey v. Commonwealth, 61 Va. App. 346, 351 n.5, 735 S.E.2d 255, 258 n.5 (2012) (emphasis and alterations in original) ("Only 'device[s] [and] equipment mentioned in § 46.2-1002' are required to be kept in a non-defective condition under Code § 46.2-1003. As a result, assuming that some non-functioning *optional* equipment would cause a vehicle to fail state inspection, such defective optional equipment would not justify a stop under Code § 46.2-1003.").

However, the United States correctly notes that, elsewhere in the applicable chapter of Virginia law, certain marker lights are in fact required for tractor trailers. See Va. Code § 46.2-1017 ("Dimension or marker lights and reflectors, generally."). In its response brief, the United States requests an opportunity to demonstrate "that the defective lights on the defendant's vehicle were marker lights." Resp. to Mem. in Supp. of Mot. to Suppress, Dkt. No. 42, at 15. Moreover, Trooper Miller did in fact refer to these lights as "marker lights" during his testimony. Covarrubaiz counters that any attempt to demonstrate that the defective lights on his vehicle were marker lights would be futile, arguing that § 1017 only requires "two lights positioned at the top right and left corners" of the vehicle. Reply Mem. in Supp. of Mot. to Suppress, Dkt. No. 43, at 7 (quoting Va. Code § 46.2-1017). While Covarrubaiz may ultimately prove to be correct, the court feels that it is necessary for this issue to be fully developed by the parties before issuing any decision on whether the defective lights were marker lights under Virginia law.

As such, the court will enter an Order directing to leave to file additional briefs on the issue within fourteen (14) days. Should additional evidence or oral argument be necessary on the issue of § 1017's applicability, the parties should so advise the court. The motion to suppress will remain under advisement.

9

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered: August 27, 2014

/s/ Michael F. Urbanski
_____
Michael F. Urbanski
United States District Judge