IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.: 5:14-CR-19 |
| v. | |
| GEORGE COVARRUBAIZ | |

### UNITED STATES' SECOND MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

This memorandum submits additional probable cause to support Trooper Miller's stop of the defendant's vehicle on February 3, 2014, which led to the seizure of 32 kilograms of narcotics (21 kilograms of cocaine and 11 kilograms of heroin). In 2013, law enforcement initiated a wiretap investigation of a significant California-based drug trafficking organization, of which the defendant was a member. The wiretaps intercepted numerous cell phone calls and text messages; law enforcement also monitored the location of the defendant's cell phone. All of this evidence led law enforcement to stop the defendant's vehicle on February 3, 2014. This additional probable cause is imputed to Trooper Miller under the collective knowledge doctrine, which is recognized and accepted by the Fourth Circuit Court of Appeals.

The United States could not reveal this additional evidence of probable cause at an earlier time because the other members of the drug trafficking organization were not yet in custody; revealing this evidence or even the existence of the wiretap investigation earlier would have jeopardized the investigation and the safety of those involved. In light

of recent investigative developments, however, the United States now reveals the evidence outlined below.

Finally, the United States requests an evidentiary hearing to introduce: (1) wiretap and other electronic evidence that provides additional probable cause supporting the stop in question, and (2) further evidence that the defective lights in question are marker lights. During the evidentiary hearing on July 16, 2014, the Court promised the parties a future opportunity to introduce additional evidence or make additional argument; this assurance was appropriate because the defendant had requested an opportunity to submit additional briefs and arguments after the United States had already submitted its evidence of probable cause for the stop. During the July 16, 2014 hearing, the United States had on hand an additional witness (not Trooper Miller) prepared to testify that the lights in question were indeed marker lights; however, the United States did not call that witness because the defendant had not argued that the lights in question were not marker lights, and the Court had promised the parties another opportunity to submit additional evidence if a party so desired. Accordingly, the United States now requests the opportunity to provide additional evidence and, as directed by the Court's order, will contact the Clerk's office to schedule the hearing.

## FACTS

**1. Wiretap Investigation**

In 2013, law enforcement initiated a wiretap investigation into the activities of a significant drug trafficking organization (DTO) based in Southern California. Law enforcement identified an individual named Everardo Amador, Sr. (aka: Senior) as the domestic manager of this enterprise. Amador owned and operated a trucking company

called Jack Rabbit Express that was based in Southern California; the company used truck yards near San Diego and in Fontana, east of Los Angeles. The company used its tractor trailer trucks to transport large amounts of heroin and cocaine to various sub-distributors across the United States. The defendant was one of Amador's drivers who transported narcotics across the country in his tractor trailer.

Law enforcement first stopped the defendant on December 4, 2013, based upon information from a pen register on the defendant's cell phone obtained pursuant to a court order and other parts of the investigation. At this time, law enforcement had already obtained subscriber information on the defendant's cell phone that showed the cell phone was registered in his name.

When Trooper Miller conducted the first stop, the defendant had been driving northbound on I-81 in the same 2008 blue Kenworth commercial tractor, pulling a flatbed trailer containing seven large empty green shipping containers. Trooper Miller stopped the defendant because his tractor trailer had multiple marker lights that were not functioning. During that stop, the defendant gave Trooper Miller a bill of lading bearing a December 2013 date, but which indicated no delivery destination address and no shipping address. When the defendant handed the bill of lading to Trooper Miller, the defendant accidentally tore the left side of the document when he removed it from his binder. Based on the unusual bill of lading, Trooper Miller called in a K9 unit to conduct a free-air sniff around the vehicle. The dog alerted to the presence of narcotics, but when the vehicle was searched it appeared that the dog had alerted to residual scent and any drugs that might have been present had already been removed. Trooper Miller did not issue a citation for

the defective lights, but instead issued a warning and allowed the defendant to continue his drive.

