```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF VIRGINIA
 2                        Harrisonburg Division

 3

 4   UNITED STATES OF AMERICA,       Criminal No. 5:14cr00019

 5                vs.                 Harrisonburg, Virginia

 6   GEORGE HENRY COVARRUBAIZ,

 7                     Defendant.    July 17, 2014

 8               TRANSCRIPT OF SUPPRESSION HEARING
             BEFORE THE HONORABLE MICHAEL F. URBANSKI,
 9                UNITED STATES DISTRICT JUDGE

10

     APPEARANCES:
11
     For the United States:
12                                   U.S. Attorney's Office
                                     GRAYSON HOFFMAN
13                                   116 N. Main St.  Room 130
                                     Harrisonburg, VA  22802
14

15   For the Defendant:
                                     Federal Public Defender's
16                                   Offc.
                                     RANDY V. CARGILL
17                                   210 First St. SW Ste. 420
                                     Roanoke, VA  24011
18
     Court Reporter:                 Sonia R. Ferris, RPR
19                                   U.S. Court Reporter
                                     116 N. Main St.  Room 314
20                                   Harrisonburg, VA 22802
                                     540.434.3181 Ext. 7
21

22

23

24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer.
```

1          MR. HOFFMAN:  Virginia State Police Senior

2    Trooper Joseph Miller.

3     JOSEPH MILLER, CALLED AS A WITNESS BY THE GOVERNMENT,

4                          SWORN

5          MR. HOFFMAN:  Your Honor, one more

6    housekeeping issue to address as well.

7          I will state at the outset that I've

8    conferred with defense counsel about the exhibits the

9    United States plans to introduce and we have

10   stipulations to the admissibility and authenticity of

11   all the exhibits. I've got roughly 15 to introduce.

12   They've stipulated to all of them, as well as a brief

13   video of the traffic stop.

14         THE COURT:  The Court will note the

15   stipulation.

16         Mr. Cargill, you agree with regard to the

17   stipulation of these exhibits?

18         MR. CARGILL:  Yes, Your Honor.

19         THE COURT:  If there's something that he

20   brings up that you haven't stipulated to, let me know.

21         MR. HOFFMAN:  I'll try not to sneak anything

22   by him.

23         THE COURT:  It would be hard to sneak

24   anything by Mr. Cargill.

25         MR. HOFFMAN:  I agree.

```
 1              THE COURT:  Go ahead, Mr. Hoffman.
 2                    DIRECT EXAMINATION
 3   BY MR. HOFFMAN:
 4      Q.  Would you just introduce yourself to the Court,
 5   please?
 6      A.  Yes, sir.  My name is Trooper Joseph Keith
 7   Miller.
 8      Q.  Who do you work for?
 9      A.  The Virginia State Police.
10      Q.  What's your title or your rank with the Virginia
11   State Police?
12      A.  I'm currently a senior trooper.
13      Q.  What does that mean, a senior trooper?
14      A.  Senior trooper is basically just a title.  We
15   have a regular trooper, then a senior trooper, then a
16   master trooper.  It's based on your performance and
17   years of service.
18      Q.  How many total years of service with the Virginia
19   State Police do you have?
20      A.  A little over 13 years.
21      Q.  Of those 13 years, how long have you been a
22   senior trooper?
23      A.  About six months now.
24      Q.  And the other 12 or so years, you were a trooper?
25      A.  Correct.
```

Miller - - Direct                                    4

```
 1      Q.   And what is your current assignment?

 2      A.   I'm currently assigned to the Criminal

 3   Interdiction and Counter-Terrorism Unit.

 4      Q.   As a senior trooper with the Criminal

 5   Interdiction and Counter-Terrorism Unit, generally,

 6   what are your day-to-day duties?

 7      A.   Trying to interdict any type of criminal activity

 8   and also perform high volume traffic stops on

 9   interstates.

10      Q.   So, all of your work is on the interstate?

11      A.   Yes, sir.

12      Q.   What types of crimes --

13           THE COURT:  Does this criminal interdiction

14   unit involve pulling people who are speeding?

15           THE WITNESS:  Yes, sir.

16           THE COURT:  Go ahead.

17   BY MR. HOFFMAN:

18      Q.   What types of crimes do you find yourself

19   investigating, generally?

20      A.   Any type of criminal activity, whether it be

21   human trafficking, narcotic investigations, cigarette

22   smuggling, smuggling of U.S. currency.  It could be

23   anything as simple as a simple suspended driver.

24      Q.   But that includes -- crimes that you investigate

25   include drug trafficking?
```

Miller - - Direct                                    5

1       A.   Correct; yes, sir.

2       Q.   In your experience, do you come across kind of

3   typical indicators or factors that raise your suspicions

4   of drug trafficking loads on the freeways?

5       A.   Yes, sir.

6       Q.   What are some of those, just briefly for the

7   Court, based on your training and experience?

8       A.   Based on my training and experience, it could be

9   as simple as masking odor, a lot of air fresheners in

10  the vehicles.  It could be as simple as seeing religious

11  items inside of the vehicle, seeing some of the patron

12  saints, being Jesus Malverde or Santa Muerte. We see

13  those typically with narcotic smugglers.

14       It could be as simple as the bill of lading being

15  off.  It could be where the bill has a handwritten seal.

16  Doesn't have any --

17       Q.   Let me interrupt you.  What is a bill of lading,

18  for anyone in the room that doesn't know what it is?

19       A.   A bill of lading would be the documents that

20  truck drivers and companies use to transport goods.  It

21  basically documents the load that's being transported.

22       Q.   What other types of information are usually,

23  based on your experience, are usually on a bill of

24  lading?

25       A.   They usually have a pick-up date when the truck

Miller - - Direct                          6

1    driver picks up the load.  It has an arrival date when

2    the load is expected to arrive at the destination.  It

3    usually has an origination, where the load originated,

4    and a destination point, where it's going to.  If

5    there's a seal, they'll usually document the seal.

6    They'll document the dates and times when the truck was

7    loaded and left.  Of course, it also documents what is

8    being transported at the time.

9    Q.  What kind of training do you have in the area,

10   generally speaking, of highway drug interdiction and --

11   A.  I've attended numerous highway interdiction

12   classes and conferences.  Specifically, the biggest one

13   is Desert Snow, which is a four-phase class.  It's

14   separate.  One through three deals with passenger

15   vehicles and phase four deals with, particularly,

16   commercial motor vehicles.

17   Q.  I'm going to go back to your duties for a minute.

18   What are you generally doing on a daily basis? How do

19   you conduct your investigations from the freeway?

20   A.  Everything basically comes from conducting

21   traffic stops.  So I try to make high volume traffic

22   stops, try to make as many traffic stops in a day as I

23   can for traffic violations.

24   Q.  And when do you conduct a traffic stop?

25   A.  When I observe a traffic infraction or violation.

1    Q.   How often do you make traffic stops?

2    A.   Numerous.  I go from anywhere from 10 to 20 a

3    day.  Just depends on the volume of traffic that's out

4    and the number of violations that I'm able to stop.

5    Q.   Are you familiar with Virginia Code Section 46.2

6    Section 1003?

7    A.   Yes, sir.

8    Q.   Have you ever made a stop based on that

9    particular section?

10   A.   Yes, sir.

11   Q.   How frequently do you make stops based on 46.2

12   1003?

13   A.   Yes, sir.

14   Q.   How frequently?

15   A.   As frequent as yesterday.

16   Q.   Is this a daily thing, week thing?

17   A.   It could be daily or weekly.  Just depends on if

18   I see that particular violation.

19   Q.   What is your understanding of 1003?

20   A.   My understanding of 1003 refers back to actually

21   1002, which says that any person driving a motor vehicle

22   that has any lighting device or defective equipment, and

23   it goes on as to other equipment listed in there, that

24   it has to be in good working order and operational.

25   Q.   So it covers defective lights, defective

1    equipment?

2        A.   Yes.

3        Q.   When you read 1003, 1002 together?

4        A.   I think it specifically says any lighting device

5    has to be operational.

6        Q.   Does your particular unit have a policy or

7    practice with respect to stops for defective lighting?

8        A.   We stop it, routinely.

9        Q.   Excuse me?

10       A.   We stop that violation routinely.

11       Q.   Is it the practice of your office to conduct

12   those stops?

13       A.   Yes.

14       Q.   To conduct traffic stops based upon defective

15   lighting equipment on motor vehicles?

16       A.   Yes, sir.

17       Q.   Before today, have you ever testified with

18   respect to a 1003 violation?

19       A.   Yes, sir, I have.

20       Q.   How many times do you think you've testified in a

21   1003 violation, state court, federal court?

22       A.   I would say at a minimum of 50 times.  That would

23   be a low number, conservative.

24       Q.   Let's shift topics briefly and discuss the manner

25   in which you personally conduct a traffic stop.

1          Could you just take a moment and explain to the

2     Court your practice in conducting a traffic stop?

3        A.   Yes, sir.

4          I'll routinely sit in a crossover and observe the

5     traffic travelling.

6        Q.   What is a crossover?

7        A.   That would be in between the interstates, in the

8     median. It's a crossover designed for emergency

9     vehicles.

10       Q.   Is that where you guys kind of hide behind the

11    bushes?

12       A.   Yes, sir.

13       Q.   So you're sitting in the crossover?

14       A.   We'll observe traffic travelling, running radar

15    and again observing the traffic, seeing if we see any

16    violations as traffic is approaching.  If we do see a

17    violation, we'll pull out of the crossover, conduct a

18    traffic stop.  We obviously advise the occupants and

19    drivers of the violation, the reason why we stopped

20    them. We'll obtain their driver's license and

21    registration.

22             THE COURT:  Do you always say, "do you know

23    why I stopped you?"

24             THE WITNESS:  Sometimes, yes, sir.

25             We'll obtain their driver's license and

1    registration, make sure everything is issued properly,

2    make sure it's accurate and we'll either give a summons

3    or arrest due to the violation.

4    BY MR. HOFFMAN:

5       Q.  Let's back up.  A moment ago, you said you're

6    sitting in the crossover. You see a vehicle go by and

7    you believe that you see a violation.

8       A.  Yes, sir.

9       Q.  You testified a moment ago, you go and conduct a

10   traffic stop.

11      A.  Yes, sir.

12      Q.  Is it your common practice to do anything in

13   between those two events? Do you take any steps to

14   confirm what you believe you saw a moment ago?

15      A.  Yes, sir.

16      Q.  What do you do?

17      A.  Routinely, what I'll do is if I see somebody with

18   defective equipment -- or even another good circumstance

19   is people will drive with headphones on.  In order just

20   to confirm what I'm seeing as they come by, because they

21   are travelling at a high rate of speed, I'll actually

22   overtake the vehicle, pull up alongside of them without

23   my lights or sirens or anything being activated, just to

24   confirm that violation.

25      Q.  So you confirm it again visually --

1    A.  Yes, sir.

2    Q.  -- before you conduct a traffic stop.

3    A.  Yes, sir.

4    Q.  Are you driving a marked or unmarked vehicle?

5    A.  It is an unmarked Chevy Impala.

6    Q.  A moment ago, you testified that after the stop,

7  you then contact the driver.  You ask for license and

8  registration.  What is your practice with respect to how

9  quickly you contact the driver after you conduct the

10  traffic stop? Is there a waiting period?

11    A.  No, sir.  What I routinely -- what we do

12  routinely is before we even stop the vehicle, we'll get

13  on the radio, because we do work at a group -- there's

14  usually between three and five of us working together --

15  we'll call out our traffic stop, tell the other members

16  of our team where we're making the traffic stop.  That

17  way, they know where we're at in case something was to

18  happen.  Then we'll make the stop.  As soon as we stop,

19  we approach the occupants and the driver.

20    Q.  Let's narrow in on a stop of a tractor trailer

21  vehicle.

22       When you approach the driver of the tractor

23  trailer vehicle, generally speaking, and request

24  documents, what documents are you requesting from a

25  commercial driver, a tractor trailer driver?

 1        A.  Typically request the driver's license, the

 2    registration for the truck and trailer, the bill of

 3    lading and the log book.

 4        Q.  You said registration for truck and trailer.  Are

 5    those registered together or separate?

 6        A.  They are separate.

 7        Q.  What do the log books -- what type of information

 8    do they contain?

 9        A.  They usually contain where their trip started

10    out, the origination. So they'll document where they

11    picked up their load.  They also have to document if

12    they make any stops and they document their driving

13    time, their time in the sleeper berth and their time off

14    duty.  So there's quite a bit of information that you

15    can obtain from the log book.

16        Q.  After you collect these documents, what do you do

17    next?

18        A.  Typically, after I obtain the documents, if

19    there's no other indicators or suspicion, I'll either

20    warrant summons or arrest for the violation.

21        Q.  Do you come back to your vehicle?

22        A.  Yes.

23        Q.  If there are no, as you said, additional

24    indicators or suspicious activity when you come back to

25    the vehicle, do you come back to the vehicle alone,

1    allowing the driver to remain in his vehicle?

2        A.   Yes.

3        Q.   Do you transmit any of the information that you

4    receive on the documents back to a dispatch of some

5    kind?

