```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF VIRGINIA
 2                      Harrisonburg Division

 3

 4   UNITED STATES OF AMERICA,      Criminal No. 5:14cr00019

 5              vs.                  Roanoke, Virginia

 6   GEORGE HENRY COVARRUBAIZ,

 7                 Defendant.    September 29, 2014

 8        TRANSCRIPT OF EXCERPT OF EVIDENTIARY HEARING
           BEFORE THE HONORABLE MICHAEL F. URBANSKI
 9                UNITED STATES DISTRICT JUDGE

10
     APPEARANCES:
11
     For the United States:
12                                   U.S. Attorney's Offc.
                                     GRAYSON A. HOFFMAN
13                                   116 N. Main St.
                                     Harrisonburg, VA  22801
14

15   For the Defendant:
                                     Federal Public Defender's
16                                   Offc.
                                     RANDY V. CARGILL
17                                   210 First St. SW  Ste. 400
                                     Roanoke, VA 24011
18
     Court Reporter:                 Sonia R. Ferris, RPR
19                                   U.S. Court Reporter
                                     116 N. Main St.  Room 314
20                                   Harrisonburg, VA 22802
                                     540.434.3181 Ext. 7
21

22

23

24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer.
```

```
1              THE COURT: Mr. Hoffman, good afternoon.
2   Welcome to Roanoke.
3              MR. HOFFMAN:  Good afternoon, Your Honor.
4   Pleasure to be here.  I've never been in here.  I've
5   never been in this courtroom.  I was joking with the
6   CSO, I think you could throw a 50-yard football pass and
7   not hit anything.  It's beautiful.  It's good to be here
8   and I want to thank the Court for entertaining our
9   request to submit additional evidence early.  I
10  understand the Court's clerk advanced it.  So, thank
11  you.
12             Just to cut right to the Court's last
13  question, Kithkart doesn't fit here, as the Court
14  pointed out.  There hasn't been a decision here yet.
15  While the Court got close to its decision, the Court
16  hasn't issued a decision yet.  Therefore, there wasn't
17  an appeal.  There wasn't a remand.
18             I think one of the most important
19  distinctions that no one has discussed here yet today is
20  the fact that the government in that case didn't have an
21  explanation.  They never provided an explanation for why
22  the additional evidence didn't go in.  And they
23  couldn't.  I think that the circuit court concluded,
24  well, there wasn't one, this is true gamesmanship.
25             I think the Court will see in our papers,
```

1   despite the timing -- I understand why the Court's

2   antenna is up and I understand why the defense attorney

3   used the word gamesmanship in its briefs, but I can

4   assure the Court it's not.  It's just a matter of

5   timing, coincidental timing. The investigation was still

6   ongoing at the time the motion to suppress was

7   originally filed.

8            Defense counsel, Your Honor, is correct.

9   The wire tap had been taken down at the time of our

10  hearing.  However, the criminal investigation was

11  ongoing.  Specifically, Mr. Everardo Amador had not been

12  arrested yet.  He was the primary domestic target of

13  this nationwide investigation.  So he was still out.

14           Our concern, and I appreciate defense's

15  suggestion we could have done it in a closed hearing,

16  our biggest concern was the defendant finding out

17  because the defendant can make phone calls and before we

18  know it, Everardo's back in Mexico.  That was our

19  biggest concern and that's why we decided we would just

20  go forward on the defective light argument.

21           Again, I want to emphasize, we're sensitive

22  to the timing issue.  We're sensitive to the way it

23  looks, but I can assure the Court, there's no

24  gamesmanship going on.  This is just how the timing

25  worked out.  He was arrested. We sat down, we made a

1    decision, put our brief together and we filed it.

2            THE COURT:  What about the fact that

3    information regarding Mr. Amador and the wire tap and

4    all that was filed on the public record and could have

5    been available for anyone with a computer and a Pacer

6    account to get that and see all of that?  Doesn't that

7    sort of -- Mr. Cargill suggests that it causes your

8    concern about the investigation safety of folks to sort

9    of ring hollow.

10           MR. HOFFMAN:  I can tell you this.  I didn't

11   know that.  I didn't know that those were unsealed at

12   the time we made these decisions.  When Mr. Cargill

13   pointed it out in his briefs, I investigated.

14           As the Court may have noticed in the brief,

15   these were not handled in my district.

16           THE COURT:  No.  For some reason, they were

17   handled in the Eastern District.

18           MR. HOFFMAN:  Location of the search;

19   location of the certain.

20           I knew that an application had been made,

21   but that's all we knew.  It wasn't until Mr. Cargill

22   raised this in his papers that I investigated and

23   learned, for some reason, and I do not know why, the

24   Assistant U.S. Attorney in EDVA, who's not investigating

25   this case -- not investigating this case, did not

1    request that that be sealed.  That's the explanation.

2            Again, I understand how it could look, but

3    two different departments, two different offices, one

4    apparently not talking to the other.  Didn't realize it

5    wasn't sealed.

6            Additionally, I think I will point out, you

7    know, a lack of a sealing order on an affidavit for a

8    search warrant buried in EDVA is very different than

9    revealing this information directly to the defendant --

10   directly to the defendant.  We're pretty confident the

11   information would have gotten back to Mr. Amador.  The

12   defendant was an active member of his drug conspiracy

13   that pushed heroin and cocaine across the United States,

14   back and forth.  That was our fear, our fear that he

15   would be gone.

16           THE COURT:  I appreciate that.  What else

17   would you like to say?

