```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF VIRGINIA
 2                     Harrisonburg Division

 3

 4  UNITED STATES OF AMERICA,      Criminal No. 5:14cr00019

 5              vs.                 Roanoke, Virginia

 6  GEORGE HENRY COVARRUBAIZ,

 7                  Defendant.    September 29, 2014

 8   TRANSCRIPT OF TESTIMONY OF BLANCA LOPEZ and GREGG MERVIS
           BEFORE THE HONORABLE MICHAEL F. URBANSKI,
 9                UNITED STATES DISTRICT JUDGE

10
    APPEARANCES:
11
    For the United States:
12                                  U.S. Attorney's Office
                                    GRAYSON HOFFMAN
13                                  116 N. Main St.  Room 130
                                    Harrisonburg, VA  22802
14

15  For the Defendant:
                                    Federal Public Defender's
16                                  Offc.
                                    RANDY V. CARGILL
17                                  210 First St. SW Ste. 420
                                    Roanoke, VA  24011
18
    Court Reporter:                 Sonia R. Ferris, RPR
19                                  U.S. Court Reporter
                                    116 N. Main St.  Room 314
20                                  Harrisonburg, VA 22802
                                    540.434.3181 Ext. 7
21

22

23

24

25  Proceedings recorded by mechanical stenography;
    transcript produced by computer.
```

1              MR. HOFFMAN:  Your Honor, we'll start with

2    our first witness, Blanca Lopez.

3      BLANCA LOPEZ, CALLED AS A WITNESS BY THE GOVERNMENT,

4                          SWORN

5              THE COURT:  Good afternoon.

6              THE WITNESS:  Good afternoon.

7                    DIRECT EXAMINATION

8    BY MR. HOFFMAN:

9      Q.  Would you please just introduce yourself?  State

10   your full name for the judge, please.

11     A.  Blanca Lopez.

12     Q.  And in what city and state do you presently

13   reside?

14     A.  I reside in Diamond Bar, California.

15     Q.  Is that Southern California?

16     A.  Yes.

17     Q.  Who do you work for?

18     A.  I work for RET Monitoring, Incorporated; contract

19   company for the Drug Enforcement Administration.

20     Q.  What's your native language?

21     A.  Spanish.

22     Q.  Where is RET Monitoring, Incorporated, located?

23     A.  Tuscon, Arizona.

24     Q.  And what is your current job at RET Monitoring?

25     A.  I'm a linguist.

Lopez - - Direct                                            3

```
 1      Q.   Do you hold any type of supervisory capacity or
 2   are you just a linguist?
 3      A.   I'm a supervisor linguist.
 4      Q.   What do you do at RET as a supervisory linguist?
 5      A.   I work on wire tap investigations, supervising
 6   other linguists.
 7      Q.   Do you supervise monitors?
 8      A.   Yes.
 9      Q.   Do you ever do any monitoring yourself?
10      A.   Yes, I do.
11      Q.   Would you just take two seconds and explain to
12   the Court, when you say you monitor yourself, what does
13   that mean?
14      A.   We monitor wire tap investigations, live
15   conversations, Title III investigations.
16      Q.   Do you also participate in transcribing?
17      A.   Yes, I do.  I mostly do the quality control on
18   transcripts.
19      Q.   So, you review transcripts also.
20      A.   Correct.
21      Q.   Do you perform -- let me back up.  Are the calls
22   always in English?
23      A.   No. The majority are in Spanish.  I would say
24   about 95 percent in Spanish.
25      Q.   Do you then interpret calls into English?
```

Lopez - - Direct

4

1    A.   Correct.

2    Q.   Your monitors that you supervise do the same?

3    A.   Yes.

4    Q.   The quality control you mentioned a moment ago

5    that you exercise, is that over the transcriptions and

6    over the interpretations?

7    A.   Yes.

8    Q.   A moment ago, I believe you testified that RET is

9    a monitoring company that's contracted with DEA?

10   A.   Correct.

11   Q.   Does RET do work for other agencies?

12   A.   Yes. They also do work for any law enforcement

13   agencies; FBI, ATF, ICE.

14   Q.   Tell us how your job works mechanically, on a

15   daily basis.

16   A.   We are in a wire room area.  Live conversations

17   come in.  We monitor them.  We write a synopsis because

18   usually, the conversations are in Spanish. We then write

19   the synopsis in English. Basically, that's what we do.

20   Q.   The synopsis, is that also called a line sheet?

21   A.   Yes.

22   Q.   At some point in time, is that synopsis

23   transcribed completely?

24   A.   Yes, at some point.

25   Q.   After it's transcribed, it could then be

Lopez - - Direct

5

1    interpreted, translated?

2        A.   Yes.   It's transcribed in English and then

3    translated.

4        Q.   Thank you.

5             What percentage of the calls would you say that

6    you monitor are in Spanish?

7        A.   About 95 percent.

8        Q.   How long have you been a supervisory linguist or

9    supervisory monitor at RET?

10       A.   Approximately 16 years.

11       Q.   16 years, as a supervisor.

12       A.   Yes.

13       Q.   How many different wire tap investigations do you

14   believe you've worked in, participated in?

15       A.   Hundreds.

16       Q.   Hundreds?

17       A.   Hundreds.

18       Q.   And in those hundreds, does that 95 percent

19   Spanish rule apply? It's always been 95 percent, give or

20   take?

21       A.   Yes.

22       Q.   And since you've been with RET, how many calls

23   individually do you believe that you've monitored and

24   transcribed?

25       A.   Hundreds.

Lopez - - Direct

6

```
 1      Q.   How many calls do you think you've interpreted
 2   from Spanish to English?
 3      A.   Hundreds.
 4      Q.   What were you doing before 1999 when you joined
 5   RET?
 6      A.   I was -- I worked for a law firm as a legal
 7   secretary.
 8      Q.   Did you ever work for a company called
 9   Professional Translators?
10      A.   Yes.
11      Q.   How long did you work there?
12      A.   For about a year.
13      Q.   What were you doing for Professional Translators?
14      A.   I was a monitor linguist.
15      Q.   So, same kind of thing?
16      A.   Yes.
17      Q.   Did you go to college?
18      A.   Yes.
19      Q.   Where did you go?
20      A.   Cal State University.
21      Q.   Did you obtain a degree?
22      A.   It was a certificate program.  I was certified as
23   a legal interpreter and translator.
24      Q.   In what year did you obtain that certification?
25      A.   1998.
```

Lopez - - Direct

7

1    Q.  Since then, have you undergone continuing

2  certification requirements of any kind?

3    A.  Yes.

4    Q.  Tell us about those.

5    A.  We are recertified every five years by the

6  Attorney General's office.

7    Q.  Attorney General's office, of California?

8    A.  Yes.

9    Q.  What does that recertification process every five

10  years entail?

11    A.  We take a class and we are certified to conduct

12  Title III wire tap investigations, monitor them.

13    Q.  In your monitoring career, have you ever trained

14  other monitors yourself?

15    A.  Yes.

16    Q.  I want to break it down, the monitoring process

17  just a little more than we did a moment ago.  I want --

18  let's tailor it how your current job, how you do it in

19  your current job.

20        So, there's a monitor waiting.  What happens when

21  a call comes in?

22    A.  We listen to the call.  It's real time.  Listen

23  to the call, write a synopsis of the call.  The call

24  will give us all detailed information, whether the call

25  is incoming, outgoing, dial digits, and we get the audio

Lopez - - Direct

8

1    of the call, date, time.  We get the audio of the call.

2    Then we translate the call from Spanish to English on

3    the line sheet.

4        Q.  Before you get there, you, sitting there as the

5    monitor, do you have to make a decision about the call

6    at any time?

7        A.  Yes.  Based on the content of the call, we decide

8    or try to decipher whether it's drug related, it's

9    pertinent, it's coded, does it have any coded language.

10       Q.  You're deciding if it's pertinent or

11   non-pertinent?

12       A.  Correct.

13       Q.  If it's non-pertinent, do you continue listening?

14       A.  We minimize the call.

15       Q.  Minimize the call; what does that mean?

16       A.  We stop recording.

17       Q.  You stop recording.

18       A.  Then we spot check it and start recording again.

19       Q.  What does spot checking mean?

20       A.  We listen to it for another 30 seconds and then

21   determine whether it's still non-pertinent or whether it

22   goes back to being a pertinent call.  Then we continue

23   to record.

24       Q.  When you intercept a call that has pertinent

25   information, what do you do with that information?

Lopez - - Direct

9

1    A.   We give it to the case agent, pass that

2    information along to the case agent.

3    Q.   Right then or at a later time?

4    A.   Right then.

5    Q.   Then how does your quality control process work

6    now?

7    A.   That's after a call has been synopsized and I or

8    another lead monitor can go into the call and listen to

9    the call for quality control, review it for the content,

10   the voices, information.

11   Q.   And you are a supervisor who conducts the quality

12   control review?

13   A.   For the transcripts, yes.

14   Q.   And in that, I want to make sure I'm

15   understanding you right.  You go and you listen to the

16   call again and you confirm that the transcript that was

17   created and the interpretation are correct.

18   A.   Correct.

19   Q.   When did you become involved in this

20   investigation?

21   A.   I don't remember the exact time that we started

22   that investigation.  I believe it was November of 2013.

23   Q.   Which names do you remember hearing in some of

24   the calls that you were involved with in this

25   investigation?

1      A.   From November?

2      Q.   November and forward.

3      A.   Okay.

4      Q.   This whole investigation.

5      A.   There was Everardo; there was Guillermo;

6   Benjamin; Jorge; Junior; Tarula; Surdo; Mono; Daniel;

7   Surdo; Juan.  That's what I remember from memory right

8   now.

9      Q.   Did you ever hear the defendant's name?

10     A.   George?  Did I mention him; yes.

11     Q.   You did not.

12     A.   I'm sorry, yes; George.

13     Q.   How long approximately was this particular wire

14   tap investigation?

15     A.   I believe it was around four months.

16     Q.   And were you -- at that time, you were a

17   supervising monitor?

18     A.   Yes.

19     Q.   And in terms of the process and the quality

20   control and everything you've already testified about,

21   did you follow those procedures with this investigation?

22     A.   Yes.

23     Q.   And let's break it down a bit.  A moment ago, you

24   testified that when you receive information as a monitor

25   or as a supervisory monitor that you share that

Lopez - - Direct

1    information quickly with the agents.

2        A.   Correct.

3        Q.   Were you doing that back toward the beginning of

4    this investigation?

5        A.   Yes.

6        Q.   Did you do that throughout this investigation?

7        A.   Yes.

8        Q.   In the beginning of the investigation, who were

9    you sharing the information with?

10       A.   Andrew Vestie.

11       Q.   Who was Andrew Vestie?

12       A.   He's the case agent on that particular

13   investigation.