On January 29, 2014, law enforcement intercepted a telephone call between the defendant and Amador. *Exhibit 1*. During this call, Amador told the defendant that the defendant's next load would consist of "about 30 pallets."[1] Law enforcement believed that "30 pallets" was coded language for 30 packages of narcotics. Later that day, law enforcement intercepted a call between Amador and Carlos Tarula, who was another member of the drug trafficking organization. Tarula worked at the Jack Rabbit Express truck yard in Fontana, California. During this call, Amador and Tarula discussed that the defendant's load would consist of "21 and 11."[2] *Exhibit 2*. Law enforcement suspected that these statements ("21 and 11") indicated the load would consist of 21 packages of one type of narcotic and 11 packages of another type of narcotic. Amador also instructed Tarula to mark some of the packages with the letter "T" and others with the letter "P". *Id*. Law enforcement also intercepted additional calls and text messages later that day in which Amador and other members of the DTO discussed the logistics of the load, the number of packages and payment for the defendant. *Exhibits 3-6*.

The following day, law enforcement intercept additional calls between the defendant, Amador, Tarula and other members of this organization in which they discussed the load consisting of "32", and how the individual packages on the load should be marked using letters "P," "TU" and the name "Tijeras." *Exhibits 7 and 8*. The

---

[1] The Court will recall that, when the defendant was stopped on February 3, 2014, the defendant had 32 packages of narcotics in the truck, and only 7 green cargo/shipping containers on the flatbed trailer.

[2] The Court will recall that law enforcement seized from the defendant's vehicle 21 packages of cocaine and 11 packages of heroin.

defendant and Amador discussed the defendant starting his journey the following day. *Exhibit 9.*

Amador then informed Tarula that "the one in the blue car" would be picking up the load of "32". Exhibit 10. Law enforcement already knew that the defendant drove a blue tractor trailer truck, based upon the first stop. During this same call, Amador instructed Tarula exactly where to place the load in the truck; Tarula was to pack as much of the load as possible where the "power passes", and he should place the rest of the load in the cable box. *Id.* Amador then told Tarula that the load would be departing Southern California on the following day. *Id.* Other intercepted calls from this day concerned the logistics of the load, marking of the packages and payment for the defendant. *Exhibits 11-15*.

On January 31, 2014, law enforcement intercepted additional calls discussing the fact the load of "22 and 10" was being loaded and that it had just departed. *Exhibits 16, 17 and 21*. On the same day, law enforcement obtained a pen register order on the defendant's cell phone, which revealed the defendant's approximate geographic location every time his cell phone made or received calls or text messages.[3] Law enforcement then used this pen register data to monitor the location of the defendant as he drove across the country toward Virginia.

On February 1, 2014, Amador called the defendant to discuss the progress of his drive. *Exhibit 18*. On February 2, 2014, law enforcement intercepted another call between the defendant and Amador during which the defendant stated he was driving through Arkansas. *Exhibit 19*.

---

[3] The pen register also obtained other information, such as the telephone numbers that were communicating with the defendant's cell phone.

On February 3, 2014, the day of the stop in question, the defendant called Amador and informed him that he was driving through Virginia, was four hours from Pennsylvania, and that he would call Amador back soon. *Exhibit 20.* The pen register data from the defendant's cell phone confirmed that he was on I-81 in southern Virginia heading north. Law enforcement officers notified Virginia State Trooper Miller that a blue tractor trailer on I-81 northbound may be carrying a load of narcotics. Shortly thereafter, Trooper Miller observed the defendant's vehicle pass his position in the crossover observing northbound traffic on I-81. As Trooper Miller previously testified, he observed defective marker lights on the defendant's vehicle as it passed his position. Trooper Miller then pulled out behind the defendant's vehicle, confirmed that the marker lights on the defendant's vehicle were indeed defective, and then executed the traffic stop.

The United States incorporates by reference all of the evidence related to the traffic stop it has previously submitted to this Court. However, in light of the defendant's most recent memorandum, the United States should clarify two facts. First, as the Court noted in its most recent opinion, during his testimony Trooper Miller did indeed refer to the lights in question as marker lights. Second, Trooper Miller did not testify that, before he conducted the traffic stop, he had already concluded that less than 50 percent of the LED lights were not functioning; Trooper Miller reached this conclusion only after he had stopped the defendant's vehicle and inspected the defective lights.

**2. Marker Lights**

At the future evidentiary hearing, the United States will present testimonial evidence that the defective LED lights in question are indeed marker lights.