6        A.   Yes.  Every traffic stop, we're required to

7    document the traffic stop itself.  We also, in some

8    circumstances, run the driver's registration and driver

9    license to make sure they're valid.

10       Q.   Different scenario.  What if, when you're in that

11   initial contact with the driver, additional suspicions

12   of some kind do come up? How do you proceed from that

13   point?

14       A.   Typically, if there's more than one occupant in

15   the vehicle, I'll typically bring the driver back, not

16   only for officer safety reasons, but also to communicate

17   with the driver.  Also, if there's some type of

18   indicators or suspicious activity, I'll bring the driver

19   back to my vehicle to do the same.

20       Q.   When you bring a driver back to your vehicle like

21   that, where do you place them in the vehicle?

22       A.   I allow them to sit in the front passenger seat

23   of my vehicle.

24       Q.   They're not under arrest at that point.

25       A.   No, sir.

 1    Q.   What's the purpose of bringing them back into

 2   your vehicle to talk to them?

 3    A.   Officer safety would be number one.  Other than

 4   that would be to communicate and to observe the driver,

 5   to see if they're nervous, if it subsides or if it

 6   escalates.

 7    Q.   Do you have some kind of training in assessing

 8   the nervousness of a driver?

 9    A.   Yes, sir.

10    Q.   What type of training did you get in that?

11    A.   I was able to attend the Reed Interrogation

12   School, which deals with reading people's body behaviors

13   and their gestures, hand motions, facial expressions.

14    Q.   Isn't everyone nervous when you pull them over?

15    A.   Yes, sir.

16    Q.   So then, how do you discern between normal

17   nervous and abnormal nervous?

18    A.   By actually talking to the driver, to the

19   occupants, making little jokes with them.  Just talking

20   with them in between running their information.  Just

21   talking to them about their trip.  Talking about the

22   weather outside.  Just anything to get them to calm

23   down.  And typically, after talking to the driver for a

24   minute or two, you can see the people's nervousness

25   subside.  It will calm down.

 1    Q.   Does their nervousness always go down?

 2    A.   Not all the time, no, sir.

 3    Q.   What else do you see?

 4    A.   Sometimes it escalates, especially if you ask

 5    certain questions about, like, if they're in a rental

 6    car, if you talk about why they're not on the rental

 7    contract, if they're driving a third party vehicle,

 8    those type of situations.

 9    Q.   The bottom line, to make sure that I'm

10    understanding you correctly, once you obtain the

11    documents after your initial contact with the driver, if

12    you observe suspicious things, you typically bring them

13    back into your car to talk to them.

14    A.   Yes, sir.

15    Q.   Officer safety and investigative strategy, so to

16    speak.

17    A.   Yes, sir.

18    Q.   If you don't observe anything suspicious, they

19    get to stay in their car, you do your thing with the

20    information, categorizing information, taking it down,

21    and then let them be on their way.

22    A.   Yes, sir.

23    Q.   Are your vehicles outfitted with any type of

24    video or audio recording equipment?

25    A.   Yes, sir, they are.

Miller - - Direct                                    16

1    Q.   What are they outfitted with, specifically?

2    A.   They are fitted with an in-car video camera

3    system, which has a microphone inside the passenger

4    compartment of my vehicle, as well as a wireless

5    microphone which I wear on my duty belt and that will

6    record any audio outside the vehicle.

7         My car is set up so it records not only the view

8    outside in front of my vehicle, but also inside so you

9    can see inside the passenger compartment of the vehicle.

10   Q.   So there are two cameras; one pointing forward

11   and one pointing into the cabin of your vehicle.

12   A.   Yes, sir.

13   Q.   Do you ever take photographs during or after your

14   traffic stops?

15   A.   Yes, sir.

16   Q.   When would you take photographs, typically?

17   A.   Typically, if we're trying to document any type

18   of evidence or a crime.

19   Q.   We're going to shift gears here.  Let's talk

20   about December 4, 2003.  Were you on duty that day?

21   A.   Yes, sir.

22   Q.   That is not the stop that's at issue here;

23   correct?

24   A.   Correct.

25              THE COURT:  Did you say 2003?

1          MR. HOFFMAN:  '13.  If I said '3, I

2    misspoke.

3    BY MR. HOFFMAN:

4    Q.  December 4, 2013.

5    A.  Yes, sir.

6    Q.  Were you on duty that day?

7    A.  Yes, sir.

8    Q.  Did you have contact with the defendant that day?

9    A.  Yes, sir, I did.

10   Q.  Do you see the defendant here in the room today?

11   A.  Yes, sir, I do.

12   Q.  Point him out please, for the record.

13   A.  To my right.

14   Q.  Thank you.

15        Prior to your contact with the defendant that

16   day, where were you on the interstate?

17   A.  Sitting in the crossover at the 258.7.

18   Q.  And what happened?

19   A.  I was given information that a commercial vehicle

20   could possibly contain narcotics and I was given a

21   description of the vehicle.  At that time, I observed

22   the vehicle matching that description travelling

23   northbound on Interstate 81.

24   Q.  What happened next?

25   A.  As the vehicle passed by my location, I was able

1    to observe several lights being out on the vehicle.

2        Q.  What did you do after that?

3        A.  I actually conducted -- I actually pulled out of

4    the crossover to conduct a traffic stop.  Pulled up

5    alongside the vehicle.  Confirmed that the lights were

6    out and made a traffic stop with the vehicle.

7        Q.  So when you pulled up beside the vehicle, which

8    side of the vehicle did you pull up on?

9        A.  It was the driver's side.

10       Q.  Driver's side.

11       A.  Yes, sir.

12       Q.  So he's in the right-hand lane, you pull up in

13   the left-hand lane beside him.

14       A.  Yes, sir.

15       Q.  Did you visually observe lights were out?

16       A.  Yes, sir.

17       Q.  Do you recall what kind of lights were out?

18       A.  He had multiple LED lights that were not

19   functioning properly, as well as he had round amber

20   lights that were not operating correctly.

21       Q.  Are those sometimes collectively referred to as

22   marker lights?

23       A.  Yes, sir.

24       Q.  After you pulled up beside the defendant's

25   vehicle and observed multiple marker lights not working,

Miller - - Direct                    19

1   what did you do after that?

2       A.   I actually initiated my emergency lighting and

3   conducted a traffic stop.

4       Q.   What was the basis of your stop?

5       A.   Defective equipment, 1003.

6       Q.   Could you please describe the vehicle that you

7   stopped?

8       A.   Yes, sir. It was a 2008 blue Kenworth tractor

9   trailer.  The tractor was blue.  The trailer was a

10  flatbed trailer and it had approximately seven

11  containers on the back of it that were green in color.

12      Q.   Do you know whether anything was in them?

13      A.   I do.  I actually searched the containers that

14  day and they were empty.  It was just the green

15  containers.

16      Q.   So you got a blue tractor, flatbed, with seven

17  empty green containers?

18      A.   Correct.

19      Q.   Did you contact the driver after the stop?

20      A.   I did.

21      Q.   What did you do during the contact?

22      A.   I informed the driver, who was identified as Mr.

23  Covarrubaiz, that the reason I stopped the vehicle was

24  for the defective equipment, for the lights being out.

25      Q.   Did you request documents from him?

1    A.  Yes, sir, I did.

2    Q.  What did you request?

3    A.  I requested his driver's license, his

4    registration for the tractor trailer, his bill of lading

5    and log book.

6            THE COURT:  Were you speaking to him in

7    English?

8            THE WITNESS:  Yes, sir.

9            THE COURT:  Did he appear to understand what

10   you were asking for?

11           THE WITNESS:  Yes, sir, he did.

12           THE COURT:  Did he speak to you?

13           THE WITNESS:  Yes, sir, he did.

14           THE COURT:  What language did he speak in?

15           THE WITNESS:  English.

16           THE COURT:  Go ahead.

17   BY MR. HOFFMAN:

18   Q.  What did the bill of lading look like that he

19   handed to you?

20   A.  It was two pieces of paper stapled together.

21   When he actually pulled it out, he pulled the bill of

22   lading out from a binder and when he did so, he actually

23   tore the left-hand side of the document.

24           On the front page, it had a date of

25   12-December-13.  I guess that was indicating the date on

Miller - - Direct                              21

1   the bill.  It also had --

2              THE COURT:  I'm sorry.  What date was that?

3              THE WITNESS:  It had 12, and then a dash;

4   December, D-E-C; and then dash, 13.

5              THE COURT:  Go ahead.

6              THE WITNESS:  As well as having that date on

7   it, it had three, what appeared to be serial numbers on

8   the bill.  Really nothing else.  It was just a

9   generic-looking bill.  It did have the name Hyundai on

10  it, I believe.  No destination.  No origin where he

11  picked it up.  No contact information for the

12  destination, where it originated.

13  BY MR. HOFFMAN:

14     Q.  No destination address?

15     A.  No.

16     Q.  No originating address?

17     A.  No, sir.

18     Q.  Were there any names, contact names or delivery

19  persons or anything like that on it?

20     A.  No, sir.

21     Q.  Was this different than the normal bill of lading

22  you see?

23     A.  Yes, sir, it is.

24     Q.  As an investigator, interdiction investigator,

25  did this particular bill of lading raise your suspicions

1  in some way?

2      A.  Yes, sir, it did.

3      Q.  Why?

4      A.  It was not a typical bill that we see.  I stop

5  tractor trailers, if not daily, at least weekly, and in

6  my contact with them, a valid bill of lading usually

7  contains the address of where it was shipped from, date

8  and time when it was loaded, when they left, and also a

9  date and time when it's supposed to arrive at the

10  destination, along with the address and contact

11  information.  It usually goes into a little bit greater

12  detail than just having some serial numbers on a piece

13  of paper.

14      Q.  A moment ago, you testified that earlier that

15  day, you actually received information that this vehicle

16  might be carrying narcotics?

17      A.  Yes, sir.

18      Q.  So based on your training and experience at this

19  point, gathering these facts, your suspicions are going

20  up?

21      A.  Yes, sir.

22      Q.  What are you thinking at that point that this

23  might be?

24      A.  That the vehicle might actually contain some type

25  of narcotics.

 1      Q.   Based on your training and experience, why would

 2   someone have kind of a generic bill of lading with them

 3   if they're actually carrying narcotics?

 4      A.   Because they're not actually transporting a

 5   legitimate load.

 6      Q.   Did you issue -- let me back up.  Did you issue

 7   him a citation that day?

 8      A.   No, sir, I did not.

 9      Q.   How would you characterize the defendant's

10   demeanor during your interaction with him on this stop,

11   December 3, 2013?

12      A.   He was nervous, I think especially when I asked

13   him about the bill that day.  His log book was also a

14   little bit off.

15      Q.   How was his log book off?

16      A.   It appeared to me that -- a lot of times, drivers

17   will show either more or less time to allow them more

18   driving time and it appeared that he was actually

19   driving more time than he was allotted.

20      Q.   Trooper Miller, I'm going to show you what's been

21   marked as Government Exhibit 1.  Do you recognize

22   Government Exhibit 1?

23      A.   Yes, sir, I do.

24      Q.   What is it?

25      A.   It is a contact form of where I stopped Mr.

Miller - - Direct                              24

1    Covarrubaiz on December 4, 2013.

2        Q.  This is the form you prepared after the first

3    stop?

4        A.  Correct, yes, sir.

5        Q.  And here, it says that, as you testified, a 2008

6    Kenworth; correct?

7        A.  Yes, sir.

8        Q.  Company name was Jack Rabbit Express.

9        A.  Yes, sir.

10       Q.  We've got the date.  What's this section here at

11   the bottom, clarifying information and notes? What's

12   that section designed for?

13       A.  It's for our own notes.

14       Q.  And your notes, this is again, this is the form

15   that you completed after the first stop in December of

16   '13.  You've typed here, "California to Chambersburg,

17   PA, with seven green empty containers.  Generic bills,

18   no contact info for shipper or person receiving the

19   load."

20           That's what you just testified about a moment

21   ago; correct?

22       A.  Correct, yes, sir.

23       Q.  Two-page container numbers.  Driver was nervous,

24   ripped the bill.

25           Is that the bill of lading?

Miller - - Direct                    25

1      A.  Correct.

2      Q.  Getting the bill out of the folder, log was off.

3  Religious items hanging inside of the cab.  Excess

4  nervous.  Kept trying to leave and go back to the truck.

5      A.  Yes, sir.

6      Q.  Let's move forward to February 3, 2014.  Were you

7  on duty that day?

8      A.  Yes, sir, I was.

9           THE COURT:  Do you want to move the

10  admission of that exhibit if you haven't done it?

11           MR. HOFFMAN:  Yes, Your Honor, move for the

12  admission of 1 or do them all at the end.

13           THE COURT:  Let's do them one at a time so I

14  don't lose track.

15           MR. HOFFMAN:  The government will move for

16  the admission of 1.

17           THE COURT:  Received, without objection.

18           MR. HOFFMAN:  Thank you, Your Honor.

19           (Government Exhibit #1 was marked for

20  identification and admitted into evidence).