18           MR. HOFFMAN:  Just two points.

19           I agree with defense counsel when he said

20   the law is scant in the Fourth Circuit on this issue.  I

21   looked and looked and all I could really find was that

22   since it is open, the Court has the discretion to

23   entertain the evidence that it wants and to make a

24   decision.  That's what it comes down to. It's up to the

25   Court.

```
 1              THE COURT:  I want to hear all the evidence
 2    today.  I'm going to hear whatever evidence the parties
 3    want to put on, but I'm reserving the issue about
 4    whether or not -- I understand you brought people here
 5    from some distance; right?
 6              MR. HOFFMAN:  Yes, Your Honor.
 7              THE COURT:  They were already travelling by
 8    the time I heard about this.
 9              To make a record, we'll put the evidence on,
10    and I'm going to write an opinion, and then -- but I'm
11    going to decide in that opinion whether I'm considering
12    that evidence or not.  Okay? I'm going to say, A, either
13    I agree with Mr. Cargill's argument that this additional
14    evidence as to this other reason should not have been
15    put on and it shouldn't be reopened and I'm not
16    considering it.  Or I'm going to say the government has
17    provided sufficient justification, I am going to
18    consider it.  But I thought since we're all here and you
19    brought the folks, makes sense to put it all on. It's
20    not like I have a jury here.  I can decide whether I'm
21    going to consider this evidence or not.  That's what I
22    planned to do.  That's why when the law clerk called me
23    on Saturday and said, what should they do, I said, have
24    them come and we'll sort it out.  It seems to me I can
25    do that.
```

```
 1              I need to do a little more research on this

 2    reopening issue. I also wanted to see what your

 3    justification was.  I wanted to see what your story was

 4    with regard to this search warrant that was unsealed in

 5    the Eastern District and I also wanted to see what the

 6    nature of the evidence is.  It very well may be -- I

 7    don't know.  We'll have to see.

 8              What do you anticipate putting on today?

 9              MR. HOFFMAN:  I anticipate putting on

10    evidence through four witnesses.  Witness number one,

11    who is the young lady who came from California, she was

12    the wire tap monitor supervisor.

13              THE COURT:  Okay.

14              MR. HOFFMAN:  Through her, we will introduce

15    a sampling of some of the intercepted telephone calls.

16              Another witness we will call will be the

17    case agent at the time.  His name is Gregg Mervis.

18              This is the team, the investigation team

19    that was working together before the stop.

20              THE COURT:  Were they out of California?

21              MR. HOFFMAN:  There were two teams.  The

22    interpreter was working with the team in California and

23    then the remaining witnesses, Gregg Mervis, Paul

24    Loconti, Trooper Miller, who testified last time, were

25    here, based in Virginia, of course.
```

```
1              THE COURT:  All right.
2              MR. HOFFMAN:  We have a small hiccup I did
3    want to advise the Court on.  This morning -- our plan
4    was to have five witnesses and the fifth witness was
5    going to be a Virginia State Police, quote, expert, who
6    was going to testify that the lights in question are
7    indeed marker lights.  I received a message from him
8    this morning that he is sick and he can't make it.  So I
9    am prepared to --
10             THE COURT:  So the evidence on the 1017
11   issue is not available.
12             MR. HOFFMAN:  Unless the Court is willing to
13   accept it by proffer.  Of course, I'm willing to proffer
14   briefly what it would be.  I'm not sure at this point if
15   the Court would be willing to accept it.
16             THE COURT:  You know, I've studied this
17   issue about marker lights.  You cite Ragland and Oddi in
18   your brief for the proposition --
19             MR. HOFFMAN:  I remember Oddi.
20             THE COURT:  The thing about Oddi is you cite
21   some of the text on -- at head note three -- Westlaw #3.
22   It's at page two -- I'm sorry -- 350 and 351 of the
23   Virginia App site.  What you don't cite is the footnote
24   and it's footnote five in Oddi.  After reading all these
25   cases -- there's a case about the mirror.  There's a
```

```
 1   case about the passenger mirror and what these cases
 2   seem to say, I don't think -- I went back and neither of
 3   you cited the Virginia Administrative Code.  There is a
 4   set of regulations called the Virginia Administrative
 5   Code and Trooper Miller testified about it when he was
 6   here the last time because I couldn't find for the life
 7   of me where this 51 percent rule was on the LED lights.
 8   Remember, he said, if it's over 51 percent, then it's in
 9   violation.  And he said I couldn't give him a ticket for
10   it because there were more than 50 percent of the LED
11   lights that were functional.
12            But we went back, although neither side
13   really cited to it, we looked at the Virginia
14   Administrative Code on this.  There's another statute
15   that says unless the lights are approved, you can't even
16   have them on the truck.  The Virginia Administrative
17   Code talks about these LED lights and they say for those
18   vehicles that are equipped with multiple LED lights,
19   they will pass inspection if more than 50 percent of the
20   diode lights are burning.
21            I go to Harrisonburg a lot, as you know, Mr.
22   Hoffman, and I ride up and down the road and I've been
23   looking at every truck that passes me as I ride up and
24   down the road to Harrisonburg --
25            MR. HOFFMAN:  All three of us probably do at
```

1      this point.

2              THE COURT: -- and seeing which one of these

3      cars and trucks have lights and which one doesn't.

4              These are optional lights. I think Trooper

5      Miller testified there's a switch in the cab.  You can

6      turn them on, you can turn them off.  They're optional

7      lights.  I think footnote five in Oddi, the Virginia

8      Court of Appeals decision, says only devices and

9      equipment mentioned in 46.2-1002 are required to be kept

10     in non-defective condition, under 1003.  As a result,

11     assuming that some non-functioning optional equipment

12     would cause a vehicle to fail state inspection --

13     because these regs, these Virginia administrative

14     regulations go to whether or not it passes state

15     inspection.  That's what it goes to.  That's where that

16     51 percent goes.  It won't pass state inspection if more

17     than 51 percent of those little diodes are out. Anyway,

18     as a result, assuming that some non-functioning optional

19     equipment would cause a vehicle to fail state

20     inspection, such defective optional equipment would not

21     justify a stop under 46.2-1003.