14       Q.   Where does Andrew Vestie work?

15       A.   Los Angeles, California.

16       Q.   Do you know who he works for?

17       A.   He works for Fontana Police Department.  He's

18   assigned as a task force officer for the Drug

19   Enforcement Administration.

20       Q.   So, that's in November. Let's fast forward to the

21   end of January.  Were you working as a monitor at the

22   end of January?

23       A.   Yes.

24       Q.   Did there come a point in time at the end of

25   January, last couple of days of January, where you were

1  passing information to a different agent?

2  A.  Yes.

3  Q.  At the end of January, to whom were you passing

4  wire tap information?

5  A.  Gregg Mervis.

6  Q.  Who is Gregg Mervis?

7  A.  He's a DEA agent.

8  Q.  Where?

9  A.  Virginia, D.C.

10  Q.  Why did you pass information to Gregg Mervis, in

11  Virginia? Why Virginia?

12  A.  Per the instruction of Andrew Vestie, knowing

13  that there was a vehicle that was going to be travelling

14  to Virginia.

15  Q.  How did you share the investigation with Gregg

16  Mervis?

17  A.  By telephone.

18  Q.  For the next few days, did you continue to pass

19  information obtained on the wire tap on which you were

20  working to Gregg Mervis?

21  A.  Yes.

22  Q.  Did you continue to pass information right up

23  through February 3?

24  A.  Yes.

25  Q.  One moment, Your Honor.

1           (Government Exhibits #1B and #1-#20 were marked

2      for identification).

3           In preparation for today's hearing, did you have

4      an opportunity to listen to some of the calls that were

5      monitored?

6      A.   Yes.

7      Q.   And did you review transcripts in connection with

8      those?

9      A.   Yes.

10     Q.   Your Honor, may I approach the witness?

11          I'm showing you what has been marked Government

12     Exhibit 1B.  Do you recognize this disc?

13     A.   Yes.

14     Q.   How do you recognize it?

15     A.   Those are my initials.  I initialed it.

16     Q.   Did you listen to items on this disc?

17     A.   Yes.

18     Q.   I'm also showing you what has been marked for

19     identification as Government 1 through 20.  Without

20     saying what they are, would you just take a moment and

21     flip through those and just tell me if you recognize

22     what they are, if you've seen those documents before?

23     A.   (Witness reviewing said documents).  They're

24     transcripts of some of the recorded conversations in

25     this investigation that were prepared by the monitors

1    and reviewed by me.

2        Q.  How do you recognize this?

3        A.  I initialed them.

4        Q.  You initialed every single one?

5        A.  I initialed every single one of them and the face

6    on the cover sheet, there's my name, which indicates

7    that I did the reviewing, the quality control for these

8    transcripts.

9        Q.  You reviewed all of these; correct?

10       A.  Correct.

11       Q.  And more recently, you reviewed them again while

12   listening to the audio on Government Exhibit 1B?

13       A.  Correct.

14       Q.  When you reviewed them, were the transcriptions

15   accurate?

16       A.  Yes.

17       Q.  Were the translations from Spanish to English

18   accurate?

19       A.  Yes.

20            MR. HOFFMAN:  Your Honor, we'd move to admit

21   1B and 1 through 20 into evidence for purposes of this

22   hearing.

23            THE COURT:  1B.

24            MR. HOFFMAN:  1B and 1 through 20.

25            MR. CARGILL:  Yes, I do object, Your Honor.

Lopez - - Direct

```
 1   Unless and until the United States can show these
 2   transcripts were used by the officers who supposedly
 3   concluded that there was probable cause to stop, I don't
 4   think they're relevant.
 5            MR. HOFFMAN:  Your Honor, she's already
 6   testified that she delivered the information from these
 7   transcripts and from this to Gregg Mervis and other
 8   agents.  Gregg Mervis will testify in a moment, but I
 9   believe she's already testified, provided the Court with
10   sufficient facts that she relayed this information to a
11   member of the investigation team.  That's as relevant as
12   it comes.
13            MR. CARGILL:  Your Honor, there's been no
14   evidence that these transcripts were even in existence,
15   had been typed up and prepared as of the date of this
16   stop on February 3.  Perhaps my colleague could ask her
17   that question.
18            THE COURT:  I think what she said was when
19   they got a phone call, in real time, that was relevant,
20   she would share that with the case agent.
21            I would assume, Ms. Lopez, that the
22   transcripts were prepared later on.
23            THE WITNESS:  That's correct.
24   BY MR. HOFFMAN:
25      Q.  How much later usually?
```

Lopez - - Direct

1      A.   Sometimes one week; sometimes six months. It

2    depends on the investigation.

3                 THE COURT:  Do you know when these

4    transcripts were prepared?

5                 THE WITNESS:  The dates are -- no, I can't

6    say exactly when.

7    BY MR. HOFFMAN:

8      Q.   The information that was in these though, correct

9    me if I'm wrong, you passed that information to Gregg

10   Mervis and to Andrew Vestie?

11     A.   That information was passed on, real time.

12     Q.   Immediately, when you received it.

13     A.   Yes.

14                THE COURT:  When you say real time, how was

15   it passed on?

16                THE WITNESS:  We are intercepting the

17   conversation.  We listen to the call and we pick up the

18   phone and we are pretty much translating what we're

19   listening to, to the case agent.

20                THE COURT:  You're actually picking up the

21   call, got a call, you need to hear this, this is what

22   they're saying.

23                THE WITNESS:  This is what they're saying.

24                THE COURT:  This is what they're saying.

25   All right.

1              I am going to sustain the objection at this

2    time.  I think there hasn't been a showing the agent has

3    actually reviewed these transcripts. I think the witness

4    can testify as to what, prior to the search, she told

5    the agents or the agents can testify as to what they

6    learned.  But as to the transcripts themselves, there's

7    been no showing they were in existence and the agents

8    had knowledge of them prior to the stop in this case.

9              MR. HOFFMAN:  Your Honor, maybe I should

10   clarify.  These are being introduced as an aid for the

11   Court to follow along with, what is said on the calls,

12   which are in Spanish.  We are not going to argue that

13   the agents reviewed these actual transcripts. These are

14   simply an aid which can be admitted into evidence simply

15   for the purpose of following along with ease of the

16   call.

17             THE COURT:  You intend to play the calls

18   here?

19             MR. HOFFMAN:  Oh, yes, yes, Your Honor.

20             THE COURT:  They're in Spanish?

21             MR. HOFFMAN:  Yes, Your Honor.

22             THE COURT:  What good is that going to do

23   me?

24             MR. HOFFMAN:  They've been interpreted.

25             THE COURT:  They've been interpreted.

1           MR. HOFFMAN:  Into English, as she just

2    testified, and the interpretation will be played on the

3    --

4           THE COURT:  On the screen?

5           MR. HOFFMAN:  Yes, Your Honor.  That's the

6    only purpose.

7           I think you'll hear, obviously, Ms. Lopez

8    speaks fluent Spanish.  Gregg Mervis will testify he's a

9    fluency level four, completely fluent Spanish speaker.

10   The people that were involved were Spanish speakers.

11   We're not going to testify that they relied on these

12   actual transcripts in developing their probable cause.

13   This is for the Court --

14          THE COURT:  You understand that,

15   Mr. Cargill?

16          MR. CARGILL:  Yes, and I still object, Your

17   Honor.

18          THE COURT:  I'm going to --

19          MR. CARGILL:  How do we know this is the

20   person who prepared the transcript?  She's the one who

21   testified she reviewed it, but she never testified she

22   is the person who was speaking to Agent Mervis, as far

23   as I could tell.

24          MR. HOFFMAN:  She did just testify a moment

25   ago that she herself spoke to Agent Mervis for a period

1    of approximately six days. She doesn't need to testify,

2    under the law, that she is the one who actually prepared

3    the transcripts.  She only needs to testify -- she

4    testified she's a supervisory monitor. She executed the

5    quality control process.  She listened to every single

6    call, confirmed the transcription was accurate and the

7    translation was accurate.

8                    The way we've done it in trials before --

9                    THE COURT:  How do you know these particular

10   calls set forth on this disc and set forth in these

11   transcripts were actually given to the case agent?

12                   THE WITNESS:  I'm sorry.  Can you repeat

13   that?

14                   THE COURT:  Yes.

15                   How do you know this information was related

16   to the case agent?

17                   THE WITNESS:  I myself related some of the

18   calls.  I can't say exactly which call until I see the

19   synopsis of the call.  But if it wasn't myself, it was

20   someone working in the investigation when the calls were

21   coming in.  That information gets relayed to the case

22   agent.

23                   THE COURT:  How do you know each of these

24   calls were relayed to the case agent?

25                   THE WITNESS:  That's our job.  That's what

1    we do. Every time a call comes in which has anything to

2    do with any coded language, it's always passed along to

3    the case agent.  That's part of our job.

4              THE COURT:  So you can testify and you've

5    reviewed these transcripts and you've reviewed this disc

6    that every one of those calls was passed on by you or

7    somebody working for you, to the case agent.

8              THE WITNESS:  Yes.

9              THE COURT:  In this case, Mr. Mervis or Mr.

10   Laconti.

11             THE WITNESS:  Or Mr. Vestie.

12             THE COURT:  Mr. Vestie.

13             I'll allow them.  I understand your

14   objection.

15             Please proceed.

16             (Government Exhibits #1B and #1-#20 were

17   admitted into evidence).

18   BY MR. HOFFMAN:

19      Q.  Let me just clarify something.

20          Which agent between, let's say, January 29 and

21   February 3rd, which agent, at the end, were you

22   communicating the information to?

23      A.  It would first go to Mervis and then it would go

24   to Vestie.

25      Q.  But you were communicating it yourself to Gregg

Lopez - - Cross                                                21

```
 1    Mervis.
 2       A.  Yes.  If I was present in the wire room, yes, I
 3    always communicated to Mervis first.
 4               MR. HOFFMAN:  Your Honor, I think at this
 5    point, it makes the most sense to go ahead and play the
 6    calls for the Court.  They're all pretty brief.  We'll
 7    go from one to the next, with the Court's indulgence.
 8               THE COURT:  Yes, please.
 9               (Audio played).
10               MR. HOFFMAN:  That's all our questions for
11    this witness, Your Honor.
12               THE COURT:  Mr. Cargill, any cross?
13               MR. CARGILL:  Yes.  Thank you, Your Honor.
14                    CROSS-EXAMINATION
15    BY MR. CARGILL:
16       Q.  Good afternoon, ma'am.
17       A.  Good afternoon.
18       Q.  So, I'm clear, we just heard a total of 19 calls;
19    is that right?
20       A.  I'm sorry. I didn't count them.
21       Q.  If there were 19 transcripts and numbered
22    exhibits -- or pardon me, 20 numbered exhibits with
23    transcripts attached to each, would that be consistent
24    with what we just heard?
25       A.  Yes.
```

Lopez - - Cross

1    Q.   And for those 20 conversations, you were not the

2  person who transcribed any of those; correct?