Nevertheless, even if the Court concludes the lights in question were not marker lights, there was still probable cause to support the stop, as outlined below.

## LAW

Temporary detention of an individual during a traffic stop is a seizure under the Fourth Amendment of the Constitution. *Whren v. United States*, 517 U.S. 806, 809 (1996). Observing a suspected traffic violation gives an officer reasonable suspicion to stop a vehicle for as long as it takes to perform a routine traffic stop. *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008); *see also, Whren*, 517 U.S. at 810. To support reasonable suspicion for a stop, the officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). When examining whether an officer had reasonable suspicion for a traffic stop, courts examine the "totality of the circumstances." *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989); *See, e.g., United States v. Whitehead*, 849 F.2d 849, 862 (4th Cir. 1988).

In examining the basis of a traffic stop, courts must apply an objective test that focuses upon whether the officer had the right to stop the vehicle. *Ohio v. Robinette*, 519 U.S. 33, 38 (1996); *Whren*, 517 U.S. at 812; *see also, United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993). Even a minor traffic violation provides an objective right to stop a vehicle. *Hassan El*, 5 F.3d at 730. The Fourth Circuit Court of Appeals has explained that "[u]nder the objective test, if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity." *Id.* Courts have repeatedly and

emphatically held that any subjective reasons an officer may have for stopping a vehicle are not germane when analyzing the constitutionality of a traffic stop. *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989); *See, e.g., United States v. Whitehead*, 849 F.2d 849, 862 (4th Cir. 1988).

Under the collective knowledge doctrine, as the Court noted in its most recent opinion in this matter, reasonable suspicion or probable cause supporting a seizure may be based on the collective knowledge of the officers involved in an investigation, even if the seizing officer did not possess that knowledge at the time he was instructed to conduct the seizure. *United States v. McRae*, 336 Fed. Appx. 301, 305 (4th Cir. 2009)("law enforcement officers cooperating in an investigation are entitled to rely upon each other's knowledge of the facts when forming the conclusion that a suspect has committed or is committing a crime.").

## ANALYSIS

### I. The wiretap evidence and pen register data provided probable cause for the stop of the defendant's vehicle on February 3, 2014.

The wiretap evidence and pen register data detailed above (and in the attached exhibits) shows ample probable cause for the stop of the defendant's vehicle on February 3, 2014. During this first stop on December 4, 2013, law enforcement confirmed the defendant's identification as well as the type of vehicle he was driving (blue Kenworth tractor trailer). Further, law enforcement had already obtained subscriber information showing that the defendant's cell phone was registered in his own name. After the first stop, law enforcement continued its investigation.

Next, law enforcement intercepted a variety of calls suggesting that the defendant was about to transport a significant amount of narcotics – 32 "pallets". *See Exhibits 1-15*.

The calls even discussed that the defendant's blue tractor would be the one making the delivery, and that the narcotics would be stuffed in his battery and cable boxes. *Exhibit 10*. Based upon training and experience, law enforcement believed that the word "pallets" was code for packages of narcotics.

Some of the intercepted calls even involved the defendant himself; during one call Amador told the defendant that his load would consist of "about 30 pallets". *Exhibits 1 and 9*. Other intercepted calls were between other members of the conspiracy who also discussed the load of narcotics, the logistics of the load and delivery, and how the packages of narcotics were to be marked. *See Exhibits 2-8 and 10-15*. On January 31, law enforcement intercepted calls suggesting that the defendant had departed with his load of narcotics. The pen register confirmed the defendant's cell phone was leaving Southern California and moving east.

Over the next few days, law enforcement intercepted additional calls by the defendant and other members of the conspiracy, revealing that the defendant was continuing to drive east across the country. Exhibits 16-19. The pen register information from the defendant's cell phone confirmed that the defendant was moving east across the nation, through Arkansas, Tennessee and ultimately into Virginia.

On February 3, 2014, the defendant called Amador to report that he was in Virginia and was four hours away from Pennsylvania. *Exhibit 20*. The pen register data confirmed the defendant was in Southwest Virginia driving northbound on I-81. Law enforcement shared some of this information with Trooper Miller, who ultimately conducted the traffic stop in question.