21  BY MR. HOFFMAN:

22      Q.  Did you have contact with the defendant on

23  February 3, 2014?

24      A.  Yes, sir, I did.

25      Q.  Prior to your contact with the defendant, where

Miller - - Direct                                26

```
 1   were you?

 2       A.   I was actually sitting in the exact same

 3   crossover, the 258.7.

 4       Q.   And what happened?

 5       A.   As the vehicle approached, I observed a blue

 6   Kenworth tractor pulling a flatbed trailer with what

 7   appeared to be the exact same green containers.

 8       Q.   Let me interrupt you.  Before you observed the

 9   vehicle coming, did you receive any other information

10   from law enforcement that day?

11       A.   Yes, sir, I did.

12       Q.   What did you receive?

13       A.   I received information that the vehicle could

14   possibly be transporting a large quantity of narcotics.

15       Q.   Then sometime after that, you see the vehicle

16   coming up the road?

17       A.   Yes, sir.

18       Q.   Did it appear to be the same vehicle that you had

19   had contact with three months prior?

20       A.   Yes, sir.

21       Q.   Based on what?

22       A.   Based on the color of the tractor, the name

23   displayed on the side, as well as the flatbed with the

24   seven green containers.

25       Q.   Did the vehicle pass your position in the
```

```
 1    crossover?

 2        A.  Yes, sir, it did.

 3        Q.  What did you observe when the vehicle passed your

 4    position in the crossover?

 5        A.  When it passed by my location, I observed what

 6    appeared to be the exact same lights that were out, back

 7    on the December 4th date.

 8        Q.  Which lights were those?

 9        A.  The round amber lights, as well as the LED

10    lights.

11        Q.  What did you do after he passed you?

12        A.  After he passed my location, I did pull out of

13    the crossover, continued to drive northbound until I

14    caught up with the tractor trailer.

15            THE COURT:  So he was going northbound.

16            THE WITNESS:  Yes, sir.

17            THE COURT:  Just like the last stop.

18            THE WITNESS:  Yes, sir.

19    BY MR. HOFFMAN:

20        Q.  Was he in the right or left lane?

21        A.  When he passed by my location at the crossover,

22    he was actually in the left lane and then changed lanes

23    back to the right lane.

24        Q.  So you pulled out?

25        A.  Yes, sir.
```

1    Q.   Then what did you do?

2    A.   As I approached the vehicle, I drove up alongside

3    the trailer and the truck and confirmed what I thought I

4    saw as he passed by the crossover, the lights being out.

5    Q.   As you pulled up beside him, you're on the

6    driver's side?

7    A.   Yes, sir, I'm looking at the driver's side of the

8    vehicle.

9    Q.   You're in the left lane, he's in the right lane.

10   A.   Yes, sir.

11   Q.   You visually confirmed some of those lights were

12   out?

13   A.   Yes, sir.

14   Q.   Round lights and LED lights?

15   A.   Yes, sir.

16   Q.   What did you do after you confirmed the lights

17   were out?

18   A.   After I confirmed the lights were out, I moved

19   behind Mr. Covarrubaiz's vehicle and activated my lights

20   and conducted a traffic stop.

21   Q.   Was your audio and recording equipment operating

22   this day?

23   A.   Yes, sir.

24   Q.   So it's capturing all of this, electronically?

25   A.   Yes, sir.

1      Q.   What was the statutory basis of your traffic

2   stop?

3      A.   1003, again.

4      Q.   Defective equipment, defective lights that you

5   observed?

6      A.   Yes, sir.

7      Q.   Did the defendant pull over when you activated

8   your equipment?

9      A.   Yes, sir, he did.

10      Q.   What did you do after both vehicles come to a

11   stop?

12      A.   As soon as my vehicle came to a stop, I exited my

13   patrol vehicle, approached on the passenger side of the

14   commercial side of the vehicle.  Got up the to passenger

15   side door, knocked on the door, the door opened and I

16   stepped up on to the running boards of the truck and

17   contacted Mr. Covarrubaiz.

18      Q.   Describe that contact, please.

19      A.   Once I contacted him, I advised him that I had

20   stopped the vehicle for the lights being out and Mr.

21   Covarrubaiz actually stopped me and said that he

22   remembered me from the last traffic stop.  I informed

23   him that yes, I had stopped him prior.

24      Q.   So, he told you that he remembered you.

25      A.   Yes, sir.

Miller - - Direct                    30

1      Q.   All right.

2      A.   I told him that I did -- I had stopped him prior,

3   back in December, for the exact same lights and

4   violation.

5      Q.   Did you request any documents from him?

6      A.   Yes, sir, I did.

7      Q.   What did you request?

8      A.   I requested his driver's license, registration

9   for the truck and trailer, bill of lading and log book.

10     Q.   Did he give it to you?

11     A.   Yes, sir, he did.

12     Q.   What did you observe with respect to the bill of

13  lading?

14     A.   The bill of lading that he handed me, again had

15  the 12-December-13 date on it and appeared to be the

16  exact same bill that he handed me back on December 4.

17     Q.   So this is February, 2014, but he's giving you

18  what appears to be the old one.

19     A.   Yes, sir.

20     Q.   In fact, has the old date on it.

21     A.   Yes, sir.  In fact, it had the tear from the

22  first time on it.

23     Q.   Same tear.

24     A.   Same tear, yes, sir.

25     Q.   Trooper Miller, I'm showing you what has been

 1    marked as Government 2 for identification.  Please take

 2    a look at that.

 3        A.  Yes, sir.

 4        Q.  Do you recognize it?

 5        A.  Yes, sir.

 6        Q.  What do you recognize it to be?

 7        A.  That is the bill that was handed to me on

 8    December 4, 2013, as well as on February 3, 2014.

 9        Q.  So in the middle, it's kind of a grainy copy, but

10    in the middle is the date you were referring to?

11        A.  Yes, sir.

12        Q.  It says 12 D-E-C -- you'll have to read the last

13    part.  It says 13?

14        A.  Yes, sir, 13.

15        Q.  These are the two pages?

16        A.  Yes, sir.

17        Q.  Those are VIN numbers listed there?

18        A.  Yes, sir, they're some type of VIN numbers or

19    delivery numbers for the containers.

20        Q.  Any delivery address?  You testified about this

21    already, but you said there's no delivery address, no

22    origin address, no contact information, things that are

23    typically on these?

24        A.  Yes.

25                THE COURT:  These two documents are

1    different.

2    BY MR. HOFFMAN:

3       Q.   Page one and page two; correct?

4       A.   Correct, two pages.

5               THE COURT:  The top part is what?

6               THE WITNESS:  The first one on top is the

7    first page and the second below is the second page.

8    It's all one bill, but two pages.

9               THE COURT:  Explain to me, was this the

10   two-page document that he gave you on both stops?

11              THE WITNESS:  Yes, sir.

12              THE COURT:  Okay. But only the bottom part

13   has the tear on it.

14              THE WITNESS:  Only the top page, the first

15   one.

16   BY MR. HOFFMAN:

17      Q.   Trooper Miller, is it difficult in this picture

18   to see the tear on the left side?

19      A.   Yes, sir, it is.

20      Q.   It didn't completely tear off the page.  There

21   was a tear in the document?

22      A.   Correct.  The tear was very minor, but still

23   notable.

24              THE COURT:  Is the tear on the top of the --

25              THE WITNESS:  It's actually right where this

1    dark line is.

2              THE COURT:  So, the tear is along the side?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Okay.  It's not at the top.

5    It's along the side.

6              THE WITNESS:  It did not completely tear off

7    the page.  It's still attached.

8              THE COURT:  So, this little angle on the

9    bottom part of the page, that's where you folded it over

10   and copied it?

11             THE WITNESS:  That's actually a photograph,

12   but yes, sir.  It's where it's folded up.

13             THE COURT:  Did you take it with a cell

14   phone or something?

15             THE WITNESS:  Issue department camera.

16             THE COURT:  A camera, okay.  And when did

17   you take this photograph that's referenced in

18   Government's Exhibit 2?

19             THE WITNESS:  This is actually on the

20   February 3rd date.

21             THE COURT:  This is the second stop.

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Thank you.

24             Go ahead.

25             THE WITNESS:  Yes, sir, Your Honor.

1           THE COURT:  I was thinking that the tear was

2   this little thing here on the corner of the bottom, but

3   that's not right.

4           THE WITNESS:  No, sir.

5           THE COURT:  That's just where he folded it

6   over.

7           THE WITNESS:  Correct.

8           THE COURT:  Fair enough.  I should stop

9   thinking.

10           MR. HOFFMAN:  We'll move for the admission

11   of Government Exhibit 2, Your Honor.

12           THE COURT:  Mr. Cargill, no objection?

13           MR. CARGILL:  No objection.

14           THE COURT:  Received, without objection,

15   pursuant to stipulation.

16           (Government Exhibit #2 was marked for

17   identification and admitted into evidence).

18   BY MR. HOFFMAN:

19   Q.  On this day -- earlier, you testified that that

20   bill of lading when you previously received it, made you

21   a little suspicious; correct?

22   A.  Correct.

23   Q.  How were you feeling about it at this time when

24   you get this bill of lading? What are your suspicions?

25   A.  My suspicions are a hundred times more.

1    Q.  Why?

2    A.  Because he has the exact same bill, what appears

3  to be the exact same containers.  The first time, he had

4  explained to me that he was to drop the containers off

5  in Chambersburg, Pennsylvania, and it appeared he had

6  the exact same containers and gave me the exact bill

7  from a prior date.

8    Q.  Did you move him back to your car during this

9  stop?

10   A.  Yes, sir, I did.

11   Q.  What was his demeanor like, based on your

12  training and experience?

13   A.  He appeared to be very nervous.  When we got back

14  to my car, it was snowing with a mix of rain that day.

15  The weather was very bad, inclement weather.  It was

16  very cold outside that day.  When we entered inside my

17  patrol vehicle, I jokingly said it's cold outside.  He

18  really didn't respond.

19       It appeared that day he had a cold of some sort.

20  Seemed like every time I asked him a question, he would

21  cough and cover his mouth.  That just seemed very odd to

22  me.  In my training and experience, that's one of the

23  ways people hide their lying statements, more or less.

24   Q.  I think you briefly testified about this a moment

25  ago, but based on your observations, it appears that he

1    also has the exact same lights out as from the previous

2    stop?

3        A.  Correct, yes, sir.

4        Q.  At this point, has the scope of your

5    investigation expanded beyond defective equipment?

6        A.  Yes, sir.

7        Q.  That's based on everything you've testified about

8    already?

9        A.  Yes, sir.

10       Q.  During your conversation with the defendant, did

11   a law enforcement K-9 arrive?

12       A.  Yes, sir.

13       Q.  What's the K-9 trained to detect; the scent of

14   narcotics near vehicles?

15       A.  Yes, sir.

16       Q.  What happened with the K-9? You were observing it

17   right there; correct?

18       A.  Correct.

19       Q.  What happened with the K-9?

20       A.  It appeared that the K-9 gave a positive alert to

21   the vehicle, toward the tractor portion where the

22   battery box would have been, driver's side.

23       Q.  You did not run the K-9 yourself; correct?

24       A.  No, I did not.

25       Q.  That was Trooper Moore?

1        A.   That was Trooper Moore.

2                    THE COURT:  When did you call for the K-9?

3                    THE WITNESS:  After I talked to Mr.

4        Covarrubaiz about the bill is when I contacted Trooper

5        Moore to come utilize his K-9.

6                    THE COURT:  Where was Mr. Covarrubaiz when

7        you called for the K-9?

8                    THE WITNESS:  Actually sitting in the front

9        passenger seat of my vehicle.

10                    THE COURT:  You go up, ask him for the

11        documents, ask him to come back to your vehicle;

12        correct?

13                    THE WITNESS:  Correct.

14                    THE COURT:  You're sitting there.  You

15        mention to him about the weather, he doesn't really

16        respond.  You ask him a few questions and he coughs

17        every time he responds; is that correct?

18                    THE WITNESS:  Correct.

19                    THE COURT:  With him sitting right there in

20        the passenger seat, you call for the K-9.

21                    THE WITNESS:  I questioned him about the

22        bill in particular, especially from it having the

23        December date the previous time.  His comment to me or

24        his statement to me is that he didn't know why he had

25        this bill.  He actually wanted to go back up into the

 1    truck, I believe, and see if he had another bill and

 2    after we talked about it is when I actually called for

 3    Trooper Moore.

 4              THE COURT:  When you called for Trooper

 5    Moore, he was sitting right there.  Mr. Covarrubaiz was

 6    sitting right there next to you.

 7              THE WITNESS:  Correct, yes, sir.

 8              THE COURT:  Go ahead.

 9    BY MR. HOFFMAN:

10       Q.  But you had already asked him about the bill of

11    lading and about the containers; correct?

12       A.  Correct, yes, sir.

13       Q.  And you called the K-9?

14       A.  Correct.

15              THE COURT:  What caused you to call for the

16    K-9?

17              THE WITNESS:  Him providing me the exact

18    same bill, and he appeared to be nervous as well, as

19    well as I also observed some religious items up in the

20    cab.