22              So the 1003 issue is dead.  It is decided --

23     until the Fourth Circuit tells me I'm wrong, the 1003

24     issue is dead.  I'm glad I finally got to the end of the

25     road as to how these lights are allowed on trucks and

 1    they're allowed on trucks under the Virginia

 2    regulations.  The regulations say what will pass

 3    inspection and what won't pass inspection.  But it's not

 4    a violation of law for which you can get a ticket, even

 5    though many state courts, I understand, may have

 6    affirmed convictions on them.  It's not a violation of

 7    law under 1003 to have these little side lights that he

 8    testified about being out.

 9              So, it takes us back to the question as to

10    whether this round amber light he testified about and

11    these diode lights he testified about were, in fact,

12    marker lights.

13              In looking at that, the way I read the

14    statute and the way I look at it, marker lights on a

15    trailer have to be red lights up in each corner of the

16    back and three across the top.  Then on the -- on a

17    tractor, they have to be two amber lights on the front.

18    What they do is they show the dimension of the vehicle.

19              I really don't think these are marker

20    lights. I'm going to -- unless you've got further

21    evidence on that issue here today --

22              MR. HOFFMAN:  Not today, we don't.

23              THE COURT:  I do not believe these are

24    marker lights. I've tried to look at everything and I

25    really think the Virginia Court of Appeals, although

```
 1   some of the decisions sort of weave in and out, the

 2   notion of inspection versus required and safety, I

 3   really think this Oddi case and the case about the

 4   mirror makes it clear that if it's not required under

 5   1002 -- and these are not -- then optional lights do not

 6   provide a basis for stop under 1003.

 7              The officer testified -- and I assume he's

 8   not testifying today.

 9              MR. HOFFMAN:  He's here today.

10              THE COURT:  What could he possibly testify

11   to? Do you intend to call him?

12              MR. HOFFMAN:  I do.

13              THE COURT:  For what purpose?

14              MR. HOFFMAN:  He was going to provide and

15   I'm -- in light of the Court's explanation that you're

16   going to entertain testimony today, I might not call him

17   -- actually, I am.  A couple of things.  He needs to

18   testify, one, under the collective knowledge doctrine,

19   his receipt from the instructing officer to make the

20   stop, which is the required portion under the collective

21   knowledge doctrine.

22              THE COURT:  But he already testified that

23   the reason for the stop was for 1003 and that was the

24   sole reason.

25              MR. HOFFMAN:  He testified differently on
```

```
1    page 26 of the transcript.  So I think -- Your Honor,

2    I'm going to defer to his testimony --

3              THE COURT:  All he said there -- I got it.

4    I read it this morning.  He never said that he was

5    instructed to stop this vehicle.  He said, I was

6    informed that there was a truck possibly transporting

7    narcotics, a blue truck.  That's what he says.

8              MR. HOFFMAN:  Correct.  And I would ask the

9    Court to simply entertain his testimony, to hear him,

10   hear his explanation for his testimony and to bear in

11   mind that at this time, all members of the law

12   enforcement team were -- it was a high wire act.  They

13   were trying to do their jobs here, answer questions and

14   present evidence of the stop while at the same time not

15   disclosing that there's a bigger investigation that

16   would alert the main target in Southern California and

17   cause his flight.

18              I understand why the Court feels his

19   testimony may be limited.  I would ask the Court to --

20   and if the Court wants to examine the witness itself,

21   the Court certainly could.  But Trooper Miller will

22   testify that he was instructed.  He received

23   instructions. The other witnesses --

24              THE COURT:  How is that consistent with his

25   testimony on cross-examination that the sole reason for
```

1    the stop was the 1003 violation? That's what he says.

2                    MR. HOFFMAN:  I understand, Your Honor. I

3    think it's best if -- I don't want to speak on his

4    behalf.  I think --

5                    THE COURT:  It's your decision whether to

6    put that testimony on or not.

7                    MR. HOFFMAN:  It is, Your Honor, and we've

8    discussed it.  I've discussed it with the trooper.  He

9    does have an explanation and he does want to put it on.

10                   Your Honor, I will also emphasize before we

11   start that his testimony, that he received instructions

12   to conduct the stop, will be corroborated by other

13   individuals who were at the meeting when they all

14   discussed what was going to happen and the instruction

15   was issued.  You have the collective knowledge doctrine

16   and the instructions from the officer who did the stop.

17   It fits very neatly into the --

18                   THE COURT:  That's spackle on a crack in the

19   wall.

20                   MR. HOFFMAN:  This is why I started, Your

21   Honor, with saying I understand.  But again, I'll remind

22   the Court, the Court has not made a decision yet.

23   There's no appeal, no remand and with the timing, again,

24   Your Honor, I'd ask the Court to bear in mind that the

25   opportunity that we had to introduce this evidence, the

Miller - - Direct                    15

1    big target was still out.  If we introduced it, great

2    chance the message would get back to him and he'd be

3    gone.  That was the strategic decision we made at the

4    time and we appreciated the risks at the time.  After he

5    was arrested, we decided to present the additional

6    evidence.

7              Out of fairness to both parties, the

8    government would implore the Court to please consider

9    the additional evidence.

10             That's all we've got by way of opening

11   remarks.  If the Court has any questions or I can just

12   call our first witness.

13             THE COURT:  I want to hear from Mr. Cargill.

14             Thank you, Mr. Hoffman.

15             (Further proceedings had, but not

16   transcribed at this juncture).