3    A.   Correct.

4    Q.   In each instance, it was either Ms. Armenta, Ms.

5  Elias; correct?

6    A.   Correct.

7    Q.   Or Ms. or Mr. Carranza; correct?

8    A.   Mr.; yes.

9    Q.   Carranza?

10   A.   Carranza, yes.

11   Q.   In each instance, you reviewed the transcripts

12  after they were prepared; correct?

13   A.   Correct.

14   Q.   And all these transcripts were prepared after

15  this February 3 stop of Mr. Covarrubaiz in Virginia;

16  correct?

17   A.   Correct.

18   Q.   Now, you mentioned also that there were synopsis

19  or synopses prepared of each one of these conversations;

20  correct?

21   A.   Correct.

22   Q.   When are these to be prepared?

23   A.   Those are prepared right after the intercepted

24  conversation.

25   Q.   Meaning?

Lopez - - Cross

1   A.   Meaning once the audio comes in, the audio is

2   recorded and can be re-listened to.  Then the synopsis

3   of the recorded conversation is prepared, in English.

4   Q.   And that's prepared by the person who listens to

5   the conversation?

6   A.   Not necessarily.  If that person who listened to

7   the conversation has ten other conversations that that

8   person monitored, somebody else can come in and

9   synopsize the call.

10   Q.   When were the synopses prepared for each one of

11   these calls?

12   A.   They should have -- well, both are prepared right

13   after the telephone conversation is recorded.

14   Q.   When?

15   A.   On the day of the recorded conversation.

16   Q.   Have you looked at the synopses for each one of

17   these conversations?

18   A.   Yes.

19   Q.   At the bottom left-hand corner of each one of

20   these synopses, is there not a date and a time stamp?

21   A.   Yes.

22   Q.   Would that indicate when the synopsis was

23   prepared?

24   A.   No, that indicates when the conversation was

25   recorded.

Lopez - - Cross

24

 1          (Defendant Exhibit #1 was marked for

 2   identification).

 3      Q.   Ms. Lopez, can you see that on your monitor?

 4      A.   Yes.

 5      Q.   And is that a synopsis of a telephone

 6   conversation on 1/29 of 2014, at 3:19 in the afternoon?

 7      A.   Yes.

 8      Q.   And in the bottom left-hand corner, do you see

 9   the date?

10      A.   Yes.

11      Q.   What's the date and the time?

12      A.   February 5, 2014, at 2:48 p.m.

13      Q.   That would be when the synopsis was prepared?

14      A.   No.

15      Q.   Why not?

16      A.   I don't know.  Our synopsis never had this date

17   down here. I don't know what this date means. I don't

18   know if that's when it was printed.  I'm not sure.

19      Q.   Is there anything on this document then that

20   tells us when this was prepared?

21      A.   No.

22      Q.   Internally, do you indicate on the document when

23   it was prepared?

24      A.   We do not.

25      Q.   Why not?

Lopez - - Cross

1      A.  It's never been the practice of us to put the

2  date or the time the synopsis was prepared because like

3  I said, they're usually prepared right after the

4  conversation is recorded and monitored.

5      Q.  Nor do you put the date of the transcription on

6  the transcript?

7      A.  On the transcript, no.

8      Q.  Why not?

9      A.  It's never been the practice.

10              THE COURT:  What does that date and time

11  mean on this document?

12              THE WITNESS:  I don't know.  I'm thinking it

13  was the date it was printed.  I'm not sure because I

14  believe it's different fonts.

15              THE COURT:  Are you the supervisor who is

16  responsible for these synopses?

17              THE WITNESS:  Yes.

18              THE COURT:  And you can't tell me what date

19  means.

20              THE WITNESS:  When we print out our

21  synopsis, we don't have the date and time stamped here

22  nor does it say Covarrubaiz wire taps.

23              THE COURT:  That little thing in the middle

24  of the page where it says Covarrubaiz wire taps.

25              THE WITNESS:  Correct.  When we print out

Lopez - - Cross

1  our synopsis, it doesn't have this date or this
2  information.
3           THE COURT:  But it's not your practice to
4  put a date or time when the synopsis is prepared.
5           THE WITNESS:  Correct.
6           THE COURT:  And it's not your practice to
7  put a date or time the transcript is prepared.
8           THE WITNESS:  Correct.
9  BY MR. CARGILL:
10     Q.  And for these 20 telephone calls which we just
11  heard and for which the transcripts were prepared, how
12  many of those calls involved Mr. Covarrubaiz?
13     A.  I believe it was two or three telephone
14  conversations.
15     Q.  2 out of about 20; correct?
16     A.  Yes, or maybe three of these.
17     Q.  Who decided that these 20 calls were the ones
18  that would support the idea that there was cause to stop
19  his car, his truck? Who made that decision?
20     A.  I don't know, sir.  We transcribe all the calls
21  and that would be up to, I believe, the case agent.
22     Q.  So can you say how many calls there were total
23  between Mr. Amador, who was the owner of this trucking
24  company, and Mr. Covarrubaiz during this time period?
25     A.  There were more calls than just these.

Lopez - - Cross

1    Q.   There were more.

2    A.   Yes.

3    Q.   But they weren't transcribed?

4    A.   Yes, we transcribe all the pertinent calls.

5    Q.   Who decides whether it's pertinent or not?

6    A.   The case agent and us, depending on what we

7    listen to.

8    Q.   Is the case agent listening real time to each one

9    of the calls?

10   A.   No, the case agent doesn't listen to, but we give

11   him the information on the call.

12   Q.   So you're making the call as to whether it's

13   relevant to a drug investigation.  In the first

14   instance, you are.

15   A.   If we believe there is drug related information,

16   coded information, then we pass along that information

17   to the case agent.

18   Q.   But if you don't think it has anything to do with

19   drugs, you don't pass it along for the case agent?

20   A.   We still do for any relevant information, whether

21   they're talking about vehicles, addresses, names, yes.

22   We pass along a lot of information.

23   Q.   What if it's entirely inconsistent with the idea

24   drugs are involved?

25   A.   If we don't believe there is anything in that

Lopez - - Cross

28

1   call, then we do not.

2      Q.   What if it undercuts the idea that there's

3   probable cause? Do you pass that on?

4      A.   Sometimes we do.

5      Q.   Sometimes?

6      A.   Yes.

7      Q.   Sometimes you don't.

8      A.   Most of the time, like I said, it depends on the

9   content.

10      Q.   Now it's most of the time?

11      A.   It depends on the content of the call, of the

12   conversation.

13      Q.   Now, with these calls, how is it that the agent

14   gets this information, real time?

15      A.   We call him when the call is being recorded.

16   When we're listening to the audio of the conversation,

17   we call the case agent.  We let them know what the

18   parties are talking about.

19      Q.   And that would be the person who's listening to

20   the conversation?

21      A.   Correct.

22      Q.   And who was listening to each one of these

23   conversations?

24      A.   The monitors, us, the linguists.

25      Q.   Who?

Lopez - - Cross

1    A.   The linguists who are assigned to this

2  investigation.

3    Q.   These are human beings; correct?

4    A.   Correct; the people who are listening to the

5  conversation.

6    Q.   They have names?

7    A.   Yes.  There's 12 people in any given

8  investigation.  I can name all of them.

9    Q.   Well, take Government Exhibit #1, the first call.

10 This happens to be one of the two between Mr.

11 Covarrubaiz and Mr. Amador.  Who listened to that

12 conversation?

13   A.   The transcriber is not necessarily the person who

14 monitored the call.  I would have to go back and look at

15 the pen register information and/or the synopsis to see

16 who actually monitored that specific conversation.

17   Q.   So you don't know as you sit here who monitored

18 that conversation or any of these conversations;

19 correct?

20   A.   Not by memory, no.

21   Q.   And you don't know, therefore, what these

22 monitors said to the agent, do you?

23   A.   Not exactly in those words, no.

24   Q.   Not exactly in those words?

25   A.   Not their exact words, no, I wouldn't know.

Lopez - - Cross

1    Unless it was me, yes, I would know.

2        Q.   Were you the monitor for any of these 20 calls?

3        A.   I believe I was.

4        Q.   Which one?

5        A.   Like I said, I don't know from memory.  I would

6    have to look at the pen register and see who exactly

7    monitored those calls.

8        Q.   Well, you flew out here from California; right?

9        A.   Correct.

10       Q.   That's a long flight; correct?

11       A.   Correct.

12       Q.   You knew you were going to be coming to testify

13   today; correct?

14       A.   Correct.

15       Q.   Did you look all this information up?

16       A.   I listened to the recorded conversations and I

17   went over the transcripts, yes.

18       Q.   But did you find out who monitored each one of

19   these calls or find out which call you specifically

20   monitored?

21       A.   I did not.

22       Q.   So as you sit here, you cannot say what any of

23   the monitors of these conversations said to the agent

24   about what occurred during these conversations, can you?

25       A.   Not by memory.  I can't remember exactly what was

Lopez - - Cross

1    said to the case agent, but whatever information was

2    obtained or heard would have been passed along.  That's

3    what we do.  That's our job.

4       Q.  I know it's your job, but you don't have any

5    firsthand personal knowledge as to what was communicated

6    to the agent, do you?

7       A.  I can testify to what I communicated to the case

8    agent.

9               THE COURT:  But you can't in this case

10   because you don't know which calls that you listened to;

11   right?

12              THE WITNESS:  Not exactly, no.

13              THE COURT:  I mean, I thought you told Mr.

14   Cargill you didn't know what calls you listened to.

15              THE WITNESS:  Not exactly.

16              THE COURT:  So you don't know what

17   information you passed on to the case agent.

18              THE WITNESS:  Exactly.  I would have to go

19   back and see what exact calls I was there for and the

20   information.

21              THE COURT:  Sitting here today, in court,

22   you didn't do that, so you don't know what information

23   you passed to the case agent.

24              THE WITNESS:  Not by memory.

25   BY MR. CARGILL:

Lopez - - Cross

1    Q.   You don't know also anything about this trucking

2    company, how many trucks are owned by the owner of the

3    trucking company, do you?

4    A.   One of the targets that we were investigating is

5    the owner of the trucking company.  We knew that he had

6    several trucks that were -- he owned several trucks in

7    his company.

8    Q.   And he had several drivers; correct?

9    A.   Correct.

10   Q.   Carrying different loads; correct?

11   A.   Yes.

12   Q.   And you mentioned code words for drugs. Is there

13   a glossary of code words for drugs that you have in your

14   office there?