The collective knowledge doctrine gave Trooper Miller probable cause to conduct the stop (separate and apart from the defective lights). Under the collective knowledge doctrine, all of the wiretap and pen register information that gave the investigative team probable cause to stop the defendant was imputed to Trooper Miller. *See McRae*, 336 Fed. Appx. at 305. When Trooper Miller conducted the stop, it was as though he possessed all of the information possessed by the investigative team outlined above. Accordingly, Trooper Miller had probable cause to stop the defendant's vehicle on February 3, 2014.

## II. The defective lights on the defendant's vehicle provided additional probable cause for the stop of the defendant's vehicle on February 3, 2014.

In addition to the probable cause outlined above, Trooper Miller also had probable cause based upon the defective lights on the defendant's vehicle. As explained in its previous briefs filed with this Court, under Virginia traffic law any light on a vehicle must be operable; if the light is defective, then the driver is in violation of Section 46.2-1003 and may be stopped by law enforcement. The United States incorporates by reference its previous arguments and evidence on these issues.

If, however, the Court agrees with the defendant's interpretation of Virginia law on this point (that only "required lights" must be functioning properly), Trooper Miller still had probable cause to stop the defendant's vehicle because the lights in question are marker lights, which must be operational under Section 46.2-1017. Even though the defendant's vehicle had more than the bare minimum number of marker lights required by § 46.2-1017, the extra marker lights still must still function. *See Otey*, 61 Va. App. at 350; *Ragland*, 1997 WL 65780 at *2. In *Otey*, the court stated:

> Code § 46.2-1003 prohibits the use on a vehicle of *any* equipment mentioned in Code § 46.2-1002 that is either unsafe or defective, whether or not this equipment exceeds the minimum requirements set forth elsewhere in the Code. Thus, the apparent intent of Code § 46.2-1003 is to compel automobile owners to repair or replace any of their vehicle's equipment that falls into a defective or unsafe condition. Appellant's attempt to harmonize Code § 46.2-1003 and Code § 46.2-1014 would have the effect of eviscerating the impact of Code § 46.2-1003 because it would create an entire class of equipment that may be legally used on a vehicle in an unsafe or defective condition simply because the requirement is in excess of the Code's minimum requirements. We decline to construe these two provisions to achieve such an unwarranted result. *Otey v. Commonwealth*, 61 Va. App. 346, 350-1 (Va. Ct. App. 2012), quoting *Ragland*, 1997 WL 65780 (emphasis original).

Therefore, the bare minimum number of marker lights under Section 46.2-1017 and extra "optional" marker lights must function properly. The defendant's distinction between required lights and optional lights is a red herring; all marker lights must work.

Alternatively, even if the Court concludes that the defendant's defective lights were not marker lights, Trooper Miller's stop is still valid under the Fourth Amendment. Trooper Miller reasonably believed that the lights were marker lights, as he testified during the evidentiary hearing. If Trooper Miller was mistaken in this belief, then his mistake was a mistake of fact, which would not invalidate the stop. As explained in the previous brief the United States filed in this matter, the Fourth Circuit has upheld traffic stops based upon mistakes of fact by the officer. *See, e.g., United States v. Arais*, Fed. App'x. 230, 233 (4th Cir. 2007); *see also United States v. McHugh* 349 Fed. App'x. 824 (4th Cir. 2009).

## CONCLUSION

The Court should deny the defendant's motion to suppress. The additional probable cause set forth above makes clear that Trooper Miller had adequate probable cause to conduct the traffic stop that led to the seizure of the narcotics that the defendant now seeks to suppress.

Dated: September 8, 2014

Respectfully submitted,

TIMOTHY J. HEAPHY
United States Attorney

s/Grayson A. Hoffman
GRAYSON A. HOFFMAN
Assistant United States Attorney
United States Attorney's Office
116 N. Main Street
Harrisonburg, VA 22802
(540) 432-6636

## **C E R T I F I C A T E**

     I hereby certify that a true and correct copy of the foregoing United States' Response to the Defendant's Motion in Limine has been electronically filed by the court's CM/ECF system on this 8th day of September, 2014.

                                          s/Grayson A. Hoffman
                                          GRAYSON A. HOFFMAN
                                          Assistant United States Attorney