21    BY MR. HOFFMAN:

22       Q.  What was unique about those?

23       A.  We typically see, with our training and

24    experience, a lot of times, they'll have certain saints

25    that I guess they're believed to protect the person and

1    it was just odd that he had several saints and several

2    religious items up in the cab as well.

3        Q.   And additionally, I think you testified earlier

4    that you had received information that he actually might

5    be carrying a shipment of narcotics; correct?

6        A.   Correct, yes, sir.

7        Q.   Did that also influence your decision to call for

8    the K-9?

9        A.   Yes, sir.

10       Q.   After the K-9 ran around the vehicle --

11              THE COURT:  Did it seem odd to you as well

12   he told you back in December he was taking these seven

13   green containers to Chambersburg and in February, you

14   see the same seven green containers?

15              THE WITNESS:  Yes, sir, it was very odd.

16              THE COURT:  When did you determine those

17   containers were empty?

18              THE WITNESS:  The first time was when we

19   actually conducted the search of the vehicle and the

20   containers.  They were found to just be empty

21   containers. He was just transporting on the back of the

22   trailer.

23              The second time was after the K-9 alerted

24   and gave us probable cause to search.

25              THE COURT:  Did you search the vehicle

1    before the K-9 alerted? How did you know -- you told me

2    that the containers were empty.

3                 Let's focus on the second stop in February.

4                 THE WITNESS:  Okay.

5                 THE COURT:  When did you learn those

6    containers were empty?

7                 THE WITNESS:  Not until after the K-9 had

8    alerted and we searched.

9                 THE COURT:  On the first stop, did you learn

10   the containers were empty, back in December?

11                THE WITNESS:  Yes, sir.

12                THE COURT:  How did you learn that?

13                THE WITNESS:  After we started searching the

14   vehicle.

15                THE COURT:  You searched the vehicle back in

16   December?

17                THE WITNESS:  Yes, sir.

18                THE COURT:  What basis did you have to

19   search the vehicle back in December.

20                THE WITNESS:  A positive K-9 alert.

21                THE COURT:  In December?

22                THE WITNESS:  Yes, sir. However, no

23   contraband was found on that date.

24                THE COURT:  So you searched the vehicle back

25   in December after the K-9 alerted and found no drugs.

Miller - - Direct                                    41

1              THE WITNESS:  Correct.

2              THE COURT:  Searched the vehicle and let him

3  go.

4              THE WITNESS:  Correct.

5              THE COURT:  Let me see Exhibit 1.

6              (Said document handed to the Court).

7              Exhibit 1 does mention at the bottom, under

8  justification, it says "consent from driver, PC K-9

9  alert on commercial vehicle."

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Go ahead, Mr. Hoffman.

12  BY MR. HOFFMAN:

13     Q.  Thank you, Your Honor.

14         Trooper, based on your training and experience

15  with these drug investigations kind of on the side of

16  the road, are there -- are these dogs that are trained

17  to detect the scent of narcotics, will they hit on

18  perhaps where drugs had been before?

19     A.  Yes, sir.

20     Q.  They're just alerting to the scent?

21     A.  To the odor, yes, sir.

22     Q.  In the February stop after the dog alerted, did

23  you and your team conduct a search of the defendant's

24  vehicle?

25     A.  Yes, sir, we did.

1     Q.   Did you discover narcotics?

2     A.   Yes, sir, we did.

3     Q.   Let's break it down.  Where did you discover

4     them?

5     A.   There was several kilo's found in the battery

6     box, on the driver's side.

7     Q.   Where is the battery box on the driver's side?

8     A.   The battery box is actually right underneath the

9     driver's side door.

10    Q.   Underneath the driver's side door.

11    A.   Yes, sir.

12    Q.   You found several kilo's. How were they packaged?

13    A.   They were wrapped in red, looked like electrical

14    tape.

15    Q.   So you found some inside the battery box?

16    A.   Correct.

17    Q.   Anywhere else?

18    A.   Yes, sir.  Behind the battery box, behind the cab

19    of the commercial vehicle was another metal or silver

20    box, like a strap box used to haul straps for the loads,

21    a lot of tying materials a driver might need.  Inside of

22    there was also several kilo's.

23    Q.   How many packages in total did you all discover

24    that day?

25    A.   32 kilo's.

1    Q.  32 individual packages?

2    A.  Correct.

3    Q.  And they weighed out subsequently to be

4    approximately a kilogram each?

5    A.  Correct.

6    Q.  Did you field-test them?

7    A.  We did.

8    Q.  What did they test positive for?

9    A.  They tested positive for being cocaine and some

10   tested positive for being heroin.

11   Q.  Ultimately, did you have knowledge about what the

12   breakdown was?

13   A.  I believe there was 21 kilo's of cocaine and

14   approximately 11 of heroin.

15   Q.  Did you prepare another contact report after the

16   second stop, the one in February?

17   A.  Yes, sir, I did.

18   Q.  Trooper Miller, I'm showing you what's been

19   marked as Government Exhibit 3 for identification.  Do

20   you recognize that document?

21   A.  Yes, sir.

22   Q.  What do you recognize it to be?

23   A.  It is the contact form that I filled out from the

24   February 3rd date.

25                MR. HOFFMAN:  Your Honor, we'd move for the

1    admission of Government 3 into evidence.

2              THE COURT:  Received, without objection.

3              (Government Exhibit #3 was marked for

4    identification and admitted into evidence).

5    BY MR. HOFFMAN:

6    Q.  So again here, you say California to

7    Chambersburg, PA, seven empty containers.  Handwritten

8    bill, logs off.  Excess nervous.  These are all the

9    things that you documented based on your investigation

10   that day; correct?

11   A.  Correct, yes, sir.

12   Q.  Bill of lading, December '13 date, exact date

13   when prior stopped him.

14       What is this, "only been with Co for six months"?

15   A.  After talking to him, he had advised me he had

16   only been with the company itself for six months.

17   Q.  At the bottom, understands justification for the

18   search, you've got K-9 alert.

19   A.  Correct.

20   Q.  That's what you testified about a moment ago.

21       Did you take photographs after this stop and

22   after the search?

23   A.  Yes, sir, I did.

24   Q.  I'm showing you what's marked as Government 4 for

25   identification.  Do you recognize Government 4?

1      A.  Yes, sir, I do.

2      Q.  What is that?

3      A.  That is the tractor trailer that Mr. Covarrubaiz

4   was driving that day, February 3rd, 2013.

5      Q.  This is a couple photographs of the tractor

6   trailer that day?

7      A.  Yes.

8      Q.  These accurately depict how it looked that day?

9      A.  Yes.

10          MR. HOFFMAN:  We'd move for the admission of

11   4, Your Honor.

12          THE COURT:  Any objection?

13          MR. CARGILL:  No objection.

14          THE COURT:  Received, without objection.

15          (Government Exhibit #4 was marked for

16   identification and admitted into evidence).

17   BY MR. HOFFMAN:

18      Q.  These are the seven green containers you're

19   referring to?

20      A.  Yes, sir.

21      Q.  These photographs were taken during the second

22   stop, the February stop.

23      A.  Correct, yes, sir.

24      Q.  I'm showing you what's been marked as Government

25   5 for identification.  Do you recognize 5?

 1    A.  Yes, sir, I do.

 2    Q.  Jody, is the ELMO on?

 3        I'm not going to use it.

 4        What do you recognize Government 5 to be, Trooper

 5    Miller?

 6    A.  Number 5 would be showing one of the LED lights,

 7    basically has lights out, as well as one reflector, one

 8    of the yellow marker lights is working and one is not.

 9            MR. HOFFMAN:  Your Honor, we'll go ahead and

10    move the admission of 5.

11            THE COURT:  No objection, Mr. Cargill?

12            MR. CARGILL:  No objection.

13            THE COURT:  Received, without objection.

14            (Government Exhibit #5 was marked for

15    identification and admitted into evidence).

16    BY MR. HOFFMAN:

17    Q.  Trooper Miller, let's break it down here.  Looks

18    like two type of lights in this, correct?

19    A.  Correct.

20    Q.  We have two round lights and these horizontal

21    lights; correct?

22    A.  Correct.

23    Q.  When you say LED lights, which of those are you

24    referring to?

25    A.  The horizontal lights.

 1    Q.  And the round lights are obviously the ones that

 2  are round.

 3    A.  Correct.

 4    Q.  Please point out for the Court the ones you say

 5  are not functioning.

 6    A.  Right here (indicating).

 7    Q.  We're talking about -- Trooper Miller, describe

 8  it for the record.

 9    A.  The LED light beside of the round yellow light.

10    Q.  Third from the right?

11    A.  It would be this light (indicating).

12    Q.  Third from the right-hand side of the photograph,

13  one, two, three?

14    A.  Yes, sir, third LED.

15    Q.  And how many kind of lights within that LED

16  appear to be not working?

17    A.  I believe there's three that is not working.

18          THE COURT:  Three of those little bitty

19  dots.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  You could see that when you

22  pulled up next to it.

23          THE WITNESS:  Yes, sir.

24  BY MR. HOFFMAN:

25    Q.  Are there any other lights in this photograph

1   that are not working?

2       A.  Yes, sir, this round light.

3       Q.  In the photograph, Trooper Miller, there are two

4   round lights in the photograph.  There's one on the left

5   and one on the right.  Which one are you referring to?

6       A.  The one on the right side.

7       Q.  The one on the right.  That one is not working.

8   Basically, in this photograph, how can you tell that is

9   not working?

10      A.  Basically, because you can see the illumination

11  of the one on the left-hand side versus the one on the

12  right-hand side is not working.

13      Q.  When you took this photograph, everything was

14  activated.  Car was on, everything was activated?

15      A.  Yes, sir.

16      Q.  The light on the right-hand side is not working

17  and the round one on the left, bright yellow, that one

18  is working.

19      A.  Correct.

20      Q.  You observed that before you conducted the stop;

21  correct?

22      A.  Correct.

23      Q.  Trooper Miller, I'm now going to show you what

24  I've marked as Government 6.

25                  THE COURT:  Let's take a brief recess.

```
 1   There may be a problem with the channel on the head set
 2   with the interpreter.  We'll take a five-minute recess.
 3              While we're in recess, I don't want you
 4   talking to anybody, Trooper.
 5              THE WITNESS:  Yes, sir.
 6              (Recess at 11:10 a.m. until 11:20 a.m.)
 7   BY MR. HOFFMAN:
 8   Q.   Trooper Miller, before we took our break, I
 9   handed you what's marked as Government 6.  Do you have
10   it in front of you?
11   A.   Yes, sir.
12   Q.   What is it, generally?
13   A.   It is a picture of some of the LED lights that
14   are out.
15   Q.   Where is this on the vehicle?
16   A.   It's on the driver's side, just basically where
17   the air filters are underneath, on the driver's side
18   door.
19              MR. HOFFMAN:  Your Honor, we'd move for the
20   admission of 6.
21              THE COURT:  Received, without objection, Mr.
22   Cargill?
23              MR. CARGILL:  Yes, sir.
24              (Government Exhibit #6 was marked for
25   identification and admitted into evidence).
```

Miller - - Direct                    50

1   BY MR. HOFFMAN:

2      Q.   Trooper Miller, a moment ago, you testified in

3   this photograph some of the LED lights are not

4   functioning; correct?

5      A.   Correct.

6      Q.   Could you please point out for the Court which

7   lights are not functioning and then we'll describe it

8   for the record?

9      A.   There are approximately four lights that are not

10  operational.

11     Q.   From the bottom, how many up?

12     A.   Third one up.

13     Q.   Third one up.  There are four that are not

14  working; correct?

15     A.   Yes, sir.

16     Q.   Any others?

17     A.   No, sir, I don't believe so, that I can see in

18  this picture.

19     Q.   Trooper Miller, I'm now showing you what's marked

20  as Government 7 for identification.  Do you recognize 7?

21     A.   Yes, sir.

22     Q.   Essentially, how do you recognize 7?

23     A.   It is the very front of the commercial vehicle,

24  the tractor itself.

25              MR. HOFFMAN: Move for the admission of 7 at

1   this time, Your Honor.

2               THE COURT:  Any objection, Mr. Cargill?

3               MR. CARGILL:  No objection, Your Honor.

4               THE COURT:  Received, without objection.

5               (Government Exhibit #7 was marked for

6   identification and admitted into evidence).

7   BY MR. HOFFMAN:

8       Q.  Trooper Miller, are any of the lights in this

9   photograph not functioning?

10      A.  Yes, sir, they are.

11      Q.  Please point out which lights are not functioning

12  to the Court and then we'll describe it for the record.

13      A.  May I request a different copy? On my copy, it's

14  very hard to see the lights.

15      Q.  I think I gave the Court the best copy.

16          (Said document handed to the witness).

17      A.  There is a light out, right there (indicating).

18      Q.  Count from the left or right, for the record.

19  Which ones are we talking about?

20      A.  The very first one to the left.

21      Q.  From the right or from the left?

22      A.  From the right, the very first one.

23      Q.  And are there any others in this photograph that

24  are not working?