17             MR. HOFFMAN:  Your Honor, we call Trooper

18   Miller.

19    JOSEPH MILLER, CALLED AS A WITNESS BY, THE GOVERNMENT,

20                          SWORN

21             THE COURT:  Nice to see you again.

22             THE WITNESS:  Yes, sir, you, too.

23                    DIRECT EXAMINATION

24   BY MR. HOFFMAN:

25      Q.  Trooper Miller, just for the record, please

Miller - - Direct                                    16

 1   reintroduce yourself to the Court.

 2       A.   Trooper Joseph Keith Miller.

 3       Q.   You work for Virginia State Police.

 4       A.   Yes, sir.

 5       Q.   You're a senior trooper?

 6       A.   Yes, sir.

 7       Q.   You've been with the state police for about 13

 8   years?

 9       A.   Yes, sir.

10       Q.   At one point, you were just a regular trooper;

11   correct?

12       A.   Correct.

13       Q.   For about nine years.

14       A.   Correct.

15       Q.   Let's go back into this case.  If I may, your

16   involvement was, you were the trooper, as you testified

17   before, who conducted the stop of the defendant's

18   vehicle on February 3, 2014; correct?

19       A.   Yes, sir.

20       Q.   Did you attend any meetings with other law

21   enforcement agencies prior to that stop?

22       A.   Yes, sir, I did.

23       Q.   Do you recall the date of that meeting?

24       A.   Yes, sir.

25       Q.   What was it?

Miller - - Direct

17

1    A.  It was February 3, 2014.

2    Q.  Do you recall the location?

3    A.  I believe it was at the Hampton Inn, in

4  Harrisonburg, at a hotel.

5    Q.  Do you recall the approximate time?

6    A.  I think it was approximately around four o'clock

7  in the morning.

8    Q.  Do you recall who attended the meeting?

9    A.  It was myself; my sergeant, Kevin Warzinski;

10  Special Agent Jimmy Akins; Trooper Jerry Moore; Trooper

11  Andy Fisher; and several of the DEA agents involved in

12  this case.

13    Q.  And did the DEA agents communicate information to

14  you and members of your team?

15    A.  They did.

16    Q.  Do you recall what was communicated to you?

17    A.  They provided us with a description of a tractor

18  trailer that was supposed to be coming northbound and

19  information we were provided was it was supposed to be

20  carrying a large quantity of narcotics.  They also had

21  advised us that they had a wire tap on the

22  investigation.

23    Q.  Was there any reference during the meeting to the

24  other stop of the defendant in which you were involved

25  that you recall?

Miller - - Direct                                                18

```
 1      A.  Not that I recall.

 2      Q.  And did the DEA agents ask you during this

 3  meeting to do anything?

 4      A.  They asked me to make a stop on the vehicle.  It

 5  was also discussed along with our, the members of my

 6  department, who is going to make the stop.  It was

 7  determined since I made the previous stop back in

 8  December that I would make this stop.

 9      Q.  Was there discussion about the type of stop that

10  you should conduct?

11      A.  My understanding was it was to be a directed

12  stop.

13      Q.  A what?

14      A.  A directed stop.

15      Q.  What does that mean?

16      A.  Basically, the information provided to us from

17  law enforcement to make a stop on the vehicle.

18      Q.  And was there a discussion about probable cause

19  at the meeting?

20              THE COURT:  Did you talk about this directed

21  stop issue before you came into this courtroom today?

22              THE WITNESS:  I'm sorry, Your Honor?

23              THE COURT:  Did you talk about this directed

24  stop issue before you came into this courtroom today?

25              THE WITNESS:  Yes, sir.
```

Miller - - Direct

1          THE COURT:  Who did you talk to about it?

2          THE WITNESS:  Special Agent Cutting.

3          THE COURT:  When did you talk to him about

4    it?

5          THE WITNESS:  During that meeting at the

6    Hampton Inn.

7          THE COURT:  Did you talk to any of these

8    other agents or the prosecutor about this directed stop

9    idea?

10          THE WITNESS:  No, sir.

11          THE COURT:  You didn't talk to them this

12    morning?

13          THE WITNESS:  No, sir.

14          THE COURT:  You didn't talk to them

15    yesterday?

16          THE WITNESS:  No, sir.

17          THE COURT:  You didn't talk to them out in

18    the hallway about it?

19          THE WITNESS:  No, sir.

20          THE COURT:  Do you remember testifying in

21    this case?

22          THE WITNESS:  Yes, sir, I do.

23          THE COURT:  Do you remember testifying at

24    all, anything about a directed stop at that time?

25          THE WITNESS:  No, sir.

Miller - - Direct

```
 1              THE COURT:  I don't think you did.
 2              Do you remember testifying in response to a
 3   question from Mr. Cargill that the sole probable cause
 4   for this stop was the 1003 violation, the lights?
 5              THE WITNESS:  Yes, sir.
 6              THE COURT:  Remember we sat there for hours
 7   talking about lights?
 8              THE WITNESS:  Yes, sir.
 9              THE COURT:  Did you ever mention for one
10   second during that hearing that this was a directed
11   stop?
12              THE WITNESS:  My understanding was --
13              THE COURT:  Did you ever mention for one
14   second that it was a directed stop?
15              THE WITNESS:  No, sir.
16              THE COURT:  And now you come into this
17   courtroom and say that it was; is that right?
18              THE WITNESS:  No, sir, that's not what I'm
19   --
20              THE COURT:  Is that what you're saying?
21              MR. HOFFMAN:  Your Honor, may I show him a
22   copy of the transcript?
23              THE COURT:  You may ask him whatever
24   questions you want in a minute.
25              You didn't say a word about directed stop at
```

1   that time, did you?