15   A.   Yes.

16   Q.   What are the code words?

17   A.   There's many code words.  There's boys, girls,

18   T-shirts, pants.  It depends on the investigation.

19   Q.   Pallets?

20   A.   Pallets.

21   Q.   Pallets is a code word for drugs?

22   A.   Not in every case, but in this particular case,

23   we believed that it was, yes.

24   Q.   Why?

25   A.   Because during that period of time, we believed

Lopez - - Cross

1    that the driver was driving a flat bed and when they

2    mentioned pallets, we gave that information to the case

3    agent.  We told him they're saying they're going to

4    transport 30 pallets.  They make that determination.  We

5    pass along the information.

6         Q.  But you in the first instance decide whether it's

7    a code word for drugs or not?

8         A.  If we believe so, yes.

9         Q.  Based on all these conversations, could you say

10   what type of drugs that you thought these people were

11   carrying?

12        A.  No.

13        Q.  You couldn't say that in truth, could you?

14        A.  No.

15             MR. CARGILL:  Thank you, ma'am.

16             Your Honor, I'd offer Defendant's 1.

17             THE COURT:  Any objection?

18             MR. HOFFMAN:  Absolutely, Your Honor.  It

19   has not been authenticated.  She, in fact, testified

20   it's not accurate.  She testified she doesn't know where

21   the time stamp at the bottom came from.  She testified

22   she has not reviewed that and doesn't know about the

23   accuracy of that information.  The document has not been

24   authenticated.

25             MR. CARGILL:  He gave it to me.  This man

Lopez - - Cross

```
 1   gave it to me, Your Honor.
 2              MR. HOFFMAN:  That doesn't mean it's
 3   admissible evidence.  You still have to follow the rules
 4   of evidence.  The document has not been authenticated by
 5   this witness.
 6              MR. CARGILL:  She said it's a synopsis.  She
 7   just couldn't account for the date stamp on the bottom
 8   left-hand corner.
 9              THE COURT:  Is that a synopsis of the type
10   that your office does in these investigations?
11              THE WITNESS:  Yes.
12              THE COURT:  And can you tell me whether or
13   not the synopsis that's here relates to this
14   investigation?
15              THE WITNESS:  Yes, it's one of the calls
16   that was transcribed.
17              THE COURT:  It's one of the calls that was
18   transcribed that was just played.
19              THE WITNESS:  Correct.
20              THE COURT:  It's admitted.  Overrule the
21   objection; Defense Exhibit 1.
22              (Defendant Exhibit #1 was admitted into
23   evidence).
24              Any redirect?
25              MR. HOFFMAN:  Yes, Your Honor.
```

Lopez - - Redirect

35

```
 1                    REDIRECT EXAMINATION
 2    BY MR. HOFFMAN:
 3       Q.  Let's clarify a couple of things, Ms. Lopez.
 4          A moment ago, the defense attorney asked you if
 5    there were two calls involving his client, George.
 6    There were actually five; is that right? We can pull out
 7    the transcripts and go through each one?
 8       A.  Yes.
 9                THE COURT:  Sitting here, do you know how
10    many of these involved Mr. Covarrubaiz?
11                THE WITNESS:  I would have to look at them.
12                THE COURT:  You don't know of your own
13    personal knowledge.
14                THE WITNESS:  Not by memory.
15                We transcribe most of the print calls in an
16    investigation.  Which ones are used, we don't control
17    that.
18                THE COURT:  Did you pick out these 20?
19                THE WITNESS:  No, I did not.
20                THE COURT:  Somebody else did.
21                THE WITNESS:  Right.
22                THE COURT:  Do you know whether there were
23    200, whether there were 50? Do you know how many calls
24    there were in total involved in this particular
25    investigation?
```

Lopez - - Redirect                                    36

1          THE WITNESS:  This -- Mr. Covarrubaiz was

2    also -- I'm trying to think.  I would say maybe 20

3    conversations between Mr. Covarrubaiz and Amador.

4          THE COURT:  20 involving Mr. Covarrubaiz and

5    Mr. Amador of which there's just been a few played here

6    today; correct?

7          THE WITNESS:  Correct.

8          THE COURT:  Do you know how many calls this

9    investigation involving Mr. Amador involved?

10          THE WITNESS:  How many calls? There were

11    hundreds.

12          THE COURT:  Hundreds of calls.  And somebody

13    decided to play these 20 for me.

14          THE WITNESS:  Correct.

15          THE COURT:  Go ahead, Mr. Hoffman.

16    BY MR. HOFFMAN:

17     Q.  The numbers you just recited to the Court, you

18    don't recall with precision, do you?

19     A.  Correct.

20     Q.  It's possible there were even thousands of calls

21    in the investigation?

22     A.  Correct.

23     Q.  It's possible there were 20 or less calls

24    involving Mr. Covarrubaiz himself; correct?

25     A.  Correct.

Lopez - - Redirect

```
1    Q.  A moment ago, you testified that you don't
2    remember, sitting here, in detail, your conversation
3    with Gregg Mervis?
4    A.  Correct.
5    Q.  Between January 29 to February 3?
6    A.  Correct.
7    Q.  But you did talk to him January 29 to February 3?
8    A.  Correct.
9    Q.  And when you spoke to him, did you speak to him
10   about the matter of the recordings we just played?
11   A.  Yes.
12              THE COURT:  But you didn't talk to him about
13   each one of these calls.
14              THE WITNESS:  Right.
15              THE COURT:  You would have talked to him
16   about the calls you were monitoring.
17              THE WITNESS:  I monitored or what's going on
18   with this particular investigation at the moment.
19              THE COURT:  Do you remember what it was that
20   you told Mr. Mervis?
21              THE WITNESS:  That we believed there was a
22   truck being -- that there was a vehicle going to
23   Virginia with 30 pallets, and to us, it sounded like it
24   was coded.  So then, you know, Mr. Mervis, they decide
25   what to do next.  We pass along the information as we
```

Lopez - - Redirect

38

 1   get it, whatever we believe is coded language or printed

 2   information and we pass that information along.

 3   BY MR. HOFFMAN:

 4       Q.  But the --

 5       A.  We, as a whole.

 6       Q.  As you said earlier, the agent is the one making

 7   the final decision about interpreting coded language and

 8   things like that; correct?

 9       A.  Yes.

10       Q.  You may, based on your 20 years of experience

11   doing this, you may believe that something is code and

12   you'll pass that on; correct?

13       A.  Correct.

14       Q.  To Mr. Mervis.

15       A.  Correct.

16       Q.  As you understand it, he or the agent is the one

17   making the final decision?

18       A.  Right.

19       Q.  You're talking to these agents multiple times a

20   day; correct?

21       A.  Every day that I'm there, yes.

22       Q.  Weren't there also circumstances, correct me if

23   I'm wrong, but circumstances where the monitors of these

24   calls would give information to you which you would then

25   discuss with Mr. Mervis?

Lopez - - Redirect

1    A.   At times, yes, yes.  If I'm not there, if it's

2 not during my shift, they themselves will call Mervis or

3 Vestie or whoever the investigating officer is.

4    Q.   What about when you're there?

5    A.   When I'm there, I do the phone calls.  I talk to

6 the agent.

7    Q.   Even if you didn't intercept the call yourself?

8    A.   That information is passed along to me and I pass

9 it along to an agent.

10    Q.   There are calls when you're on a shift that you

11 are not personally monitoring.  You're sitting right

12 there with the monitor; correct?

13    A.   Correct.

14    Q.   The monitor gives that information to you.

15    A.   Correct.

16    Q.   And you would share that information with Gregg

17 Mervis between January 29 and February 3; correct?

18    A.   Sometimes there are four monitors assigned to a

19 case.  So there are four monitors intercepting calls.

20 So one call could go to one monitor and another call to

21 another monitor.  It doesn't go to just one person.  It

22 can go to four different people there.  It's not me

23 who's always intercepting the call.  It can be one of

24 the other three.

25    Q.   But on January 29 to February 3, it's your

Lopez - - Redirect

 1   testimony information flowed from monitors to you and

 2   you passed that information to Gregg Mervis on those

 3   topics?

 4       A.  Yes.  Like I said, I don't remember exactly on

 5   which of those, but yes.

 6       Q.  And you also testified a moment ago about

 7   deciding whether the call is pertinent or non-pertinent

 8   and making that decision, whether it's relevant to the

 9   case or not.  At the beginning of a wire tap

10   investigation, isn't there some type of briefing you

11   receive from the agents?

12       A.  Correct.

13       Q.  What happens? Why don't you describe that for the

14   Court, at the beginning of a wire tap investigation?

15       A.  We have a briefing and we're told basically what

16   to listen for, who's involved in this investigation,

17   whether there's a company involved, whether it's a store

18   involved.  We get a briefing on what we need to listen

19   for.

20       Q.  So do you then make your pertinent, non-pertinent

21   decisions based on that briefing?

22       A.  Based on that and after listening to calls, we

23   can, you know, we kind of try to determine what is

24   pertinent and what is non-pertinent, what is legitimate

25   and what is not legit.

Mervis - - Direct                                                41

 1    Q.  As time goes on, on a wire tap investigation and
 2  you're monitoring these calls day in and day out, does
 3  your knowledge base, your familiarity with the
 4  investigation grow?
 5    A.  Yes.
 6    Q.  Do you incorporate that information in your
 7  decision about pertinent and non-pertinent?
 8    A.  Yes, and based on the players that we're
 9  listening to.
10          MR. HOFFMAN:  Thank you, Your Honor.
11          THE COURT:  Call your next witness.
12          MR. HOFFMAN:  Your Honor, I'd call Special
13  Agent Gregg Mervis.
14    GREGG MERVIS, CALLED AS A WITNESS BY THE GOVERNMENT,
15                      SWORN
16                 DIRECT EXAMINATION
17  BY MR. HOFFMAN:
18    Q.  Good afternoon.
19    A.  Good afternoon.
20    Q.  Please introduce yourself to the Court.
21    A.  Your Honor, my name is Gregg Mervis.
22    Q.  And who do you work for?
23    A.  Drug Enforcement Administration.
24    Q.  What is your current assignment?
25    A.  I'm a special agent at the Special Operations

Mervis - - Direct

1   Division in Chantilly, Virginia.

2       Q.   What are your duties at the Special Operations

3   Division, SOD, in Chantilly, Virginia?

4       A.   I'm currently assigned to a bilateral

5   investigation unit. We conduct drug investigations with

6   an international focus.

7       Q.   What is your focus?

8       A.   Latin America.

9       Q.   How long have you been assigned to SOD?

10      A.   Approximately six months.

11      Q.   What was your assignment prior to SOD?

12      A.   I was assigned to the Washington division office,

13  Annandale Task Force, group 12.

14      Q.   You were a special agent then?

15      A.   Correct.

16      Q.   What were your duties there?

17      A.   I was assigned to a task force working with the

18  local counterparts handling drug investigations in and

19  around the D.C. metropolitan area.  Primarily domestic

20  drug cases.