25      A.  Yes, sir.  There's also one from the -- the fifth

1   light from the left.  Looks like there's --

2       Q.  Fifth light from the left, there's defective

3   lights in there? Am I hearing you correctly?

4       A.  Yes, sir.  It looks like there are some out.

5       Q.  Please show that to the Court.

6       A.  This light (indicating).

7       Q.  Fifth from the left, you said?

8       A.  Yes, sir.

9       Q.  Trooper Miller, I'm now showing you what's been

10  marked as Government 9 for identification.  What do you

11  recognize 9 to be?

12      A.  9 is basically the overall appearance of the

13  front of the tractor, as well as the top picture would

14  be the front of my vehicle, the hood section, with the

15  32 kilo's.

16      Q.  Let's just focus on the bottom photograph of the

17  vehicle.

18          Your Honor, we'd go ahead and move for the

19  admission of 9.

20              THE COURT:  Mr. Cargill?

21              MR. CARGILL:  No objection, Your Honor.

22              THE COURT:  Received, without objection.

23              (Government Exhibit #9 was marked for

24  identification and admitted into evidence).

25              There wasn't an 8?

1          MR. HOFFMAN:  Correct.  We're skipping 8.

2     There is no 8.

3     BY MR. HOFFMAN:

4        Q.   In the photograph of the front of the defendant's

5     vehicle that's depicted in Government Exhibit 9, are

6     there any defective lights pictured in that photograph?

7        A.   It would be the -- again, the fifth one down on

8     the bottom.

9        Q.   So the answer is yes?

10       A.   Yes.

11       Q.   So the fifth one from which side, please?

12       A.   The fifth one from the left.  Then again -- it's

13    hard to see, but the first one from the right.

14       Q.   Please point those out for the Court.

15       A.   Again, it would be this light assembly

16    (indicating).

17       Q.   Fifth from the left?

18       A.   Fifth from the left, and then the very first one

19    from the right.

20          THE COURT:  Counsel approach.

21          (Side bar discussion held on the record).

22          THE COURT:  I don't know if you all are --

23    if there's a reason for this or not, but for the sake of

24    the record, would it make sense to have him, with a red

25    pen, circle those lights he says are out, for the sake

1   of the record? Would anybody have an objection if the

2   Court asks him to do that?

3                  MR. HOFFMAN:  No objection.

4                  MR. CARGILL:  No objection.

5                  THE COURT:  I'm going to go back in my

6   chambers and get a red pen.

7                  (Conclusion of discussion at side bar).

8                  I'm going to hand you, Trooper, a red pen.

9   I want you, starting -- I want you to take exhibit

10  number  --

11                 MR. HOFFMAN:  I think we started with 5,

12  Your Honor.

13                 THE COURT:  5, the Court's copy of it, and I

14  just want you to circle with the red pen on 5, 6, 7 and

15  9, if you can, I want you to circle the lights that you

16  testified observing being out.

17                 THE WITNESS:  Yes, sir (indicating).

18                 THE COURT:  Any objection to that question

19  from either counsel?

20                 MR. HOFFMAN:  No, Your Honor.

21                 MR. CARGILL:  No.

22                 THE COURT:  Thank you.  Please proceed.

23                 You've done that on 4 -- excuse me, 5, 6, 7

24  and 9.  You've circled in red the lights that are out.

25  On Exhibit #5, you circled one of the banks of LED

1    lights and one of the round amber lights; right?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  On Exhibit 6, you have circled

4    one of the banks of the LED lights, some of the little

5    dots are out.  On both 7 and 9, you circled the same

6    lights on the front of the tractor; correct?

7              THE WITNESS:  Correct, yes, sir.

8              THE COURT:  Some of which the little

9    individual bulbs are out; correct?

10             THE WITNESS:  Correct.

11             THE COURT:  Do counsel want to look at

12   these?

13             MR. CARGILL:  I have copies of these.

14             THE COURT:  Do you want to look at the ones

15   he circled?

16             MR. CARGILL:  No, that's fine, Your Honor.

17             THE COURT:  The clerk will have these if you

18   want to use them for cross-examination or direct.

19             Go ahead.

20   BY MR. HOFFMAN:

21     Q.  Now, I'm showing you what's been marked as

22   Government Exhibit 10 for identification.  Do you

23   recognize 10?

24     A.  Yes.

25     Q.  What do you recognize 10 to be?

Miller - - Direct                                          56

1       A.   In the top part of the photograph --

2       Q.   Without describing it, what are they, just

3  generally?

4       A.   Lights being out, defective lights.

5       Q.   These are photographs of different parts of the

6  defendant's vehicle?

7       A.   Correct.

8            MR. HOFFMAN:  Your Honor, we'd move for the

9  admission of 10.

10           MR. CARGILL:  No objection.

11           THE COURT:  Received, without objection.

12           (Government Exhibit #10 was marked for

13  identification and admitted into evidence).

14  BY MR. HOFFMAN:

15      Q.   Let's focus on the top photograph.  Before we

16  talk about the lights in the top photograph in

17  Exhibit 10, what is the top photograph a photograph of?

18      A.   The top photograph is the back of the cab of the

19  tractor.

20      Q.   Back of the tractor, so kind of in between the

21  tractor and the trailer?

22      A.   Correct, yes, sir.

23      Q.   Are there lights out in that photograph?

24      A.   Yes, sir, on the passenger side.

25           MR. HOFFMAN:  Your Honor, do you want him to

 1   do the same thing with the red pen on this one?

 2              THE COURT:  It seems to me that's a good

 3   idea unless counsel has an objection to it.

 4              MR. CARGILL:  No objection.

 5              MR. HOFFMAN:  I think it's a good idea,

 6   Judge.

 7              THE COURT:  Go ahead and take the -- this

 8   has been admitted.  We've given it to the witness so he

 9   can circle the lights he identified as being out, just

10   so the record is clear.

11   BY MR. HOFFMAN:

12      Q.  Trooper Miller, right now we'll focus on the top

13   of the photograph.

14      A.  Yes.

15      Q.  Please describe for the record which one you've

16   just circled.  Count from either the top or the bottom.

17      A.  From the bottom to the top, it would be the

18   second light visible.

19      Q.  We're talking about the top photograph in

20   Government's Exhibit 10.

21      A.  Correct.

22      Q.  The bottom photograph, I believe that is a

23   photograph of lights that are already in evidence, but

24   go ahead and circle in that photograph the lights that

25   are not working as well.

1     A.   (Indicating).

2     Q.   What did you circle there?

3     A.   I circled the third light from the right, the

4  round amber light; and then the fourth light from the

5  right, LED, horizontally.

6     Q.   Thank you.

7          Trooper, I'm now showing you what's been marked

8  as Government 11 for identification.  Do you recognize

9  Government's Exhibit 11?

10    A.   Yes, sir.

11    Q.   What do you recognize it to be?

12    A.   It is a picture with defective lights on the

13 tractor.

14    Q.   How many photographs are in Government

15 Exhibit 11?

16    A.   There's two.

17              MR. HOFFMAN:  We'd move for the admission of

18 11, Your Honor.

19              MR. CARGILL:  No objection.

20              THE COURT:  Received, without objection.

21              (Government Exhibit #11 was marked for

22 identification and admitted into evidence).

23 BY MR. HOFFMAN:

24    Q.   Trooper, let me focus your attention to the top

25 photograph.

Miller - - Direct                         59

1    A.  Yes, sir.

2    Q.  What portion of the vehicle is pictured in the

3  top photograph in Government's Exhibit 11?

4    A.  The top one displays the rear portion of the cab

5  on the tractor.

6    Q.  Are there any defective lights in that

7  photograph?

8    A.  Yes, sir.

9    Q.  Would you please, with the red pen, circle on the

10  Court's exhibit the defective lights for 11?

11    A.  Yes, sir; (indicating).

12    Q.  Go ahead and orally describe, please, which --

13  what you circled.  Let's count from the left, please.

14    A.  From the left --

15    Q.  Top photograph.

16    A.  From the left, on the top photograph, it would be

17  the third and fourth light.

18    Q.  Thank you.

19          THE COURT:  Those are the same ones you

20  circled on another photograph.

21          THE WITNESS:  Correct, yes, sir.

22          THE COURT:  That round amber one and then

23  the one next to it with a few of the bulbs out.

24          THE WITNESS:  Correct, yes, sir.

25  BY MR. HOFFMAN:

1      Q.   Trooper, I'm showing you what has been marked as

2   Government 12.

3      A.   Yes, sir.

4      Q.   Do you recognize Government 12?

5      A.   Yes, I do.

6      Q.   Generally, what do you recognize this to be?

7      A.   That is the battery box displayed on the driver's

8   side.

9           MR. HOFFMAN: Your Honor, we'd move for the

10   admission of 12 in evidence.

11           THE COURT:  Any objection, Mr. Cargill?

12           MR. CARGILL:  No objection.

13           THE COURT:  Received, without objection.

14           (Government Exhibit #12 was marked for

15   identification and admitted into evidence).

16   BY MR. HOFFMAN:

17      Q.   The battery box, I think you testified earlier,

18   is the location where the drugs were found; correct?

19      A.   Yes, sir, some of the drugs.

20      Q.   Some of the drugs were found.

21           Trooper, I'm now showing you Government 13.  Do

22   you recognize Government 13?

23      A.   Yes, sir, I do.

24      Q.   What do you recognize 13 to be?

25      A.   That is the battery box on the driver's side,

1   with the housing removed.

2          MR. HOFFMAN: We'd move to admit 13, Your

3   Honor.

4          THE COURT:  Any objection?

5          MR. CARGILL:  No objection, Your Honor.

6          THE COURT:  Received, without objection.

7          (Government Exhibit #13 was marked for

8   identification and admitted into evidence).

9   BY MR. HOFFMAN:

10     Q.  So this is simply a photograph of the battery box

11   that has been opened.  In this photograph, can you see

12   the suspected narcotics?

13     A.  Yes, sir.

14     Q.  Where are they or describe them, please, in the

15   photo.

16     A.  They are the red packages surrounding the

17   batteries, which you can see, the full batteries, and

18   there's also one in a white plastic bag or maybe

19   cellophane on top.

20     Q.  Your Honor, we're going to skip 14 and go right

21   to 15.

22          Trooper, I'm showing you what has been marked as

23   Government 15. Do you recognize what has been marked as

24   15?

25     A.  Yes, sir, I do.

1    Q.   What do you recognize 15 to be?

2    A.   That is the tool or compartment box located

3    behind the cab, on the driver's side.

4    Q.   Also known as the strap box?

5    A.   Yes, sir.

6              MR. HOFFMAN:  Your Honor, we'd move for the

7    admission of 15 into evidence at this time.

8              MR. CARGILL:  No objection.

9              THE COURT:  Received, without objection.

10             (Government Exhibit #15 was marked for

11   identification and admitted into evidence).

12             MR. HOFFMAN:  Again, there will be no 14.

13   BY MR. HOFFMAN:

14   Q.   What is significant about this box in Government

15   15?

16   A.   That is where the other narcotics were located,

17   inside of that.

18             THE COURT:  Were those locked?

19             THE WITNESS:  No, sir.  This one was not

20   locked and --

21             THE COURT:  This one, you mean that's the

22   tool box, the strap box?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  How about the battery box?

25             THE WITNESS:  The battery box was held on by

 1   screws, so you actually had to remove the screws.

 2                THE COURT:  With a screwdriver?

 3                THE WITNESS:  No, sir.  You could do it by

 4   hand.

 5                THE COURT:  But there was not a key to open

 6   it.

 7                THE WITNESS:  No, sir.

 8   BY MR. HOFFMAN:

 9      Q.  Trooper, do you have 16 in front of you there?

10      A.  Yes, sir.

11      Q.  Do you recognize Government 16?

12      A.  Yes, sir, I do.

13      Q.  What do you recognize that to be?

14      A.  That is the other kilo's that were found inside

15   of the strap box.

16                MR. HOFFMAN: Your Honor, we'd move for the

17   admission of 16.

18                MR. CARGILL:  No objection.

19                THE COURT:  16, received, without objection.

20                (Government Exhibit #16 was marked for

21   identification and admitted into evidence).

22   BY MR. HOFFMAN:

23      Q.  Trooper Miller, you said that your video and

24   audio recording equipment was also operating that day?

25      A.  Yes, sir.

1     Q.  Before today, have you reviewed the video from

2  this case?

3     A.  Yes, sir.

4     Q.  Is it an accurate depiction of what happened that

5  day?

6     A.  Yes, sir.

7     Q.  From the perspective of those cameras?

8     A.  Yes, sir.

9          MR. HOFFMAN:  Your Honor, if we could just

10  -- I want to play a video.  I guess we'll give the Court

11  a copy of the CD for the record.  I guess we can just

12  mark that 17.

13          We'd move for the admission of 17 at this

14  time, Judge.

15          THE COURT:  Mr. Cargill, any objection?

16          MR. CARGILL:  No objection.

17          THE COURT:  Government's 17 will be

18  admitted.

19          I guess we have to have the witness identify

20  it. You can play the video and then ask him afterwards

21  if that's the video.

22          (Government Exhibit #17 was marked for

23  identification and admitted into evidence).