2                   THE WITNESS:  No, sir.

3                   THE COURT:  I think you said on page 26 of

4   the transcript that you had gotten word that there was a

5   suspected large quantity of narcotics coming into

6   Virginia; right?

7                   THE WITNESS:  Yes, sir.

8                   THE COURT:  And then you said you stopped

9   him because of the lights; right?

10                  THE WITNESS:  Yes, sir.

11                  Mr. Cargill, the conversation that I recall

12  that I think you're talking about --

13                  THE COURT:  Didn't we talk about lights for

14  about two hours?

15                  THE WITNESS:  Yes, sir, we did.

16                  THE COURT:  Wasn't there some question you

17  weren't certain which side of the truck these lights

18  that you supposedly saw were on or off? Remember, we

19  were all standing around the podium and we couldn't

20  figure out whether it was the passenger side or the

21  driver's side?

22                  THE WITNESS:  Yes, sir.

23                  THE COURT:  Did you talk that night about a

24  meeting with DEA?

25                  THE WITNESS:  No, sir.

Miller - - Direct

```
 1                    THE COURT:  Did you talk at your last
 2   hearing about a meeting with DEA?
 3                    THE WITNESS:  No, sir.
 4                    THE COURT:  Did you talk about DEA directing
 5   the stop?
 6                    THE WITNESS:  No, sir.
 7                    THE COURT:  Go ahead, Mr. Hoffman.
 8                    MR. HOFFMAN:  Thank you, Your Honor.
 9                    THE COURT:  In fact, it was only after I
10   wrote the opinion in this case in which I put in a
11   footnote on page one of that opinion that this whole
12   issue of a directed stop came up; isn't that right?
13                    You understand you're under oath?
14                    THE WITNESS:  Yes, sir.
15                    THE COURT:  Go ahead, Mr. Hoffman.
16   BY MR. HOFFMAN:
17      Q.  Trooper Miller, I'm going to show you your
18   transcript from before.
19      A.  Yes, sir.
20      Q.  This is page 26.
21                    "Question:  Let me interrupt you.  Before
22   you observed the vehicle coming, did you receive any
23   other information from law enforcement that day?
24                    "Answer:  Yes, sir, I did.
25                    "What did you receive?"
```

Miller - - Direct                                    23

1          Your answer is, "I received information that

2    the vehicle could possibly be transporting a large

3    quantity of narcotics."

4          Did I read that correctly?

5    A.   Yes, sir.

6    Q.   What information were you referring to at that

7    time? You received information that the vehicle could be

8    transporting a large quantity of narcotics.  What

9    information were you referring to?

10   A.   To the meeting we had had that morning.

11   Q.   The meeting you had just had?

12   A.   Yes, sir.

13   Q.   Now I'd like to go to the part the Court was just

14   asking you about of the transcript.  I believe it's on

15   page 72.

16          THE COURT:  Bottom of 71, top of 72.

17          MR. HOFFMAN:  Thank you, Your Honor.

18   BY MR. HOFFMAN:

19   Q.   Mr. Cargill says, the only reason -- he's asking,

20   the very beginning of your cross-examination, the only

21   reason that you stopped Mr. Covarrubaiz was because of

22   these defective lights; correct?  You say, correct.

23   That's the sole reason you stopped him.  And your answer

24   was "correct."

25   A.   Yes, sir.

Miller - - Direct

1    Q.  Why was that your answer? Please explain that to

2  the Court.

3    A.  I believed that the defense was asking me just

4  about the traffic infraction, not about the other

5  information coupled with the traffic stop.  I thought

6  the defense attorney was asking me solely the only

7  reason you stopped the vehicle, the tractor trailer, was

8  just for the traffic violation, just the lights being

9  out.  I didn't think he was asking me was that the only

10  reason, meaning that that was the only reason not based

11  on the information, not the totality of everything that

12  I knew.  I thought he was just referring to the traffic

13  stop itself, just the traffic violation since that's the

14  only violation that I actually stopped him for, was for

15  the lights.

16          THE COURT:  But the question was, the sole

17  reason you stopped him was for the 1003 violation.

18          THE WITNESS:  Correct, and that's the way I

19  interpreted it.

20          THE COURT:  You're telling me now that's not

21  true.

22          THE WITNESS:  It was a -- the information

23  that I was provided with in the morning was that DEA

24  wanted us to conduct a directed stop.

25          THE COURT:  Let me ask you this -- I'm

Miller - - Direct                                                25

1    sorry.  Go ahead and finish your answer.

2              THE WITNESS:  Our practice or my practice

3    is, and our team, that if we can find a legal traffic

4    violation, to find our own reasonable suspicion or

5    probable cause that we'll try to do that, incorporate it

6    into the other information that we have.

7              THE COURT:  Did you think on February 3 that

8    based on those LED lights and amber lights that you saw

9    that weren't working, did you think that you had

10   reasonable articulable suspicion?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  To do the stop.  I understand

13   what the DEA agents told you.

14             THE WITNESS:  Just for the traffic?

15             THE COURT:  Yeah, just for the traffic

16   infraction.

17             THE WITNESS:  Yes, sir.

18             THE COURT:  And you thought you did.

19             THE WITNESS:  Yes, sir. I've made numerous

20   stops on 81 for the exact same violation.

21             THE COURT:  Go ahead, Mr. Hoffman.

22   BY MR. HOFFMAN:

23     Q.  That day --

24             THE COURT:  Was it your understanding -- did

25   anybody from the DEA tell you, look, y'all go ahead and

Miller - - Direct

26

 1   try to establish probable cause on your own? Did that

 2   issue come up in that meeting?