21      Q.   How long did you work on that assignment?

22      A.   About five years.

23      Q.   And were you with the DEA before that?

24      A.   Yes.

25      Q.   What were you doing?

Mervis - - Direct

```
 1    A.   I was an agent assigned to the Baltimore district
 2  office, in Baltimore, Maryland.
 3    Q.   Same thing?  Special agent, just in Baltimore?
 4    A.   Correct.
 5    Q.   How long were you a special agent assigned to the
 6  Baltimore area?
 7    A.   One year.
 8    Q.   And before that assignment?
 9    A.   I was a special agent at the Carracus, Venezuela
10  country office at the embassy in Carracus.
11    Q.   How long were you assigned at the embassy at
12  Carracus?
13    A.   About three years.
14    Q.   What were you doing there?
15    A.   There, I was working drug cases with informants
16  and the Venezuelan counterparts, in Venezuela.
17    Q.   Prior to your Venezuela assignment?
18    A.   I was assigned to the Imperial County residence
19  office in Imperial, California.
20    Q.   Were you a special agent then also?
21    A.   Yes, I was.
22    Q.   For how long?
23    A.   About six years.
24    Q.   And prior to that assignment, where were you?
25    A.   Prior to that, I was in the DEA academy.  That was
```

Mervis - - Direct

 1  my first assignment with DEA, in California.

 2      Q.   Were you a contract linguist at some point?

 3      A.   Yes, I was.

 4      Q.   That was with what agency?

 5      A.   DEA.

 6      Q.   What does a contract linguist with the DEA do?

 7      A.   Translations, interpretations of phone

 8  conversations, body wires.  My focus was Spanish.

 9      Q.   How long were you a contract linguist with a

10  focus of Spanish?

11      A.   One year.

12      Q.   Have you continued to utilize your Spanish

13  throughout your career with the DEA?

14      A.   Yes.

15      Q.   And have you taken any type of assessment with

16  DEA in terms of your language skill?

17      A.   Yes.  Prior to my assignment in Carracus, I was a

18  -- administered a DEA Spanish language exam.

19      Q.   What was your score on that?

20      A.   It was a four out of five.

21      Q.   Does four mean fluent Spanish?

22      A.   Yes.

23      Q.   Five is what, native; right?

24      A.   Correct, native speaker.

25      Q.   In your -- how long have you been with the DEA

Mervis - - Direct

1    total now?

2        A.   About 15 years.

3        Q.   In that time, throughout, how frequently have you

4    used Spanish?

5        A.   Depending on the assignment, when I was in

6    Imperial County and Venezuela, it was daily.  Annandale,

7    it was frequent, dealing with informants. We worked a

8    lot of wires, Spanish-speaking wires. I was case agent

9    on some.

10       Q.   These are all drug cases.

11       A.   Correct.

12       Q.   Spanish.

13       A.   Correct.

14            My current assignment is every day dealing with

15   informants who are Spanish speakers.

16       Q.   Let's talk about some of your previous

17   investigations.  Throughout your career, how many drug

18   investigations have you been personally involved in,

19   roughly?

20       A.   I would say hundreds.

21       Q.   How many of those involved wire taps?

22       A.   I don't know if I can put a number on it.

23   Numerous, numerous wire taps.

24       Q.   How many, portion wise, of the wire tap

25   investigations that you've been personally involved,

Mervis - - Direct
46

1    involved Spanish speakers?

2      A.   As far as I can remember, all of them except one.

3      Q.   Every single one, but one.

4      A.   One in Baltimore, correct, was English.

5      Q.   In these investigations, have you sat and

6    monitored yourself?

7      A.   Yes.

8      Q.   How many times do you think you've monitored that

9    yourself?

10     A.   I would say, percentage wise, maybe a quarter of

11   them because we have linguists assigned to the cases a

12   lot of times.

13     Q.   Of the ones that you sat and monitored, were they

14   Spanish?

15     A.   Yes.

16     Q.   Very quickly, just kind of walk us through the

17   mechanics of obtaining -- like when you went to obtain a

18   wire tap, just kind of the basic steps you have to walk

19   through yourself.

20     A.   Correct.  So, as an agent, I would prepare an

21   affidavit for probable cause laying out pretty much the

22   case, the probable cause, the necessity.  I would submit

23   that affidavit to the prosecutor for him or her to

24   review and then myself and the prosecutor would go

25   before a judge to seek an order for an interception.

Mervis - - Direct

1    Q.  How is a wire tap used during an investigation,

2    based on your experience?

3    A.  The wire tap is used, I would say, as a way to

4    attack an organization rather than an individual.  So we

5    look at a wire tap to go after not just the individual

6    using the phone, but to identify the whole structure of

7    the organization.  If we have certain means that aren't

8    able to infiltrate the particular organization, such as

9    -- say we don't have an informant in the investigation

10   or the means aren't working, then we'll seek a wire tap

11   as a way to infiltrate the organization, to obtain

12   evidence.

13        You have somebody's voice and you're able to

14   corroborate it with a seizure, a surveillance and other

15   techniques, it's pretty good evidence.

16   Q.  Do wire taps ever spawn you to, say, conduct

17   surveillance?

18   A.  Oh, yes.

19   Q.  Do you ever seize evidence as a result of what

20   you hear on the wire tap?

21   A.  Yes.

22   Q.  Make arrests?

23   A.  Yes.

24   Q.  In your experience in drug investigations, you've

25   heard drug code before?

1    A.   Yes.

2    Q.   What is drug code?

3    A.   Drug code is frequently used to avoid detection

4    by law enforcement to not reveal the actual drug

5    terminology that the speakers are using.

6    Q.   In your experience, you're listening to an

7    intercept call on a wire tap, are the participants in

8    the call talking about "bring me heroin;" "no, how about

9    some cocaine?" Are you hearing them using the actual

10   words of the drugs, like PCP?

11   A.   No.

12   Q.   What do they do instead?

13   A.   They'll use certain words that both speakers know

14   to be terms for drugs, such as cars or in this instance,

15   pallets was used.

16   Q.   Is it sometimes different from case to case?

17   A.   Oh, yes, it is different.

18   Q.   How do you get a feel for it, what the code

19   means?

20   A.   For me, a lot of it's just experience.  It's

21   being the case agent on numerous wires.  It's sitting

22   there and reviewing the calls and listening to the

23   calls.  Having been a linguist as well as case agent,

24   you just get a feel for these individuals.  You're

25   listening to their calls and, you know, communications

Mervis - - Direct

1    on a daily basis, so it becomes evident what's

2    legitimate talk or non-pertinent talk and what's

3    pertinent drug talk.

4        Q.   In your experience as a DEA special agent, have

5    you employed pen registers?

6        A.   Yes.

7        Q.   What is a pen register?

8        A.   A pen register, once again, requires a Court

9    order and that's to get toll information live, as well

10   as the cell sites, as well as location information, real

11   time.

12       Q.   Let's shift to this case.  You were involved in

13   this case?

14       A.   Yes.

15       Q.   What was your role in this?

16       A.   I was the case agent in Annandale, Virginia.

17       Q.   Let's -- just sort of the background of the

18   investigation, what were you investigating as the case

19   agent here?

20       A.   We were investigating a drug trafficking

21   organization based out of California that was using

22   tractor trailers primarily to move drug shipments and

23   bulk between California and various destinations, to the

24   east coast.

25       Q.   You actually made seizures; correct?

1    A.   Correct.

2    Q.   And drug seizures?

3    A.   Correct.

4    Q.   And bulk cash seizures; correct?

5    A.   Correct.

6    Q.   Those were all coming from the wire taps.

7    A.   No.  Some of them came from other means, but

8  primarily wire tap.

9    Q.   Did you, based on the wire tap, did you all

10  develop an idea of who the leader was?

11    A.   Yes.

12    Q.   Who was that?

13    A.   It was Everardo Amador, Sr.

14    Q.   Based on, you listened to some of the calls?

15    A.   Yes.

16    Q.   How would you characterize his leadership style?

17    A.   I view him as almost a micro manager.  He's very

18  detailed, very involved in the process of moving drugs

19  or money.

20    Q.   Did you check subscriber information?

21    A.   Yes.

22    Q.   On him?

23    A.   On the phones he was using, yes.

24    Q.   To whom are they registered?

25    A.   To Everardo Amador.

Mervis - - Direct

1    Q.   He registered them in his own name?

2    A.   He did.

3    Q.   Did you check the defendant's subscriber info?

4    A.   Yes.

5    Q.   Who was his registered to?

6    A.   George Covarrubaiz.

7    Q.   In his own name.

8    A.   Yes.

9    Q.   The first seizure in this case was for what? What

10   did you all seize?

11   A.   The first seizure involved in this case was

12   money.

13   Q.   Where did that occur?

14   A.   In California.

15   Q.   You were in Virginia at the time though, correct?

16   A.   Right.

17   Q.   Approximately how much money?

18   A.   Approximately $400,000.

19   Q.   Was there another seizure?

20   A.   Yes.

21   Q.   Prior to February 3?

22   A.   Yes.

23   Q.   And what was that seizure?

24   A.   The seizure was approximately 1.8 million

25   dollars.

Mervis - - Direct

52

1    Q.   And that occurred in California also?

2    A.   Yes.

3    Q.   And you were in Virginia at that time; correct?

4    A.   Correct.

5    Q.   What was your role -- back up.  Are you familiar

6    with the facts, the stop of the defendant, in December

7    of 2013?

8    A.   Yes.

9    Q.   What was your role in connection with that stop?

10   A.   My role, I was monitoring the pen register on the

11   defendant's cellular telephone at the time.

12   Q.   So you were watching his location?

13   A.   Correct.

14   Q.   After that stop, did you learn the driver's

15   identity?

16   A.   Yes.

17   Q.   Let's fast forward to January 29, 2014.  Were you

18   working this day?

19   A.   Yes.

20   Q.   What happened on that day in connection with this

21   investigation?

22   A.   Los Angeles DEA was cutting a wire tap and they

23   began to intercept phone calls involving the defendant.

24   Q.   How did you learn that?

25   A.   I learned it from Blanca, the head linguist there

1    in Los Angeles.

2        Q.  How did she contact you?

3        A.  Via telephone.

4        Q.  And what did you discuss with Blanca?

5        A.  Essentially that there was conversations

6    intercepted that she believed were indicative of a

7    pending drug shipment from California, possibly to the

8    east coast.

9        Q.  And did you in the days to come continue to talk

10   with Blanca?

11       A.  Yes.

12       Q.  Did you two discuss any code language or code

13   word that may have been intercepted on the wires in

14   California?

15       A.  Yes.

16       Q.  Do you recall what code words were being used

17   around that time?