24          MR. HOFFMAN:  We can do it that way, Judge.

25  I just want to play a small portion.

1            THE COURT:  Mr. Cargill, can you

2    stipulate --

3            MR. CARGILL:  I stipulate.

4            THE COURT:  We'll stipulate the videos can

5    be played from the traffic stop on February 3rd of this

6    year.

7            MR. HOFFMAN:  That's right, Judge, this

8    year.

9            Again, before the hearing, we agreed to

10   stipulate to all of this.

11           THE COURT:  Go ahead.

12           (Video played).

13   BY MR. HOFFMAN:

14     Q.  Trooper Miller, can you see the video in front of

15   you?

16     A.  Yes, I can.

17     Q.  Please describe what we're seeing.

18     A.  The top screen is the outside view in front of my

19   vehicle.  The bottom screen is the portion captured

20   inside the cabin of my car.

21     Q.  Looks like this is the start of the video.  When

22   the video starts, you are already on the road here.

23   You've already pulled out?

24     A.  Yes, sir. I'm trying to catch up to the tractor

25   trailer being driven by Mr. Covarrubaiz.

1    Q.   Your audio equipment does not capture audio until

2   you activate your equipment; is that correct?

3    A.   Correct.

4    Q.   I should say until you turn on your lights.

5         At this time, can you see the defendant's vehicle

6   in the video in front of you?

7    A.   Yes, sir. I'm approaching it right now.

8    Q.   What were the weather conditions like this day?

9    A.   Very cold; snow, rain mix.  Visibility was very

10   poor.

11    Q.   What are you doing here right now?

12    A.   I'm coming up behind the tractor trailer driven

13   by Mr. Covarrubaiz and I'm pulling up alongside, just to

14   confirm the lights that I observed as he passed by,

15   being out.

16    Q.   We can see on the bottom, we can see your head

17   actually looking there.  You're confirming, you said,

18   the lights are actually out?

19    A.   Yes, sir.

20    Q.   What are you doing now?

21    A.   After I confirmed that the lights were, in fact,

22   defective, I slowed down to get in behind Mr.

23   Covarrubaiz's vehicle.

24    Q.   (Video continued).

25         What are you doing now, Trooper Miller?

Miller - - Direct                                          67

1      A.   Trying to make contact with the driver, Mr.

2   Covarrubaiz.

3      Q.   Is this the point where you're requesting these

4   documents?

5      A.   He just now opened the door.  Right now, I'm

6   explaining to him the reason I have him stopped.

7              THE COURT:  How come we can't hear your

8   microphone?

9              THE WITNESS:  The microphone, if we get so

10   far away, will not pick up.  Sometimes other

11   disturbances will cause it to go in and out.

12              MR. HOFFMAN:  Your Honor, if the Court

13   wishes, we can have the video continue to play.

14              THE COURT:  Please.

15              MR. HOFFMAN:  I was going to say, I believe

16   if the Court would, I believe the defense is prepared to

17   stipulate the length of the stop and the PC for the

18   subsequent search were valid.  If the Court would like

19   me to continue playing the video, we can.

20              THE COURT:  Mr. Cargill?

21              MR. CARGILL: As I stated, I have no dispute

22   about the probable cause to search based on the dog

23   alert or length of detention from this point forward.

24   This is solely about the stop, so I'm fine with not

25   considering anything further for the purposes of the

1    motion.

2                 THE COURT:  I want to hear part of the

3    conversation in the police vehicle once he comes back.

4    I'd like you to keep playing it.

5                 MR. HOFFMAN:  Your Honor, there's about

6    90 seconds, the next 90 seconds or so, where he's in the

7    front of the vehicle and then he walks back and the

8    conversation starts.  I'll just let it play.

9                 THE COURT:  Thank you.

10                (Video played).

11   BY MR. HOFFMAN:

12     Q.  What's going on now, Trooper Miller?

13     A.  Again, made contact with him.  Explained to the

14   defendant why I stopped him for the defective equipment.

15   He, in turn, mentioned I stopped him prior.  I advised

16   him that, yes, I had stopped him prior for the exact

17   same violation for the lights. Requested his driver's

18   license, his registrations, his bill of lading and log

19   book and at this time, he's obtaining that information

20   for me.  As he's giving me that information, I'm briefly

21   skimming over it until I obtain all the documents I

22   asked for.

23     Q.  Trooper Miller, did Trooper Moore just give you a

24   thumbs up a minute ago?

25     A.  I wasn't watching Trooper Moore.

1    Q.  At some point in this area, did he give you a

2    thumbs up?

3    A.  Yes.  He advised me the K-9 gave a positive

4    alert.

5    Q.  So thumbs up means the K-9 has already alerted?

6    A.  Correct.

7    Q.  Did he tell you where the alert occurred?

8    A.  He did.  When I exited my vehicle --

9    Q.  Go ahead, Trooper Miller.

10   A.  Yes, sir. I spoke to Trooper Moore about the K-9

11   alert and he advised me that the dog indicated on the

12   driver's side, front portion of the vehicle where the

13   battery box and strap box would have been.

14            THE COURT:  Is the entire video going to be

15   in evidence?

16            MR. HOFFMAN:  Yes, Your Honor.

17            THE COURT:  Okay.  Here's my question and

18   I'll ask counsel.  Each of you have viewed this video;

19   is that right?

20            MR. HOFFMAN:  Yes, Your Honor.

21            MR. CARGILL:  Yes, Your Honor.

22            THE COURT:  Is there any discussion in the

23   police vehicle about the lights?

24            MR. CARGILL:  I recall there is, Your Honor.

25            MR. HOFFMAN:  Judge, I'm not certain, but I

1    think there is discussion at some point about the lights

2    being the same ones out, but I'm not 100 percent

3    certain.  The video is 40 or 50 minutes long.

4              THE COURT:  I can play it and watch it.

5              Do the parties know whether there is a

6    discussion about the lights before Trooper Miller exits

7    the vehicle? In other words, does he go up, see the

8    drugs, discuss the lights or is the discussion of the

9    lights before he exits this vehicle?

10             MR. HOFFMAN:  I don't recall, Judge.

11             THE COURT:  I don't need to see anymore.

12   The drug dog has alerted and we go from there.  What I'm

13   interested in is what the discussion was about the

14   lights. I was interested in the discussion at the cab,

15   but we couldn't hear that and I'm interested in the

16   discussion about the lights in the car, but --

17             MR. HOFFMAN:  I'm sure Trooper Miller can

18   describe what he recalls about the discussion in the

19   cab, Your Honor.

20             THE COURT:  I think he already testified to

21   that.

22             MR. HOFFMAN:  I'm sorry.  I interpreted your

23   comment as you wanted more?

24             THE COURT:  No, I just wanted to know if it

25   was on the video as well.  I know what he testified to.

Miller - - Cross                         71

```
 1    He testified he stopped him because he had some lights

 2    out.

 3    BY MR. HOFFMAN:

 4       Q.  Correct me if I'm wrong, Trooper Miller.  You

 5    testified you requested his driver's license,

 6    registration for both parts, bill of lading and the log

 7    books?

 8       A.  Correct.

 9            THE COURT:  And Mr. Covarrubaiz said "you

10    pulled me over last time."  I've got that.  I was just

11    wondering if there was any discussion about the lights

12    on the video, but I'll watch the whole video.

13            Please proceed.

14            MR. HOFFMAN:  I think that's all we have,

15    Your Honor.

16            THE COURT:  Before cross, let me take a

17    two-minute recess to get an extension cord for my iPad.

18    We're not going anywhere.

19                       CROSS-EXAMINATION

20    BY MR. CARGILL:

21       Q.  Good afternoon, sir.

22       A.  Good afternoon.

23       Q.  Let me just see if I'm clear about this, to begin

24    with.

25            The only reason that you stopped Mr. Covarrubaiz
```

Miller - - Cross

1   was because of these defective lights; correct?

2       A.  Correct.

3       Q.  So, that's the sole reason that you stopped him.

4       A.  Correct.

5       Q.  And you observed these defective lights the first

6   time when you were in the median and you saw him pass by

7   and you saw the driver's side portion of his tractor

8   trailer; correct?

9       A.  Yes, sir.

10      Q.  So you didn't see, of course, the passenger side

11  of this tractor trailer before you stopped him, did you?

12      A.  No, sir.

13      Q.  And you really, in truth, didn't see or notice

14  these defective lights on the front of his vehicle

15  before you stopped him, did you?

16      A.  On the front of the bumper? Are those the ones?

17      Q.  Yes.

18      A.  I observed the lights out on the tractor, which

19  would have been, yes, the front light and as well as the

20  lights going down the side, the marker lights.

21      Q.  So, as you're sitting in the median and he's

22  coming up the highway at about, what, 60 miles per hour

23  or so; correct?

24      A.  Correct.

25      Q.  You look back.  You notice these defective lights

1    on the front bumper as he's approaching you; correct?

2        A.   Correct.

3        Q.   Did you know to look for his truck? Did you know

4    you were looking at the truck that you were warned about

5    that perhaps was transporting drugs?

6        A.   Yes, sir.  I was provided information that this

7    tractor trailer was --

8        Q.   So you identified this tractor trailer before he

9    ever came up beside you?

10       A.   No, sir. I observed -- I was able to see a blue

11   tractor trailer travelling northbound with the same

12   green containers as the prior.

13       Q.   When did you first observe him? How far was he in

14   your position when you first observed him and confirmed

15   this was the tractor trailer you wanted to be on the

16   look-out for?

17       A.   From the crossover where I was sitting, you can

18   see at least a mile down the interstate.

19       Q.   So you saw him a mile away down the road?

20       A.   You could see him at least a tenth of a mile, if

21   not two-tenths of a mile, travelling northbound.

22       Q.   So when did you see him and recognize this is the

23   truck you needed to be on the look-out for?

24       A.   Approximately a tenth, two-tenths of a mile as he

25   was approaching.

Miller - - Cross

1    Q.  So, about a block or two.

2    A.  Correct.

3    Q.  And it's snowing.

4    A.  Correct.

5    Q.  From that vantage point, you noticed that a

6    couple of these LED lights within the light assemblies

7    on the front bumper of this truck were out?

8    A.  On the front inside, yes, sir.

9    Q.  I'm talking about when you first saw the truck.

10   You didn't see the side of the truck when it was behind

11   you, did you?

12   A.  No, sir.

13   Q.  So the first thing that you saw would have been

14   the bumper; correct?

15   A.  Correct.

16   Q.  And you're testifying that from a tenth of a mile

17   to two-tenths of a mile away, you were able to see that

18   a couple of these tiny LED lights are out on the front

19   bumper.

20   A.  No, sir, not from that far of a distance.  As he

21   got closer, I was able to see.

22   Q.  So when did you notice that?

23   A.  As he was basically passing by my location.

24   Q.  So how close was he when you noticed that the

25   front bumper lights were out?

1    A.   With him being in the left lane and I was sitting

2   in the crossover, approximately 25, 30 feet away?

3    Q.   And he's going 60 miles an hour.

4    A.   Correct.

5          THE COURT:  He was in the passing lane, I

6   think you said, when you first saw him and you're

7   sitting in the crossover.

8          THE WITNESS:  Correct.

9          THE COURT:  Which way is your vehicle facing

10  in the crossover?  Is it facing toward the northbound

11  lane or toward the southbound lane?

12          THE WITNESS:  The front of my vehicle, my

13  vision is actually seeing the northbound traffic coming.

14          THE COURT:  Your vehicle was actually facing

15  southbound.

16          THE WITNESS:  Correct.

17          THE COURT:  You were looking dead down the

18  southbound lane.

19          THE WITNESS:  Correct.

20          THE COURT:  Go ahead.

21  BY MR. CARGILL:

22   Q.   Then he passes by you and you see these other

23  lights that you've testified to that are depicted in

24  Government's 5 and 6; correct?

25   A.   Yes, sir.

1    Q.  So just so we're clear, the lights that you

2    describe as being out and that are depicted in

3    Government's 10, those lights were on the passenger

4    side; correct?

5    A.  Yes, sir.

6              THE COURT:  Just to be clear, the top of

7    Government 10 is on the passenger side.  The bottom of

8    Government 10 is on the driver's side; is that right?

9              THE WITNESS:  Yes, sir, Your Honor.

10   BY MR. CARGILL:

11   Q.  The top of Government's 10 you did not see before

12   the stop.

13   A.  No, sir.

14   Q.  Now, focusing on Government's 5, you testified,

15   as I understand it, that what you observed from this

16   vantage point on the side, in the median, was about

17   three of these small LED lights within the assembly were

18   not illuminated; correct?

19   A.  Correct, yes, sir.

20   Q.  And this amber light to the right of that, the

21   light I just described, that was not out -- that was not

22   burning; correct?

23   A.  Correct, it was defective.

24   Q.  Was there a bulb behind that amber light?

25   A.  Yes, sir, there was.

1     Q.   That's not a reflector?

2     A.   No, sir. There was actually a light with wires

3   running to it.

4     Q.   On the other side, the passenger side, was this

5   amber light illuminated on the passenger side?