 3             THE WITNESS:  Yes, sir.

 4             THE COURT:  What was said, if you will,

 5   Trooper Miller?

 6             THE WITNESS:  If I recall, I asked Cutting,

 7   who is the actual -- who I thought was the actual case

 8   agent in this case, if they wanted us to, in fact, do

 9   the directed stop and if I could provide my own

10   reasonable suspicion or probable cause to stop the

11   truck, if he wanted me to do that instead of the

12   directed stop.  That way, they didn't have to provide

13   the information for the directed stop later.  It was my

14   understanding they wanted us to, if we could, find our

15   own reasonable suspicion or probable cause to stop the

16   tractor trailer.

17             THE COURT:  That's, in fact, what you

18   thought you did.

19             THE WITNESS:  Yes, sir.

20             THE COURT:  That's why you answered the

21   question from Mr. Cargill that way.

22             THE WITNESS:  Correct.

23             THE COURT:  You thought when you pulled over

24   Covarrubaiz, just as you had done in December, that

25   those lights provided you with sufficient probable cause

1    to do that; right?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  In fact, you were acting that

4    morning when you pulled him over on your own probable

5    cause based on the lights; correct?

6              THE WITNESS:  Correct.

7              THE COURT:  You weren't acting pursuant to

8    that direction, were you?

9              THE WITNESS:  No, sir.

10             THE COURT:  Did you read my opinion where I

11   said I thought there wasn't probable cause to -- based

12   on my reading of 1002?

13             THE WITNESS:  Actually, Your Honor, I've

14   never even seen the opinion.

15             THE COURT:  All right.

16             He might not agree with it, but that's for

17   another day.

18             THE WITNESS:  I've honestly never even seen

19   the opinion that came out.

20   BY MR. HOFFMAN:

21      Q.  Trooper Miller, let me just clarify something you

22   just said.  Let me ask you this. Would you have made the

23   stop if you hadn't attended that meeting? Would you have

24   known to go and stop that car if you had not attended

25   the meeting at the hotel?

1        A.   No, sir.

2              THE COURT:  Had you seen him -- had you been

3    driving -- I think you were driving an unmarked car.

4              THE WITNESS:  Correct.

5              THE COURT:  You were driving along and you

6    said you stopped people for these kind of lights all the

7    time.  Had you seen those lights, would you have made

8    the stop, not knowing anything else about this meeting

9    or this drug activity?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Because those lights were not

12   functioning.

13             THE WITNESS:  Correct.

14             Like I say, prior, I've made numerous stops

15   for the exact same violation in numerous times and been

16   upheld in state court.

17             THE COURT:  You've issued citations.  You've

18   had state courts enter judgment based on that.

19             THE WITNESS:  Yes, sir.

20             THE COURT:  I went back and looked.  When

21   you testified last time, I went back and looked at the

22   Virginia regulations on these lights because I remember

23   you telling me that you couldn't give him a citation in

24   this case because it was more than 51 percent of the

25   lights.

```
1                THE WITNESS:  Operational.

2                THE COURT:  And that was in the regulations

3   that say you can't pass inspection if more than 51

4   percent of those little LED diodes aren't working.

5                THE WITNESS:  Correct.

6   BY MR. HOFFMAN:

7      Q.  Trooper Miller, I want the record to be very

8   clear.  Separate and apart from your stopping him, the

9   defendant, for the defective lights, what you perceived

10  to be a traffic violation, the other basis, the other

11  reason you were there was because DEA requested the

12  assistance of Virginia State Police to conduct that

13  specific stop; is that correct?

14     A.  Yes, sir.

15               THE COURT:  That's why they had the meeting.

16  That's why you were all gathered at three in the

17  morning.

18               THE WITNESS:  Yes, sir.

19               THE COURT:  You weren't there randomly

20  sitting at that interstate stop.  You were placed there

21  by the DEA; is that right?

22               THE WITNESS:  I wasn't specifically told

23  where to sit.  That's where I chose to sit, but I was

24  told to --

25               THE COURT:  But your team was contacted by
```

Miller - - Direct

30

1    DEA.  All you guys, you and Agent Warzinski and Jerry

2    Moore and Andy Fisher and all the other folks had been

3    brought in for the purpose of contacting this truck;

4    right?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  And you're told at this meeting

7    that if you can go ahead and establish probable cause

8    and do your own stop, do that; right?

9              THE WITNESS:  Correct.

10             THE COURT:  You thought you had done that

11   and that's what you did.

12             THE WITNESS:  Correct, yes, sir.

13             THE COURT:  That's why you answered the

14   question of Mr. Cargill the way you did last time.  As

15   far as you're concerned, the sole reason you stopped him

16   was because of the 1003 violation.

17             THE WITNESS:  Correct, yes, sir.

18   BY MR. HOFFMAN:

19     Q.  Finally, when you were testifying that day on

20   July 17, 2014, this transcript you just reviewed, were

21   you answering the questions as best and as accurately

22   and as truthfully as you could?

23     A.  Correct.

24             MR. HOFFMAN:  Thank you, Your Honor.

25             THE COURT:  Mr. Cargill?

Miller - - Cross

31

```
 1                    CROSS-EXAMINATION
 2  BY MR. CARGILL:
 3     Q.  Good afternoon, sir.
 4     A.  Good afternoon.
 5     Q.  When you testified in July of 2014, you raised
 6  your right hand.  You swore to tell the truth?
 7     A.  Correct.
 8     Q.  The whole truth?
 9     A.  Correct.
10     Q.  The whole truth?
11     A.  Correct.
12     Q.  What does that mean to you?
13     A.  To tell the truth.
14     Q.  What does the whole truth mean?
15     A.  To tell the truth.
16     Q.  Everything; right?
17     A.  Yes, sir.
18     Q.  So, I asked you, as you've been asked already --
19  let me just see if I'm clear about this, to begin with.
20  The only reason you stopped Mr. Covarrubaiz was because
21  of these defective lights; correct?  And you answered
22  correct, under oath?
23     A.  Yes.
24     Q.  Was that the whole truth?
25     A.  That question that you just asked me is exactly
```

Miller - - Cross

1   what I explained to the judge when he asked.  I thought

2   that day that you were asking specifically about the

3   traffic violation.