18       A.  One code used, I believe, was pallets.  There was

19   a reference made to 30 pallets in a conversation between

20   the defendant and Amador, Sr.  There was also a

21   conversation intercepted between Amador, Sr., and his

22   employee, Tarula, where there was reference made to a

23   blue car coming by essentially to pick up the

24   merchandise.

25       Q.  Blue car.  Was that significant to you?

1    A.   Yes.

2    Q.   Why?

3    A.   Because we knew based on the prior stop in

4    December 2013, we knew the defendant to have a blue

5    tractor trailer.

6    Q.   And a moment ago, you mentioned the words

7    pallets.  You and Blanca Lopez discussed that?

8    A.   Yes.

9    Q.   Was that significant in any way to you?

10   A.   Well, the number 30, which was discussed between

11   the defendant and Amador, Sr., was significant because

12   in further conversation between Amador, Sr., and other

13   individuals, the number 32, 34, around 30, was

14   consistent throughout that conversation.  Also, when we

15   had stopped the defendant in December, there were no

16   pallets on the tractor trailer.  He was transporting

17   containers at the time on his flat bed.  There was

18   reference in these conversations in January of 2014

19   about containers being transported.  We knew the

20   containers not to be transported on pallets so that sort

21   of raised our suspicion.

22   Q.   The stop occurred on February 3; correct?

23   A.   Correct.

24   Q.   Of 2014.  So let's talk about your actions and

25   your involvement and your knowledge from January 29 to

Mervis - - Direct

1    February 3.

2         During that time, were you working with anyone

3    else on this investigation in addition to Blanca Lopez?

4    A.   Yes.

5    Q.   Who else were you working with?

6    A.   On the Virginia side, it was myself; Task Force

7    Officer Paul Loconti; Task Force Officer Dave Cutting;

8    and Special Agent Julie Whisenhunt.

9    Q.   What was Paul Laconti doing?

10   A.   Each one of us had a role in our side of the

11   investigation. Paul's role was to interface or contact

12   Verizon, which was the provider of the defendant's cell

13   phone, to get updated location information.  We had

14   obtained a pen register on the defendant's cell phone

15   and his job, like I said, was to contact Verizon,

16   provide updates to the team as far as location.

17   Q.   Let's move forward -- and you're working with

18   these people how frequently during this time period?

19   A.   With Laconti and Cutting?

20   Q.   Uh-huh.

21   A.   Daily.  We're a team, so we're working this.

22   Q.   All of those days, 29 through the 3rd?

23   A.   Absolutely, yeah.

24   Q.   How frequently are you talking to Blanca Lopez

25   during this period?

Mervis - - Direct

1    A.   I'm getting updates.  I wouldn't say every call

2  she's calling me, but periodically, she'd call me with

3  updates, something she felt significant for us to know.

4  She'd pass on the lead or the information.

5    Q.   Would you share that information with your team?

6    A.   Yes.

7    Q.   Was Paul Laconti sharing the pen register data

8  with you?

9    A.   Yes.

10    Q.   So you were receiving the wire tap information

11  from Blanca Lopez and you're receiving the pen register

12  data from Paul Laconti.

13    A.   Correct.

14    Q.   Let's fast forward to January 30, January 31.

15  What's going on in the investigation at that time?

16    A.   At that time, LA's intercepting additional phone

17  calls between Amador, Sr., Tarula; Amador, Sr., and

18  Juan; the other individuals involved in the

19  organization, that are basically discussing this pending

20  shipment -- how it's supposed to be packaged, where it

21  should be concealed, how it should be labeled.  Pretty

22  detailed information's coming across.

23    Q.   Of your own recollection, what do you recall

24  about -- I think you just said something about where it

25  should be located.

1      A.   Correct.

2      Q.   Do you have recollection about that?

3      A.   Yes.  There was a call between Amador, Sr., and

4    Tarula where Amador, Sr., was essentially instructing

5    Tarula to place a quantity of narcotics in the area

6    where -- I believe the area where the current passes,

7    which we interpreted to be the battery box.

8      Q.   Did he use the word narcotics?

9      A.   No.

10     Q.   How did you learn that for the first time? How

11   did you hear this information about the wire?

12     A.   From Blanca.

13     Q.   February 1, February 2, you were working on the

14   investigation those days?

15     A.   Yes.

16     Q.   What is happening with this investigation on

17   those two days?

18     A.   I'm in contact with TFO Laconti, who is providing

19   location updates as the defendant is moving east from

20   California.  As well, I'm getting updates from Blanca as

21   far as contacts between the defendant and Senior where

22   -- Amador, Sr., where the defendant is providing updates

23   regarding his location.

24     Q.   Did you yourself come down to Harrisonburg some

25   time?

Mervis - - Direct                                          58

```
 1        A.   Yes; on the night of February 2.

 2        Q.   Did you come down by yourself or with others?

 3        A.   With others.

 4        Q.   Paul Laconti come with you?

 5        A.   Yes.

 6        Q.   And the others you mentioned a moment ago?

 7        A.   Yes.   There was actually more than that.   There

 8   was, I think, about six of us.

 9        Q.   The team of six or so of y'all came down?

10        A.   Correct.

11        Q.   To Harrisonburg?

12        A.   Yes.

13        Q.   And what happens next?

14        A.   On the morning of February 3, early morning --

15        Q.   The day of the stop?

16        A.   The day of the stop, call it like three or four

17   in the morning, we met with VSP, a team from VSP, at the

18   hotel there in Harrisonburg.

19        Q.   When you say VSP, what do you mean?

20        A.   Virginia State Police.

21        Q.   Multiple people from Virginia State Police?

22        A.   Yes.

23        Q.   And what happened during the meeting with your

24   team and the Virginia State Police?

25        A.   Like I said, TFO Cutting was the primary point of
```

1    contact between our team and Virginia State Police.  He

2    gave a briefing to the state police regarding the

3    defendant heading east.  He suspected him to be

4    transporting narcotics.  TFO Laconti provided the latest

5    location update.  We set up a plan for DEA, our team, to

6    set up more or less a dragnet, for lack of a better

7    word, on I-81.  So we'd essentially set up surveillance.

8    We'd pick up the defendant's truck and hand that off to

9    the state police for them to conduct the traffic stop.

10        Q.   During this meeting, did a member of your team or

11   your team make a specific request or give instruction to

12   the Virginia State Police troopers?

13        A.   Yes.

14        Q.   What was it?

15        A.   The request was to conduct a wall off stop.

16        Q.   What is a wall off stop?

17        A.   A wall off stop is basically -- at the time, our

18   investigation was ongoing.  We had other tractor

19   trailers in play, as far as the overall organization,

20   that we believed to be transporting bulk currency. We

21   didn't at the time want to reveal our entire

22   investigation to the defendant because we didn't want it

23   to be compromised as far as the other tractor trailers.

24   We also did not have Amador, Sr., in custody at the

25   time, so we didn't want to jeopardize those angles.

Mervis - - Direct

60

1    Q.  Okay.  So those are the reasons for conducting a

2    wall off stop.  How do you actually go about conducting

3    a wall off stop?

4    A.  We asked the state police if they could develop

5    their own probable cause to conduct the stop and pretty

6    much, that's where we left it.

7    Q.  You were at this meeting; right?

8    A.  Yes.

9    Q.  And did you all share all of the details of your

10   four-month investigation with the troopers that were

11   there that day?

12   A.  No.

13   Q.  How much did you give them?

14   A.  Pretty much just the basics; that this is the

15   truck we expect to be coming east, the defendant being

16   the driver.  I believe we had information at the time

17   about possibly drugs being concealed in the battery box.

18   That's a possible stash location within the truck.  Like

19   I said, the latest location update and then we set up

20   the plan and that was pretty much it.

21   Q.  Okay.  Were you involved --

22           THE COURT:  When you say wall off, that

23   means to do a stop of this defendant, but not let him

24   know that other things were going on.

25           THE WITNESS:  That's correct.

Mervis - - Direct

1          THE COURT:  That's what the wall off part
2  is, right?
3          THE WITNESS:  That's right.
4          THE COURT:  Do you know when Amador was
5  arrested?
6          THE WITNESS:  That was this summer, I
7  believe.
8          THE COURT:  So it was the summer of '14.
9          THE WITNESS:  Correct.
10          THE COURT:  So it was substantially after
11  the stop involving Mr. Covarrubaiz.
12          THE WITNESS:  Correct.
13          MR. HOFFMAN:  Your Honor, with everyone's
14  consent, I can proffer the date of that.
15          THE COURT:  I was just asking. I don't mean
16  to interrupt.  Go ahead.
17          Did you tell the state police the name of
18  the defendant?
19          THE WITNESS:  I don't know if we said the
20  name, but we suspected him to be the driver because we
21  stopped him in December of 2013 while monitoring the
22  same cell phone in his name.  We intercepted calls in LA
23  where Amador, Sr., referred to the defendant as George.
24  So it was, you know, highly probable that it was going
25  to be the defendant driving.

BY MR. HOFFMAN:

Q.   So it was the same cell phone number that you were monitoring on the pen?

A.   The pen back in 2013?

Q.   Yes.

A.   Yes, same number.

Q.   From the first stop.

A.   Correct.

Q.   Okay.  So please take a moment and describe for the Court kind of what the catch plan was, so to speak, for that morning.

A.   Okay.  So that morning, the DEA team set up along -- staggered, I should say, along I-81, different exits.

Q.   How far spread out were you?

A.   We were probably spread out, call it, I don't know, ten miles maybe, more or less.

Q.   Where were you positioned?

A.   One of those exits, one of the overpass or exits along I-81.

Q.   Were you going to be one of the first ones to intercept?

A.   No.  We had a TFO in our group that was kind of the go-to.  He was very good at observing traffic.

Q.   What was the plan? What was going to happen?

A.   He was the furthest south.  He would pick up the

Mervis - - Direct                                                   63

1    defendant's vehicle travelling north on I-81, get in

2    behind it and we'll fall in behind it as the vehicle was

3    proceeding north on I-81.

4        Q.   With lights on?

5        A.   No, in regular vehicles, just surveillance.  Then

6    at some point, TFO Cutting, who was talking to Virginia

7    State Police, would turn over surveillance.  He would

8    call us off and give Virginia State Police the

9    surveillance and operation.

10       Q.   DEA would establish surveillance of the

11   defendant's vehicle coming up 81 and once you were

12   comfortable that was the right one, you would pass off,

13   do the hand-off to the state troopers and they would do

14   the stop?

15       A.   That's right.

16       Q.   Did you participate in that plan as executed?

17       A.   Yes.

18       Q.   Did you personally observe the defendant's

19   vehicle?

20       A.   Yes.

21       Q.   Anything remarkable about the vehicle? Anything

22   important that you noticed that day that fit into the

23   investigation?

24       A.   There was transporting containers on the back of

25   it.  It was blue.