6     A.   Yes, sir, it was.

7     Q.   It was.

8          Do you have Government's 11?

9     A.   Yes, sir.

10     Q.   Do you recognize that, sir?

11     A.   The top or bottom?

12     Q.   Bottom, please.

13     A.   Yes, sir.

14     Q.   What does that depict?

15     A.   That depicts the amber light that is out.

16     Q.   On which side of the truck?

17     A.   That is on the driver's side.

18     Q.   Are you sure about that?

19     A.   Yes, sir.

20     Q.   What's directly beneath that amber light on

21   Government's 11?

22     A.   Are you talking about this (indicating)?

23     Q.   Government's 11, yes.  What is directly beneath

24   it?

25     A.   That would be the gas tank.

Miller - - Cross                           78

1        Q.   Pardon me?

2        A.   The gas tank.

3        Q.   What is directly beneath the amber light on the

4   gas tank?

5        A.   That is the, I guess, the diesel lid.

6        Q.   It's where you open it up to refuel it; correct?

7        A.   Correct.

8        Q.   If you would, go back to Government's 5.  Do you

9   have Government 5?

10       A.   Yes, sir.

11       Q.   What's that depict?

12       A.   That depicts the amber light.

13       Q.   On which side?

14       A.   Looks like the light in #11 would actually be --

15   the light in #11 on the bottom is actually on the

16   driver's side and #5, that one appears to be actually on

17   the passenger's side.

18       Q.   So when you testified that these LED lights next

19   to the amber light in Government's 5, that you noticed

20   they were defective as Mr. Covarrubaiz went by your

21   location, you were mistaken.

22       A.   In #11, they were defective as he passed by.

23       Q.   Okay.  So 5, for purposes of the stop, we can

24   ignore.  You did not see that before you stopped him;

25   correct?

1    A.  #5, no, sir.  That is actually on the passenger

2    side.

3    Q.  So what you saw instead is what's depicted on

4    Government's 11?

5    A.  Yes, sir.

6    Q.  And the only lights that are not operational on

7    11 -- the only light that's not operational is the amber

8    light; correct?

9    A.  In #11, it is actually the light and the amber

10   light could be the light next to it -- or actually, on

11   the top one, there's an amber light and one of the LED

12   lights that are not operational.

13   Q.  Would you use your red marker and mark that for

14   us?

15   A.  Sure.

16           THE COURT:  We already marked it on the

17   original.  Do you want to hand those to him,

18   Mr. Cargill?

19           I'm going to give you 5 and 11, the Court's

20   original.

21           (Said documents handed to counsel).

22   BY MR. CARGILL:

23   Q.  So, are you with me on Government's 11?

24   A.  Yes, sir, I believe so.

25   Q.  We were focusing on the bottom photograph on 11.

1   The top photograph on 11, actually though, that depicts

2   the opposite side of the truck from what's the bottom

3   #11; correct?

4       A.  Correct, yes, sir.

5       Q.  So the red circles on the top part of 11, they

6   don't show anything that you saw before the stop;

7   correct?

8       A.  11 on the top, yes, sir, it does.  It depicts the

9   yellow amber and the LED.

10      Q.  I'm sorry.  You've confused me.

11          The amber light that was not functioning that you

12  saw before this stop, was it the amber light that's just

13  above the gas tank with the top showing or the other

14  one?

15      A.  There is multiple lights that were not

16  functioning.  The one --

17      Q.  Talk about the amber light.  I'm trying to figure

18  out which side of the truck is the correct indication of

19  what you saw before the stop.

20      A.  #11 would be the correct indication, which has

21  the yellow amber, the round one, and also the LED.

22      Q.  But the bottom on 11 is different from the top of

23  11.

24      A.  Correct.  That's on the passenger side, which I

25  could not see the passenger side until after the stop.

Miller - - Cross                    81

```
 1      Q.  So the top of 11 has nothing to do with this
 2   stop; correct?
 3      A.  No.  The top of 11 is what I observed as he came
 4   by and observed the violation, the defective equipment.
 5   #11 was the light that was observed after the stop.
 6              THE COURT:  This is what I want you to do
 7   because I am utterly confused.  I want you to take 10, I
 8   want you to take 11 and I want you to take 5.  I don't
 9   want you to mark anything.  I have a very simple
10   question.
11              With regard to 5, which side of the truck is
12   this; passenger or driver?
13              Y'all can approach if you want to.
14              THE WITNESS:  I apologize, Your Honor.  There
15   are several variations.
16              THE COURT:  I just think it's important that
17   you identify for 5, 10 and 11 which side of the truck it
18   is and on 10 and 11, you have to talk about top and
19   bottom.
20              THE WITNESS:  So on #11, this picture --
21              THE COURT:  Which picture are you pointing
22   to?
23              THE WITNESS:  The bottom picture.  This
24   would be the passenger side.
25              THE COURT:  Bottom of 11 is the passenger
```

1    side.

2              Go ahead.

3              THE WITNESS:  The top portion would be the

4    driver's side.

5              THE COURT:  Top of 11 is the driver's side.

6              THE WITNESS:  On #5 -- #5, it looks like

7    that's going to be LED -- #5, I believe, is going to be

8    the passenger side.

9              #10 --

10             THE COURT:  At the bottom.  We already know

11   the top of 10 is the passenger side.

12             THE WITNESS:  #10, I believe the bottom is

13   going to be on the driver's side.

14             THE COURT:  Just so that we can reconfirm

15   this, and you correct me if I'm wrong, the photographs

16   that we have in front of you, Exhibits 5, 10 and 11, the

17   -- #5, the bottom of 10 and the top of 11 are all the

18   driver's side.

19             THE WITNESS:  The top of 11 is definitely

20   the driver's side.

21             THE COURT:  I asked you about 5 and the

22   bottom of 10.

23             THE WITNESS:  #5, I believe, is the

24   passenger side.

25             The bottom of #10, I believe is also the

```
 1   passenger side.

 2              THE COURT:  What about the bottom of #11?

 3              THE WITNESS:  The bottom of #11 would be the

 4   driver's side.

 5              THE COURT:  So, in looking at the photos you

 6   have in front of you, the only ones of the driver's side

 7   is going to be Exhibit 11; correct?

 8              THE WITNESS:  Yes, sir.

 9              THE COURT:  5 is passenger side; 10 is

10   passenger side; 11 is driver's side; is that correct?

11              THE WITNESS:  Yes, sir, I believe so.

12              THE COURT:  Thank you.

13              Go ahead, Mr. Cargill.

14   BY MR. CARGILL:

15     Q.  So I'm clear about this amber light then, it

16   appears that from the photographs, the amber light is

17   out on both the passenger side and the driver's side;

18   correct?

19     A.  Correct.

20     Q.  And you confirmed there's a bulb that goes to

21   that light; correct?

22     A.  Correct, yes, sir.

23     Q.  You testified to these matters in state court,

24   when these were in state court, is that correct?

25     A.  I'm sorry.  I could not hear you.
```

 1     Q.   You testified to these matters in state court?

 2     A.   Correct.

 3     Q.   Under oath?

 4     A.   Yes, sir.

 5     Q.   Several months ago?

 6     A.   Yes, sir.

 7     Q.   And you mentioned then which lights were out;

 8  correct?

 9     A.   Yes.

10     Q.   And you never mentioned then seeing the front

11  bumper lights were out?

12     A.   I believe I did.

13     Q.   You testified that before the stop, you noticed

14  the front bumper lights were out?

15     A.   I believe I mentioned that there were several

16  lights and pointed in state court which lights were out.

17     Q.   Now, you saw no other problems with the lights or

18  the equipment on Mr. Covarrubaiz's truck, tractor

19  trailer, before the stop, did you?

20     A.   Before the stop?

21     Q.   Yes.

22     A.   No, sir.

23     Q.   No problems with the headlights, the tail lights,

24  the brake lights, any other equipment on this vehicle;

25  simply these defective marker lights, correct?

Miller - - Cross                              85

1      A.  Correct.

2      Q.  And these lights are not required lights, are

3  they?

4      A.  No, sir.

5      Q.  A truck can have these lights or not have these

6  lights.  It doesn't matter; correct?

7      A.  Correct.  They're required only to have a certain

8  minimum amount of lights.

9      Q.  And these lights in particular are optional;

10  correct?

11      A.  Correct.

12      Q.  So if he had been going down the road and all of

13  these lights had been off, that would have been fine;

14  correct?

15      A.  Yes, sir.

16      Q.  And if none of these lights had been on the

17  truck, that would have been proper; correct?

18      A.  Correct.

19      Q.  So if he had a switch inside his truck and he

20  just decided he would turn them all off, that would have

21  been fine.

22      A.  Yes, sir.

23      Q.  If he had a switch inside his truck and he

24  decided he wanted to disable every other one of these

25  lights so he would have just, say, 15 of the 30

Miller - - Cross                86

1   illuminated versus all 30, in your view, would that have

2   been lawful?

3       A.   As long as the switch wasn't on and a light that

4   was on and defective, then yes.

5       Q.   So he can pick whatever pattern he wishes with

6   respect to these lights; correct?

7       A.   Yes, sir.

8       Q.   Now, you didn't know whether he had control over

9   each individual light from inside the cab, do you?

10      A.   Actually, we were able to turn off and on all of

11   the lights that were running down the side.  When we

12   turned on and off the switches, all the lights went off.

13   All of them came back on except the ones I described

14   that were defective.

15      Q.   But before the stop, you didn't know what

16   controls he had over these lights, did you?

17      A.   No, sir.

18      Q.   Your view of the law is if there's a light on the

19   vehicle, on the outside of a vehicle, that light has to

20   be fully functional; correct?

21      A.   Correct.

22      Q.   Even to the point where if one or two out of

23   the -- it looks like about ten LED lights within each

24   assembly, if one or two of those is out, in your mind,

25   that makes it defective equipment; correct?

1      A.   No, sir.  The law states that 51 percent of the

2   actual LED lights has to be not operational for it to be

3   -- to write a defective ticket for that.

4      Q.   51 percent?

5      A.   Yes, sir.

6      Q.   Which of these lights violated that rule?

7      A.   None of those.

8      Q.   So, they were all within the law?

9      A.   Yes, sir.  By law, I cannot write him a ticket

10   for the LED lights.

11      Q.   So you didn't suspect a violation of law when you

12   pulled him over.

13      A.   No, sir, I did.  Until I actually stopped him and

14   was able to see each individual light inside the LED's,

15   I could not verify, even when driving beside of him,

16   that four lights or ten lights or however many lights

17   were out inside that assembly were actually defective.

18      Q.   Now, you've seen drivers who install optional

19   lights on their vehicles on the highways of the

20   Commonwealth, I take it, many, many times, haven't you?

21      A.   Yes, sir.

22      Q.   To take an absurd example, you've perhaps seen

23   during Christmastime, sometimes truckers put wreaths or

24   Noel signs or Rudolph the Red Nosed Reindeer or

25   decorative lights like that on their vehicle; right?

1      A.   Correct.

2      Q.   Is it your view if one of those decorative lights

3  is not burning that that's defective equipment?

4      A.   Yes, sir.   It could be defective equipment if

5  it's mounted to the truck.

6      Q.   Every light must be operational.

7      A.   Yes, sir.

8      Q.   Do you have Defendant's 1 in front of you?

9      A.   Yes, sir.

10     Q.   Can you tell us what that is, please?

11     A.   It is a picture of the overall driver's side of

12  the truck.

13     Q.   Is that just a closer view of what's actually

14  depicted in Government's 4?

15     A.   Yes, sir.

16     Q.   Does that show the truck as you saw it as he went

17  passed you on this February date when you stopped Mr.

18  Covarrubaiz?

19     A.   No, sir. This picture is actually a lot further

20  away than what he had passed by me at.

21     Q.   So you were closer than that?

22     A.   Yes, sir. I'm actually standing up on the top of

23  the berm that's in between the northbound and southbound

24  lanes taking this picture.

25     Q.   But that fairly shows the truck on that day

1   except from a different vantage point?

2      A.   Correct.

3            MR. CARGILL:  I'd offer Defendant's 1, Your

4   Honor.

5            THE COURT:  Any objection?

6            MR. HOFFMAN:  No, Your Honor.

7            THE COURT:  Defendant's 1, received, without

8   objection.

9            (Defendant Exhibit #1 was marked for

10  identification and admitted into evidence).

11           MR. CARGILL:  Thank you, sir.

12           THE WITNESS:  Yes, sir.

13           THE COURT:  Any redirect, Mr. Hoffman?

14           MR. HOFFMAN:  Yes, Your Honor.

15                  REDIRECT EXAMINATION

16  BY MR. HOFFMAN:

17     Q.   Trooper Miller, there's been a lot of testimony

18  about what you saw before the stop; correct?

19     A.   Correct.

20     Q.   I just want to clarify something though.  After

21  the vehicle passed and you observed some of the lights

22  were out, you did not immediately conduct the traffic

23  stop, did you?

24     A.   No, sir.

25     Q.   You went on to develop your investigation further

1    before you turned on your lights; correct?

2        A.   Correct, yes, sir.

3        Q.   You went up and got an even closer look, you

4    testified earlier; right?