4       Q.  Was that the whole truth?

5       A.  My opinion, that's the question you were asking,

6   that's the way I answered.

7       Q.  So your belief is you told the whole truth then.

8       A.  Yes.

9       Q.  And then when I followed up and asked, so that's

10  the sole reason you stopped him, you said correct.

11      A.  Correct.

12      Q.  That again is the whole truth.

13      A.  Again, the way you asked the question is the way

14  I answered.

15      Q.  This is my fault for asking the question that

16  way? This is my fault? What could I have asked you that

17  would have elicited this information that it was a

18  directed stop, that you were directed to stop him?  What

19  could I have asked you?

20      A.  If it was a directed stop.

21      Q.  Was it a directed stop?

22      A.  I was there solely initially for a directed stop.

23      Q.  Did you not just testify to the judge that

24  despite what directions you were given, you were

25  stopping him only for this reason?

1    A.   I did develop my own probable cause and

2  reasonable suspicion to stop him.

3    Q.   So this was not a directed stop.

4    A.   This was a traffic infraction is the reason I

5  stopped him.

6    Q.   You were not acting pursuant to whatever

7  instruction or directions you had been given by anyone,

8  were you?

9    A.   I think I was doing both.

10   Q.   You were doing both, yet you told us the sole

11  reason was for the traffic violation?

12   A.   Again, on the question you asked that day, that's

13  why I responded the way I did.

14   Q.   Right, right.  Let me go back to earlier in your

15  testimony, and I'm on page 36.  This is in response to

16  someone else's questions, not mine.  You were asked,

17  quote, I think you briefly testified about this a moment

18  ago, but based on your observations, it appears that he

19  also has the exact same lights out as from the previous

20  stop; correct?  Yes, sir.

21      Then the question was, at this point, and this

22  was after you saw the bill of lading and the religious

23  items in the cab of the truck, at this point, has the

24  scope of your investigation expanded beyond defective

25  equipment?  Your answer was, yes, sir.

1        Do you remember that?

2    A.   Yes, sir.

3    Q.   What did you mean by that?

4    A.   That based on the driver's behavior, having the

5    bill of lading, all the things that I saw that day on

6    the traffic stop, that I had also, along with the

7    information that I had, that I should call K-9 and along

8    with the K-9 alert, we had more.

9    Q.   So that's when it turned into a drug

10   investigation.

11   A.   No, sir.

12   Q.   When did it turn into a drug investigation?

13   A.   It was a drug investigation from the moment that

14   DEA called us to do the directed stop.

15   Q.   From the very start, right?

16   A.   It was their drug investigation.

17   Q.   And yet, you never revealed this, that it was a

18   drug investigation from the very start, a directed drug

19   investigation from the very start, when you testified in

20   July, did you?

21   A.   I guess not, no, sir.

22   Q.   Now, the judge touched upon this, but --

23        THE COURT:  Back then, in July, was anybody

24   telling you to stay away from that topic, to not mention

25   the directed stop?  Was anybody saying don't go there,

```
 1   just talk about your probable cause?
 2              THE WITNESS:  No, sir.
 3   BY MR. CARGILL:
 4     Q.  You didn't have a meeting with the prosecutor or
 5   any of the DEA agents or the task force officers where
 6   you discussed whether you should mention the wire tap
 7   information and the directed stop? Never discussed that
 8   with anybody?
 9     A.  I actually didn't even have any information other
10   than DEA had a wire tap.  I never personally saw any of
11   the transcripts or any of the information involved with
12   the wire tap.
13     Q.  So all they told you is this is a truck going
14   down the highway, possibly transporting narcotics?
15     A.  Yes.
16     Q.  That's it?
17     A.  Yes.
18     Q.  Same truck that you stopped in December and that
19   you searched and found nothing.
20     A.  Yes.
21     Q.  Did you mention in any of your reports that you
22   prepared that this was a directed stop, that you had
23   been directed to stop?
24     A.  Not a directed stop, only that there was
25   information provided from the DEA.
```

1    Q.   But no mention that anyone had directed you to

2    stop Mr. Covarrubaiz.

3    A.   No, sir.

4    Q.   Now, between the July hearing and this hearing

5    today, did you talk to anybody about this whole directed

6    stop issue and this meeting you had at the Hampton Inn?

7    A.   No, sir.

8    Q.   You didn't speak to the prosecutor even?

9    A.   I spoke to the prosecutor, but just the questions

10   he asked me.

11   Q.   What were those?

12   A.   Basically, he asked me what was said with Agent

13   Cutting and basically what I testified to just earlier.

14   Q.   Did he mention to you that this whole issue had

15   arisen and that it was important that you discuss this

16   being a directed stop?

17   A.   No, sir.  He only --

18   Q.   Pardon me?

19   A.   No, sir.

20   Q.   No mention of directed stop when you met with the

21   prosecutor?

22   A.   I mentioned to him that when I met with the DEA

23   agents that morning that they wanted us to conduct a

24   directed stop.  However, I made my own reasonable

25   suspicion and probable cause for the defective lights.