Mervis - - Direct

1    Q.   So there were containers?

2    A.   There were containers.

3    Q.   Did you see any pallets?

4    A.   No.

5    Q.   Did you see 30 pallets?

6    A.   No.

7    Q.   Did you see any tacos?

8    A.   No.

9    Q.   No tacos. Did you see any rolls?

10   A.   Rolls, no.

11   Q.   No rolls.  I think you said a moment ago, what

12   was the color of the tractor itself?

13   A.   Blue.

14   Q.   And that was the same color as the previous stop?

15   A.   Yes.

16          THE COURT:  Were you around, physically

17   around, back in December at the previous stop?

18          THE WITNESS:  No.

19          THE COURT:  Was DEA trailing the truck then?

20          THE WITNESS:  Yes.

21          THE COURT:  Just as it was trailing it --

22          THE WITNESS:  Same set-up.

23          THE COURT:  You surveil it for a while, you

24   find out where he is, you call the state police, you

25   turn it over to them and they make the stop.

Mervis - - Direct

1              THE WITNESS:  Correct.

2              THE COURT:  Back in December, the truck was

3    pulled over, a drug dog was there.  Real quick, the drug

4    dog alerted.  The truck was searched, but no drugs were

5    found.

6              THE WITNESS:  Correct.

7              THE COURT:  Were you present on the scene

8    back in December or was that just left to the state

9    police?

10             THE WITNESS:  No, I wasn't present.  I was

11   in Annandale.

12             THE COURT:  Were there any DEA guys that

13   came on the scene or was it just the state police?

14             THE WITNESS:  I'm pretty confident it was

15   just state police.

16             THE COURT:  Was that part of this wall off

17   strategy? You didn't want to let him know the DEA was on

18   to him in a big way?

19             THE WITNESS:  That's correct.

20   BY MR. HOFFMAN:

21     Q.  So after you observed --

22             THE COURT:  Let me ask you this.

23             Back before the December stop, what led you

24   all to set up this same sort of staggered spread on

25   I-81? Did you have phone call from the wire tap

Mervis - - Direct

```
 1    information that there was going to be a shipment?

 2              THE WITNESS:  Yes -- well, what happened

 3    there were conversations intercepted in LA where Amador,

 4    Sr., was discussing a pending shipment.  I believe, if

 5    I'm not wrong, he dropped his phone, he terminated his

 6    phone. So at the time of the stop, the first stop of the

 7    defendant, nobody was listening.  But based on the

 8    timing of that conversation and the fact that the

 9    defendant was heading east around the same time of this

10    pending shipment, we believed him to be transporting a

11    shipment of narcotics.

12              THE COURT:  When you say Amador dropped his

13    phone, what do you mean by that?

14              THE WITNESS:  He terminated use. He ceased

15    making calls.

16              THE COURT:  He didn't just physically drop

17    it on the ground.

18              THE WITNESS:  No, no, no, no.  That's a term

19    we use. Discontinued use.

20              THE COURT:  He discontinued use of his

21    phone.

22              THE WITNESS:  Correct.

23              THE COURT:  But back then in December, just

24    as later on in January, you thought the defendant was

25    bringing a drug shipment east from California, to the
```

Mervis - - Direct

1    east.

2                    THE WITNESS:  Correct.

3                    THE COURT:  So you had this staggered set-up

4    and the same plan to turn it over to the Virginia State

5    Police. They didn't find anything.  He got a warning and

6    went on his way.

7                    THE WITNESS:  Correct.

8                    THE COURT:  You guys just continued the

9    investigation and went on.

10   BY MR. HOFFMAN:

11      Q.  The drug alerted then previously; correct?

12      A.  It did.

13                   THE COURT:  When I first saw the video, I

14   was wondering why that dog was on the scene in two

15   shakes.  It was within a minute or two that dog was

16   there and it's because it was planned.  I got it.

17                   Go ahead, Mr. Hoffman.

18   BY MR. HOFFMAN:

19      Q.  It sounds like, correct me if I'm wrong, this

20   time, you had live wire taps?

21      A.  Yes, much more information.

22      Q.  Involving the defendant himself?

23      A.  Yes, much more information the second time.

24      Q.  Let's pick up where you left off.  So you've got

25   your eyes on the defendant's vehicle. You see that it's

Mervis - - Cross

1   a flat bed, there's no pallets, no tacos. It's blue.

2   What happens next?

3       A.   So the DEA team surveils the truck as it proceeds

4   north on 81.  Eventually, the operation is turned over

5   to the Virginia State Police and they conduct the

6   traffic stop and it's their ball from there.

7               MR. HOFFMAN:  Thank you, Your Honor.

8               THE COURT:  Mr. Cargill.

9                   CROSS-EXAMINATION

10  BY MR. CARGILL:

11      Q.   Good afternoon, sir.

12           When you say the operation was turned over to

13  Virginia State Police, what do you mean?

14      A.   I mean, to conduct the traffic stop.  That was

15  their part of the operation.

16      Q.   Their operation was to develop their own probable

17  cause to support the stop; correct?

18      A.   Correct.

19      Q.   And then conduct the stop.

20      A.   Correct.

21      Q.   And then I take it if they found drugs, they

22  would call you in and you would then take over the

23  investigation.

24      A.   If they found drugs, yes, they would eventually

25  call us in.

Mervis - - Cross

1    Q.  But it was their -- it was their province to

2    develop the probable cause to stop and to stop the

3    vehicle; correct?

4    A.  We asked them, yes, to use their probable cause

5    to stop the vehicle.

6    Q.  So if they didn't have probable cause to stop the

7    vehicle, if they didn't develop their probable cause,

8    they were not empowered to stop the vehicle; correct?

9    A.  I believe we said if they couldn't find probable

10   cause, we believed based on our information from Los

11   Angeles, there were drugs in that vehicle and they

12   should stop it.

13   Q.  So you directed them to stop or not?

14   A.  What do you mean, directed?

15   Q.  Did you direct them to stop the vehicle or not?

16   A.  We provided them the information to stop, sure.

17   Q.  So you told them to stop the vehicle?

18   A.  Yes, as part of --

19   Q.  When?

20   A.  In the briefing.

21   Q.  In the briefing at the hotel in the morning?

22   A.  Correct.

23   Q.  So this part about develop your own probable

24   cause really was meaningless?

25   A.  No.  That was to set up the wall, as far as the

1  wall off stop.  If they could develop their own probable

2  cause, that's the way we wanted the stop to take place.

3       Q.   So where were you when this stop did occur?

4       A.   Off the side of the road, off 81.

5       Q.   You weren't on the scene of what you knew to be a

6  stop?

7       A.   No.

8       Q.   Were any other DEA agents there?

9       A.   No.

10      Q.   Did you memorialize in a report that you had

11  directed them to stop this vehicle?

12      A.   I did not, no.

13      Q.   Did anybody memorialize in any DEA 6, in any

14  report, that the Virginia State Police had been directed

15  to stop this vehicle?

16      A.   Not that I'm aware of.

17      Q.   No one?

18      A.   Not that I'm aware of.

19      Q.   Isn't that something you would ordinarily note in

20  a report, that you had directed a stop?

21      A.   I don't know if we'd put that in, like directed a

22  stop.  We'd put in there we coordinated the stop with

23  Virginia State Police.

24      Q.   In each one of the reports I've seen, everyone

25  describes this as a traffic stop; correct?

Mervis - - Cross

1   A.   I don't know. I haven't seen all the reports.

2   Q.   Have you seen the reports of Mr. Laconti?

3   A.   Not recently.  Maybe back then.

4   Q.   Are you the lead case agent?

5   A.   Yes.

6   Q.   Have you reviewed the reports?

7   A.   Yes.

8   Q.   Have you seen a single report where any agent

9   memorializes that this was a directed stop?

10   A.   No, not that I'm aware of.

11   Q.   So your probable cause to stop this vehicle, I

12   take it, was that you spoke with Ms. Lopez about these

13   recorded calls; correct?

14   A.   That was part of it, yes.

15   Q.   And she told you that there was mention of

16   pallets on the vehicle; correct?

17   A.   There was a mention between Amador, Sr., and the

18   defendant about 30 pallets being involved, yes.

19   Q.   30 pallets.  And to this point of the

20   investigation, there had been two seizures, one -- both

21   of them in California; correct?

22   A.   Correct.

23   Q.   And both of them involving money; correct?

24   A.   Correct.

25   Q.   One for $400,000, one for 1.8 million dollars;

Mervis - - Cross

72

1  correct?

2      A.  Correct.

3      Q.  No seizures of drugs at that point; correct?

4      A.  Not at this part of the investigation, no.

5      Q.  So no seizures of drugs. Only seizures of money;

6  correct?

7      A.  Well, there were seizures of drugs.  This is kind

8  of -- how can I say this? There's one big case and

9  there's another side of this where we did seize drugs

10 back in early, like, the spring of 2013.

11     Q.  But we're talking about this part of the case,

12 the case involving Mr. Amador and allegedly Mr.

13 Covarrubaiz.

14     A.  I understand.

15     Q.  In this part of the case, there were two seizures

16 and only of money; correct?

17     A.  That's correct.

18     Q.  To this point in the investigation, had you

19 seized any drugs where anybody involved in the

20 investigation had described those drugs as pallets?

21     A.  No.

22     Q.  So this conclusion that pallets referred to drugs

23 was a hunch, I take it, on your part?

24     A.  Correct.  That was -- yeah, based on my training,

25 yeah, and additional calls as well.

1    Q.   And these additional calls, they involved other

2    people besides Mr. Covarrubaiz; correct?

3    A.   That's correct.

4    Q.   Most of them actually involved Mr. Tarula;

5    correct?

6    A.   I don't know if it was most, but there were a

7    significant number of calls with Tarula, yes.

8    Q.   How many trucks were owned, operated by this

9    trucking company?

10   A.   They had several trucks.

11   Q.   Several trucks; five, six, trucks?

12   A.   I would think, yes.

13   Q.   How many of them were blue?

14   A.   Oh, I don't know.

15   Q.   You think there was only one blue truck?

16   A.   I don't know.

17   Q.   So if you had gone to a judge on February 2 of

18   2014 with your probable cause to search this truck, what

19   would you have said to the judge?

20   A.   I would have provided all the phone calls between

21   the defendant and Mr. Amador, Sr. --

22   Q.   And you would have said -- what did those calls

23   indicate to you? What would you have said to the judge

24   about those calls?

25   A.   Which calls?

Mervis - - Cross

1    Q.  The ones you would have mentioned to the judge in

2  trying to get probable cause to search this truck.  What

3  would you have said?

4    A.  About the calls between Amador, Sr., and

5  Covarrubaiz?

6    Q.  The ones that would have supported your request

7  for a warrant.