5        A.   Yes, sir.

6        Q.   So before you turned on the lights when you were

7    in the left-hand lane, as you testified, at that point,

8    how close were you to the lights that you observed were

9    not functioning?

10       A.   Anywhere between five, ten feet, maybe closer.

11             THE COURT:  You were in the next lane of

12   travel.

13             THE WITNESS:  Correct.

14   BY MR. HOFFMAN:

15       Q.   So your stop was not based exclusively on what

16   went by you at 60 miles per hour; correct?

17       A.   No, sir.

18             THE COURT:  You didn't pull in front and see

19   the lights in the front.  When you pulled up, you just

20   pulled up beside and saw the lights on the driver's

21   side; correct?

22             THE WITNESS:  Correct.

23             THE COURT:  You can see that in the video.

24             THE WITNESS:  Yes.

25   BY MR. HOFFMAN:

1    Q.  To be very clear for the record, your testimony

2    is as the defendant's vehicle was approaching your

3    position, just before he passed you, you saw there were

4    defective lights in the front of the bumper.

5    A.  Correct.

6    Q.  There's apparently some confusion about the sides

7    of the vehicle that were discussed a moment ago.  I

8    believe in the end, your thought a moment ago was that

9    the pictures depicted in 5 and Government 10 were

10   actually the passenger side.  I'd like to talk about

11   that for a minute.

12        I think we should start with Defendant 1.

13        Does the Court have Defendant 1?

14             THE COURT:  No, but I can peek over his

15   shoulder.

16             Mr. Cargill, you're free to come up here if

17   you want to.  Everybody else is.

18   BY MR. HOFFMAN:

19   Q.  Defendant's 1 is an overall picture of the

20   driver's side; correct?

21   A.  Yes, sir.

22   Q.  If we look at that, on which side of the gas tank

23   are the steps located?

24   A.  On the driver's side, they're located in front of

25   the gas tank.

1    Q.  So the left or to the right?

2    A.  To the right -- maybe I look at it differently.

3    Q.  The steps in Defendant's 1, are the steps to the

4    left or to the right of the gas tank?

5    A.  To the left.

6    Q.  To the left, correct.  So if we were looking at

7    the opposite side of the vehicle, the steps, would they

8    be to the right?

9    A.  Yes.

10   Q.  Let's take a look at Government 5 again.  In

11   Government 5, the steps are on which side of the gas

12   tank?

13   A.  To the left.

14   Q.  So in Government 5, what side of the vehicle are

15   we looking at; the driver or passenger?

16   A.  The driver.

17   Q.  The driver's side?

18   A.  Yes, sir.

19   Q.  I want you to be certain here.

20   A.  You can see the handle on the step and the handle

21   on the step in this picture.  You can also see the Vin

22   and the studio sleeper right above, facing in between

23   the two right there, as well as the little IFTA fuel tax

24   visible in the picture.

25   Q.  What about, let's look in the picture that we're

1    all certain here.  Defendant's A is the driver's side.

2        A.  Yes, sir.

3        Q.  Above the gas tank, there appears to be some kind

4    of almost a door with some writing on it, not the

5    driver's door, but is that some kind of storage

6    compartment?

7        A.  Yes, sir.

8        Q.  Do you see a handle on that door?

9        A.  Yes, sir.

10       Q.  Is the handle on the right side or left side of

11   that door?

12       A.  It's on the right-hand side of the door.

13       Q.  Let's look at Government 5.  Do things appear to

14   be the same or different as they are in Defendant 1?

15       A.  They appear to be the same.

16       Q.  So again, Defendant's 5 is a photograph of what

17   side of the vehicle?

18       A.  The driver's side.

19       Q.  A moment ago when Mr. Cargill asked you some

20   questions, you testified that you thought that 5 was

21   perhaps on the passenger side.

22       A.  Correct.

23            THE COURT:  I think that's when I asked him

24   the question.  He thought 5 and 10 were passenger and 11

25   was driver.

Miller - - Redirect                              94

1          Go ahead.

2   BY MR. HOFFMAN:

3      Q.   After Mr. Cargill asked you the questions, I

4   believe the Court is correct, he also followed up with

5   additional questions and you thought 5 was passenger

6   side.

7      A.   Yes, sir.

8      Q.   So, what happened?

9      A.   After taking a closer look, it appears it's

10  actually the driver's side.  After being able to see the

11  handle on the step, as well as the handle that the

12  picture the defense counsel handed me, it depicts the

13  exact same appearance.  You can see the IFTA fuel tax

14  sticker, as well as the VIN with the last digits, as

15  well as the studio sleeper.  Then the straps on the

16  tank, as well as the gas tank lid.

17     Q.   You're pointing, for the record, you're matching

18  up both exhibits, Defendant 1 and 5.

19     A.   Correct.

20          Then it appears that would be in the vicinity

21  that the lights are actually out, which matches up

22  pretty well from that light, matching this light in 5.

23     Q.   So just to be clear here, notwithstanding your

24  testimony a moment ago in response to the Court's

25  questions, your testimony now is that Government 5 is

1    indeed the driver's side; correct?

2        A.   Yes, sir, I believe it to be.

3        Q.   And that's the side that you observed pass by

4    you.

5        A.   Correct.

6        Q.   Why don't you hold on to Defendant 1?

7             I believe that similarly, you said in your

8    testimony a moment ago that you thought perhaps 10 could

9    be passenger side, too; correct?

10       A.   Correct.

11       Q.   In light of the discussion we just had and the

12   testimony you provided, let's talk about 10.  Let's talk

13   about the bottom.  What side of the vehicle is depicted

14   in the bottom of Government 10? Take your time.

15       A.   As well, it looks like it's the driver's side.

16       Q.   Why do you say that?

17       A.   Again, because of the same identification with

18   the handle on the box, the sleeper markings.

19       Q.   Let me make sure I'm understanding you right.

20   You say based on your inspection of Defendant 1,

21   comparing it to Government 10, you see the handle on the

22   battery box is the same in both exhibits, the markings

23   are in the same configuration in both exhibits.

24       A.   Correct.

25       Q.   Would the same be the inverse if things were on

Miller - - Redirect

1   the other side of the vehicle?

2      A.   Yes, sir, I believe so.

3      Q.   Photograph on the top of Government 10, you

4   testified, correct me if I'm wrong, but the picture is

5   taken from the driver's side looking through, out the

6   passenger side; correct?

7      A.   Correct; somewhere in this vicinity, looking from

8   this portion (indicating).

9      Q.   To be clear for the record, the photograph you

10  just indicated on Defendant 1, the photographer would

11  have been standing on the driver's side of the vehicle

12  near the back of the gas tank shooting across the back

13  of the tractor?

14     A.   Correct.

15     Q.   Now, previously, you've circled an LED light in

16  the top of Government's 10 as being out.  Did you

17  observe that light before the stop or after the stop as

18  being out?

19     A.   I can see that light actually as I was driving up

20  beside of the defendant's vehicle.

21     Q.   Before the stop.

22     A.   Before the stop.

23     Q.   Then a moment ago, I believe you testified or

24  concluded that 11 was indeed the driver's side; is that

25  correct?

1      A.   Yes, sir.

2                THE COURT:  Where is the admitted copy of

3      11? Do you have that, Mr. Cargill?

4                MR. CARGILL:  No, sir, I don't think so.

5                THE COURT:  The one with the --

6                MR. HOFFMAN:  Let me make sure it's not at

7      my table, Judge.

8                MR. CARGILL:  I do, Judge.

9                THE COURT:  You do?

10                MR. CARGILL:  I'm sorry.  I started writing

11     on it.

12                THE COURT:  I'll swap with you.

13                You have written on this one.

14                MR. CARGILL:  I know.

15                THE COURT:  Let me hand you this admitted

16     copy of 11.  I want you to ignore the handwriting.  I

17     want you to tell me which of the lights -- as I

18     understand it, both of these are driver's side; is that

19     correct?

20                THE WITNESS:  Yes, sir.

21                THE COURT:  You previously circled in the

22     top picture these red ones, circled in red, these being

23     out; correct?

24                THE WITNESS:  Correct.

25                THE COURT:  On the bottom, are there any

1   lights out?

2                THE WITNESS:  The amber light there.

3                THE COURT:  That was out as well, that you

4   observed.

5                THE WITNESS:  Yes, sir.

6                THE COURT:  Can you circle that in red,

7   please?

8                THE WITNESS:  Yes, sir.

9                THE COURT:  I'll just state for the record

10  that during the swap of exhibits, the original exhibit

11  11 was handed to Mr. Cargill and he made some

12  handwritten notes in blue on it and those are to be

13  ignored.

14                Mr. Hoffman, do you have any further

15  questions?

16                MR. HOFFMAN:  I might, Your Honor, if I can

17  have the Court's indulgence just a moment.

18                (Counsel conferred).

19  BY MR. HOFFMAN:

20    Q.  Just to be very clear for the record, photograph

21  exhibits we just discussed are all photographs of the

22  driver's side of the vehicle; is that correct?

23    A.  Yes, sir.

24    Q.  That's the side you observed when it went by you;

25  correct?

Miller - - Recross                        99

1        A.  Yes, sir.

2        Q.  And that's also the side of the vehicle you

3    inspected more closely when you drove up beside him

4    before you conducted the driver's stop.

5        A.  Yes, sir.

6               MR. CARGILL:  May I ask a couple questions?

7               THE COURT:  Yes, sir.

8                    RECROSS-EXAMINATION

9    BY MR. CARGILL:

10       Q.  I'm sorry to beat this.  Government's 5 --

11              THE COURT:  Can I come over?

12              MR. CARGILL:  Yes, yes, of course.

13   BY MR. CARGILL:

14       Q.  Government's 5 is driver's side?

15       A.  Yes, sir.

16       Q.  Government 11, bottom, is driver's side?

17       A.  Yes, sir.

18       Q.  On Government 5, the amber light is three or four

19   light assemblies removed from the gas cap; correct?

20       A.  Are you talking about the round one?

21       Q.  This one (indicating). Amber light here, that's

22   the light that was out; correct?

23       A.  Correct.

24       Q.  Gas cap is three or four light assemblies to the

25   left; correct?

 1     A.  Correct.

 2     Q.  That's the driver's side on #5?

 3     A.  Yes.

 4     Q.  Bottom of 11, amber light is directly above the

 5  gas cap; correct?

 6     A.  Correct.

 7     Q.  So this cannot be the driver's side, can it?

 8     A.  Yes, sir, it can.  Again, this is only my

 9  opinion, but the light being defective, it could be on

10  -- it could have been a shorted wire and that's why it's

11  on in this picture and not in this picture.

12          THE COURT:  That's not the question he's

13  asking you. The question he's asking you is in 5, the

14  light appears to be to the left.  The amber light is to

15  the left of the gas tank.  In 11, it appears to be a

16  little bit to the right of the top of the gas tank. How

17  can they be the same side of the truck -- I mean, that

18  light didn't move.

19          THE WITNESS:  From the angle taking the

20  picture, this is more dead on, whereas this one is back

21  further, taking the picture from an angle.

22          MR. CARGILL:  That's all I have.  Thank you.

23              FURTHER REDIRECT EXAMINATION

24  BY MR. HOFFMAN:

25     Q.  Let me ask one more question.  I'm going to

 1    continue.  Let's look at 11, bottom picture.

 2         What is that letter, that big letter? I'm

 3    pointing at the photograph.

 4       A.  T.

 5       Q.  And what is that?

 6       A.  H.

 7       Q.  Let's look at Defendant's 1.  Do you see the T

 8    there?

 9       A.  Yes, sir.

10       Q.  Do you see the H there?

11       A.  Yes, sir.

12       Q.  Are you still confident 11 is the driver's side?

13       A.  Yes.

14              MR. HOFFMAN:  That's all, Judge.

15              THE COURT:  Any further questions,

16    Mr. Cargill?

17              MR. CARGILL:  No, Your Honor.

18              THE COURT:  Thank you, Senior Trooper

19    Miller.  You may stand down.

20

21

22

23

24

25

1                          **INDEX**

2     **WITNESS FOR GOVT.**

3     Joseph Miller
        Direct Examination by Mr. Hoffman..................3
4       Cross-Examination by Mr. Cargill..................71
        Redirect Examination.............................89
5       Recross Examination..............................99
        Further Redirect Examination....................100

6
      **EXHIBIT NO.**                **Marked**          **Admitted**
7
      Govt. #1                     25                25
8     Govt. #2                     34                34
      Govt. #3                     44                44
9     Govt. #4                     45                45
      Govt. #5                     46                46
10    Govt. #6                     49                49
      Govt. #7                     51                51
11    Govt. #9                     52                52
      Govt. #10                    56                56
12    Govt. #11                    58                58
      Govt. #12                    60                60
13    Govt. #13                    61                61
      Govt. #15                    62                62
14    Govt. #16                    63                63
      Govt. #17                    64                64
15    Deft. #1                     89                89

16

17    "I certify that the foregoing is a correct transcript

18    from the record of proceedings in the above-entitled

19    matter.

20

21

22    /s/ Sonia Ferris                    September 9, 2014"

23

24

25