1   Q.   What prompted you to say that to the prosecutor?

2   A.   Because that's what happened.

3   Q.   What prompted you to tell the prosecutor that?

4   A.   Because that's what happened.

5   Q.   What did he ask you that prompted you to answer

6   that question in that way, to say it was a directed

7   stop?

8   A.   Because that's what happened, so that's why I

9   told him.

10   Q.   I'm asking you, what did he ask you?  How did he

11   pose the question to you to cause you to mention that it

12   was a directed stop?

13   A.   I honestly don't remember the questions he asked

14   me, specifically.  I can't sit here and tell you what

15   exact questions he asked me.

16   Q.   Did he ask you what was the reason for the stop?

17   A.   Yes, which I just testified to.

18   Q.   And you said it was a directed stop.

19   A.   Correct.

20   Q.   And you said that to the prosecutor.

21   A.   Correct.

22   Q.   Yet, when I asked you whether your sole basis for

23   the stop was the defective lights, you answered yes.

24   A.   Yes, because the day that you asked me --

25   Q.   You answer one question one way when I'm asking

1  it and another way because the prosecutor's asking it.

2  Is that true?

3      A.  No, sir.  I think it's just the question that

4  you're asking.

5      Q.  Aren't we all entitled to the whole truth? Aren't

6  we all entitled to the whole truth? This Court, me, even

7  little old me, and the prosecutor?  Aren't we all

8  entitled to your whole truth?

9      A.  And I've provided the truth.

10     Q.  On July --

11         THE COURT:  But you didn't tell us anything

12  about a meeting with the DEA on the morning of February

13  3 and you didn't tell us anything about that back then

14  because if you had done that, we may not have had to

15  spend the last five hours here in Roanoke and had to

16  bring you down here for this. You didn't say a word

17  about that and I'm really troubled by it.  I really am.

18  BY MR. CARGILL:

19     Q.  Trooper Miller, you also testified, I think, in

20  response just now to the judge's questions that in fact,

21  these lights were in compliance with state law because

22  at least 51 percent of the diode bulbs were lit;

23  correct?

24     A.  In reference to the LEDs, I believe the majority

25  of those were operational.

Miller - - Redirect                                    39

1    Q.   Therefore, there was no reason to give him a

2  defective equipment citation; right?

3    A.   The yellow amber lights were actually defective.

4    Q.   So that's why you gave him a defective equipment

5  citation?

6    A.   Right.  I could not issue him a citation for the

7  LEDs because of the way the manual and code is written.

8  51 percent have to be not operational before you can

9  write a citation.

10    Q.   Let me close with this.  What question should I

11  have asked you in order to elicit from you that you had

12  this meeting at the Hampton Inn on February 3 where you

13  were directed to stop Mr. Covarrubaiz's truck?

14    A.   That, I can't answer, sir.

15         MR. CARGILL:  Thank you, sir.

16         THE COURT:  Mr. Hoffman?

17              REDIRECT EXAMINATION

18  BY MR. HOFFMAN:

19    Q.   Trooper Miller, during the last hearing, did

20  anyone ever ask you, did I, Mr. Cargill or the Court ask

21  you if you had a meeting at the hotel, a meeting with

22  the DEA prior to the stop?

23    A.   No, not that I recall.

24    Q.   Did anyone ask you if you had ever received

25  instructions from another agency to conduct the stop?

1    A.   During the hearing? Not that --

2    Q.   During the hearing.

3    A.   Not that I recall.

4    Q.   Again, did you tell the truth that day, back in

5    July of this year, 2014, to the best of your ability as

6    you were sitting in that chair that day?

7    A.   Yes, sir.

8    Q.   Based on the questions that you were asked.

9    A.   Yes, sir.

10        MR. HOFFMAN:  Thank you, Your Honor.

11   Nothing more.

12        THE COURT:  Are you aware of footnote five

13   in the case of Oddi vs. Commonwealth, 61 Virginia Court

14   or Appeals 346, decided by the Virginia Court of

15   Appeals -- I'm asking you -- on December 26, 2012, that

16   says the following.  This is a case involving brake

17   lights.  Only devices and equipment mentioned in

18   46.2-1002 are required to be kept in non-defective

19   condition under Code Section 46.2-1003.  As a result,

20   assuming that some non-functioning optional equipment

21   would cause a vehicle to fail state inspection, such

22   defective optional equipment would not justify a stop

23   under Code Section 46.2-1003.

24        Were you aware that that was the law in

25   Virginia at the time you engaged in this stop?

```
 1                THE WITNESS:  No, sir.  And it's my
 2    understanding if there is a light with a wire attached
 3    to it, and a bulb, then it has to be operational.
 4                THE COURT:  I think if you read the cases, I
 5    think you'll find that may be true for inspection
 6    purposes, but not to justify a stop under the Fourth
 7    Amendment of the U.S. Constitution.
 8                So you might want to get your supervisor to
 9    look at Oddi vs. Commonwealth, footnote five.
10                THE WITNESS:  Yes, sir.
11                THE COURT:  Any other questions for this
12    witness?
13                MR. HOFFMAN:  None from the government, Your
14    Honor.
15                THE COURT:  Thank you, Trooper Miller.
16                (Conclusion of requested excerpt).
17
18
19
20
21
22
23
24
25
```

1          **INDEX**

2     **WITNESS FOR GOVT.**

3     Joseph Miller
        Direct Examination by Mr. Hoffman...............15
4       Cross-Examination by Mr. Cargill...............31
        Redirect Examination by Mr. Hoffman............39
5

6

7

8

9

10

11

12    "I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled

14    matter.

15

16

17    /s/ Sonia Ferris                October 3, 2014"

18

19

20

21

22

23

24

25