8    A.  I would have said there's calls regarding 30

9  pallets.  There's further calls between Amador, Sr., and

10  the other individuals referring to the packages, black

11  and white; where certain packages should be stored

12  within the truck; the blue car coming, you know.

13    Q.  So you would have mentioned all that.  When the

14  judge says how many trucks are involved in the

15  operation, what would you have said?

16    A.  I would have said there's numerous trucks.

17    Q.  When the judge says how many of them were blue,

18  what would you had said?

19    A.  I don't know.

20    Q.  When the judge said are you sure about this

21  conversation about placement of these items in the

22  battery box involved Mr. Covarrubaiz's truck, what would

23  you have said?

24    A.  I would have said I believe it does.

25    Q.  On what basis?

1    A.   Based on the fact the defendant and Amador, Sr.,

2    talked about this pending shipment about the defendant

3    picking up approximately 30 pallets.  The number 30 or

4    approximately 30 was consistently thrown out in multiple

5    conversations.  The blue car, the fact --

6    Q.   Pardon me, but in Spanish, there are two

7    different words for car and truck, aren't there?

8    A.   Yeah, there's two different words.

9    Q.   What is the word for car?

10   A.   Carro.

11   Q.   And for truck?

12   A.   Troca.

13   Q.   Or camion?

14   A.   Camion; could be.

15   Q.   The word for car and truck are not confused in

16   Spanish.  They're distinctly different words; correct?

17   A.   They are.

18   Q.   Would you also have told the judge you stopped

19   this same vehicle in or near Harrisonburg in December of

20   2014 and found no drugs?

21   A.   Yes.

22   Q.   You would have said that; correct?

23   A.   Yes.

24   Q.   You would have said, back then, you suspect there

25   would be drugs in the truck; correct?

Mervis - - Cross

1    A.   The first time?

2    Q.   Back in 2013.

3    A.   We suspected there were drugs.

4    Q.   You would have said we suspected there were drugs

5  there then and we were wrong, but now we suspect there

6  are drugs again?

7    A.   Correct.

8    Q.   Based on this information, you thought there was

9  a load of drugs originating in California and heading

10 where?

11    A.   To the east coast.

12    Q.   Where on the east coast?

13    A.   We knew that that organization had a customer

14 base in New Jersey, for instance; Boston; Philadelphia;

15 New Jersey.

16    Q.   You had already stopped this same truck in the

17 Harrisonburg area in December and found nothing;

18 correct?

19    A.   That's correct.

20    Q.   In your own mind, wouldn't that seem to indicate

21 to you perhaps you ought to stop him before Harrisonburg

22 and the likelihood that you would find something would

23 be greater?

24    A.   I don't know why.  The customer base, as far as

25 our knowledge, was all north of Harrisonburg.

Mervis - - Cross

1    Q.   You found nothing when you searched him in

2  December of 2013 in Harrisonburg, though; right?

3    A.   That's right.

4    Q.   You thought the drugs were in the truck when he

5  left California; correct?

6    A.   Correct.

7    Q.   Did you stop him in California?

8    A.   No.

9    Q.   Did you stop him in Arizona?

10    A.   No.

11    Q.   Texas?

12    A.   No.

13    Q.   Arkansas?  You were tracking him all the way

14  across the country; correct?

15    A.   Yes.

16    Q.   Did you stop him when he got into Virginia,

17  southwest Virginia?

18    A.   No.

19    Q.   Did you know whether he had off-loaded anything

20  from that truck in between California and when he was

21  stopped in Harrisonburg, Virginia?

22    A.   No.

23    Q.   You had no idea what he had done with anything on

24  that truck between California and when he was stopped in

25  Harrisonburg; right?

1    A.  There were calls, like I said, between the

2    defendant and Amador, Sr., as he's moving east.  There

3    was no conversation regarding him having dropped

4    anything along the way.

5    Q.  But he was stating where he was though; correct?

6    A.  Periodically, yes, he'd provide updates.

7    Q.  As he went across the country?

8            THE COURT:  Said he had a shower in Arizona

9    or Arkansas.

10            THE WITNESS:  Yeah, exactly.

11   BY MR. CARGILL:

12   Q.  So you didn't listen to any of these

13   conversations yourself, I take it?

14   A.  I did, a handful of them.

15   Q.  A handful; when?

16   A.  More or less January 31, January 30, maybe even

17   into the weekend, February 1, February 2.

18   Q.  Did you participate in the request to get the pen

19   register on Mr. Covarrubaiz's phone?

20   A.  Yes.

21   Q.  You did.  Did you provide the information that

22   went on the application to get that pen register?

23   A.  Yes.

24   Q.  Now, I take it the most that could be said about

25   what you believe Mr. Covarrubaiz was tractor-trailering

Mervis - - Cross

```
 1    in his truck was some quantity of narcotics; correct?
 2        A.   You said the most I could say?
 3        Q.   Yes, about what he was carrying.
 4        A.   We believed, correct, to be a shipment of
 5    narcotics.
 6        Q.   But you couldn't say whether it was cocaine or
 7    heroin or type of narcotics.  You thought it was
 8    narcotics; right?
 9        A.   I think we suspected it to be cocaine and heroin
10    because there was a reference, I believe, to white and
11    black.
12        Q.   Could you state under oath that you believed
13    based on those conversations that he was transporting
14    cocaine and heroin?
15        A.   Believed it? Sure.
16        Q.   Under oath, you'd say that?
17        A.   Referencing white and black, yeah.  To me, when
18    you're differentiating that, that could mean, yeah.
19        Q.   Did the varying numbers of pallets or other items
20    that were listed mentioned in these telephone calls,
21    anywhere from 30 to 34 to 32, to 15 and 17 and 22 and
22    11, the various numbers that we heard in these telephone
23    conversations, did that perhaps lead you to believe
24    there might have been other shipments involved with
25    other truck drivers?
```

Mervis - - Redirect

1    A.   No.

2    Q.   You didn't.

3    A.   I believe it was all in reference to this

4  particular shipment.

5    Q.   Even if there were different numbers involved?

6    A.   When you're referencing the 15 and 17 and the

7  smaller numbers, possibly there was two customers

8  involved.  So a portion of the narcotic shipment was

9  going to Customer A and a portion was going to Customer

10  B and they want to differentiate there between the two.

11   Q.   Who made the call as to which of these phone

12  calls were relevant to this trip?

13   A.   What do you mean, relevant?

14   Q.   Who made the call --

15   A.   I would get periodic updates from Blanca.

16   Q.   So she made the call to which of these calls

17  related to this trip? She did?

18   A.   She would call me, yeah.

19   Q.   Is she a DEA agent?

20   A.   No.

21           MR. CARGILL:  Thank you, sir.

22           THE WITNESS:  Thank you.

23           THE COURT:  Any redirect, Mr. Hoffman?

24           MR. HOFFMAN:  Yes, Your Honor.

25              REDIRECT EXAMINATION

BY MR. HOFFMAN:

Q.  Agent Mervis, a moment ago, you testified about cash seizures that were made?

A.  Yes.

Q.  Based on your investigation at the time, what did you believe the cash was from?

A.  Narcotics proceeds.

Q.  Why?

A.  Based on the way it was packaged.

Q.  What do you mean, the way the cash was packaged?

A.  Correct.

Q.  How?

A.  So, the cash would be packaged, taped, bound.  I don't remember these particular two seizures, but a lot of times, it will have the denomination on there or a label on the package of currency so the individual who's receiving it knows the denomination or to who that particular package of money is to go to.

Q.  So it was the packaging? The packaging was one of the things that led you all to believe it was drug related?

A.  Drug related and quite frankly, the amount. 1.8 million dollars, that's a lot of money.  Looking at it like trying to think legitimately, what could 1.8 million in cash be derived from?  I don't know too

```
1    many businesses that involve 1.8 million dollars in cash

2    being transported in bulk in a tractor trailer.

3        Q.   And those seizures came out of this

4    investigation?

5        A.   Yes.

6        Q.   Do you recall the location of the seizures --

7    excuse me, where the money in the vehicle was, where it

8    was discovered?

9        A.   I don't.

10              THE COURT:  Was Mr. Covarrubaiz involved in

11   either of those seizures?

12              THE WITNESS:  No.

13   BY MR. HOFFMAN:

14       Q.   But the drug trafficking organization was.

15       A.   Yes, Amador, Sr., was directly involved in both.

16       Q.   Is that the same Amador, Sr., that was talking to

17   this man?

18       A.   Yes.

19       Q.   A moment ago, defense counsel walked you through

20   some of the things that you might identify for a judge

21   as part of your probable cause; right?

22       A.   Yes.

23       Q.   I think earlier you testified that you actually

24   had subscriber information on the phone that the

25   defendant had that day; correct?
```

1    A.   Yes.

2    Q.   You also had a pen register order and active on

3    that phone; correct?

4    A.   Yes.

5    Q.   Would you have included that in your probable

6    cause statement?

7    A.   Yes.

8    Q.   Would you have included the previous stop in your

9    probable cause statement?

10   A.   Yes.

11   Q.   What about any of the observations that you made

12   on the road before the case was -- the stop was

13   officially and kind of finally passed off to Virginia

14   State Police?

15   A.   Yes.

16   Q.   A moment ago, you testified under oath, white and

17   black could mean cocaine and heroin.  Can you explain

18   your basis for that?

19   A.   Yes.  Cocaine in its powder form is white in

20   color and heroin, a lot of times, is a darker color,

21   substance.  So a lot of times, it's referred to as

22   black.

23   Q.   Are you aware of the legitimate purpose of the

24   business you were investigating, Jack Rabbit Express,

25   what their legitimate loads were?

Mervis - - Redirect

1    A.  I believe they legitimately were hauling

2 machinery parts, like, for instance, crane parts.  In

3 reference to the defendant, it was these metal

4 containers, almost like dumpsters or containers.

5    Q.  Ever had a discussion about pallets and their

6 legitimate use?

7    A.  Not that I'm aware of.

8           MR. HOFFMAN:  Thank you, Your Honor.

9           THE COURT:  Mr. Cargill, anything further

10 for this witness?

11           MR. CARGILL:  No.  Thank you.

12           THE COURT:  You may stand down.  Thank you.

13           (Conclusion of testimony).

14

15

16

17

18

19

20

21

22

23

24

25

1                          **INDEX**

2    **WITNESS FOR GOVT.**    **Direct**    **Cross**    **Redirect**

3    Blanca Lopez            2            21           35

4    Gregg Mervis            41           68           80

5

6    **EXHIBIT NO.**          **Marked**                 **Admitted**

7    Govt. #1-20             13                          20

8    Govt. #1B               13                          20

9    Deft. #1                24                          34

10

11

12

13

14   "I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled

16   matter.

17

18

19   /s/ Sonia Ferris                   October 31, 2014"

20

21

22

23

24

25