**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | | |
| | ) | **Case No. 5:14-cr-00019** | |
| **v.** | ) | | |
| | ) | | |
| **GEORGE HENRY COVARRUBAIZ,** | ) | **By:** | **Michael F. Urbanski** |
| *a/k/a Jorge Covarrubiaz* | ) | | **United States District Judge** |
| *a/k/a George Henry Covarrubiaz* | ) | | |
| Defendant. | ) | | |

## MEMORANDUM OPINION

On February 3, 2014, defendant George Henry Covarrubaiz ("Covarrubaiz") was stopped by law enforcement while driving a tractor trailer on Interstate 81 in the Western District of Virginia. Large amounts of illegal drugs were discovered in Covarrubaiz's truck, and he was indicted on federal drug charges. This matter is before the court on Covarrubaiz's motion to suppress (Dkt. No. 30) and motion in limine to bar reopening of the suppression hearing (Dkt. No. 55). For the reasons stated herein, the motion in limine will be **GRANTED** and the motion to suppress **DENIED** following the recent decision of the United States Supreme Court in <u>Heien v. North Carolina</u>, 135 S. Ct. 530, 2014 WL 7010684 (Dec. 15, 2014).

## I.

On June 10, 2014, Covarrubaiz moved to suppress the evidence discovered in his tractor trailer, arguing that the initial traffic stop violated the Fourth Amendment. The government responded on July 15, 2014 that the officer who conducted the stop, Virginia State Police Senior Trooper Joseph Miller, "personally observed multiple non-functioning lights on the defendant's vehicle before conducting the stop. Therefore, Trooper Miller had reasonable suspicion sufficient to stop the defendant's vehicle." Response to Defendant's Motion to Suppress, Dkt. No. 36, at 6.

At a suppression hearing held on July 17, 2014, the government argued consistently that the stop of Covarrubaiz's tractor trailer was lawful because Trooper Miller observed several defective amber lights on the side of the tractor. The evidence and argument at the suppression hearing focused almost exclusively on whether the lights on Covarrubaiz's truck violated Virginia law, justifying the stop for defective equipment under Virginia Code §§ 46.2-1002 and 46.2-1003.[1] At the July 17, 2014 suppression hearing, Trooper Miller conceded that the defective lights he observed on Covarrubaiz's truck were optional. Transcript of July 17, 2014 Suppression Hearing, Dkt. No. 53, at 85. Optional or not, Trooper Miller testified that he believed that Virginia law required each and every light on a vehicle to be fully functional, id. at 86, and that is why he stopped Covarrubaiz's truck.

Although Trooper Miller testified, consistent with his police report and the government's brief, that before the traffic stop he had "received information that the vehicle could possibly be transporting a large quantity of narcotics," id. at 26, at no time did he testify that his traffic stop of Covarrubaiz's truck was directed by other law enforcement officers. Rather, the consistent thrust of the government's evidence and argument at the July 17, 2014 suppression hearing was that Trooper Miller was authorized to stop Covarrubaiz's tractor trailer under Virginia Code § 46.2-1003 solely because certain amber lights on the side of the tractor were defective.

Trooper Miller's testimony on this point could not have been more clear. On direct examination, Trooper Miller testified as follows:

> Q. What was the statutory basis of your traffic stop?
>
> A. 1003, again.
>
> Q. Defective equipment, defective lights that you observed?

---

[1] Virginia Code § 46.2-1003 makes it "unlawful for any person to use or have as equipment on a motor vehicle operated on a highway any device or equipment mentioned in § 46.2-1002 which is defective or in unsafe condition." Virginia Code § 46.2-1002 concerns, in pertinent part, "any lighting device . . . for which approval is required by any provision of this chapter."

A.      Yes, sir.

Id. at 29.  On cross-examination, Trooper Miller confirmed that he stopped Covarrubaiz's truck

only because of the defective lights.

>     Q.      Let me just see if I'm clear about this, to begin with.  The
>     only reason that you stopped Mr. Covarrubaiz was because of these
>     defective lights; correct?
>
>     A.      Correct.
>
>     Q.      So, that's the sole reason that you stopped him.
>
>     A.      Correct.

Id. at 71-72.

Following the July 17, 2014 suppression hearing, the parties filed briefs on the issue of the

validity of the traffic stop.  In its brief filed on August 4, 2014, the government continued to argue

that the stop was justified based on Trooper Miller's observation of defective lighting on the truck.[2]

In its August 4, 2014 brief, the government argued that "Trooper Miller had reasonable suspicion to

conduct the traffic stop because he twice observed lights on the defendant's vehicle that were not

functioning, which he reasonably believed was a violation of § 46.2-1003, as outlined above.

Trooper Miller had the lawful authority to conduct a traffic stop to confirm or dispel his reasonable

suspicions of that violation."  United States' Response to Defendant's Memorandum In Support of

Motion to Suppress, Dkt. No. 42, at 11.  Nowhere in its August 4, 2014 brief does the government

contend that the traffic stop was conducted by Trooper Miller based on direction from other law

enforcement officers.

---

[2] To be sure, the government's brief reiterated Trooper Miller's testimony that earlier that day he "had received information that the defendant may be travelling northbound on I-81 carrying a large shipment of narcotics," and that "before the stop, another law enforcement agency had alerted him to be on the lookout for defendant's vehicle."  United States' Response to Defendant's Memorandum in Support of Motion to Suppress, Dkt. No. 42, at 2, 4.  While making these passing statements, however, the government's brief does not stray from the testimony and argument at the July 17, 2014 suppression hearing that the basis for the traffic stop was defective lighting.

As the government's August 4, 2014 brief explained, Trooper Miller claimed he recognized Covarrubaiz from a traffic stop two months earlier.[3] Covarrubaiz presented Trooper Miller with the same bill of lading from the previous stop. The brief continued: "Trooper Miller also recognized the defendant, the tractor trailer, the same defective lights, and the same seven green cargo containers from the previous stop. These facts further raised Trooper Miller's suspicions that the defendant may have been engaged in criminal conduct." Id. This representation in the government's brief is consistent with Trooper Miller's testimony at the July 17, 2014 suppression hearing that presentation of the identical bill of lading raised Trooper Miller's suspicions "a hundred times" and that "the scope of [his] investigation expanded beyond defective equipment," Transcript of July 17, 2014 Suppression Hearing, Dkt. No. 53, at 34, 36.

Without elaboration, the government alternatively argued at the end of its August 4, 2014 brief that even if the nonfunctioning lights were not subject to Virginia Code § 46.2-1002, the lights in question were "marker lights" governed by Virginia Code § 46.2-1017. The government suggested that "[i]f necessary, the United States will offer evidence that the defective lights on the defendant's vehicle were marker lights." Dkt. No. 42, at 15.

In a memorandum opinion entered on August 28, 2014, the court agreed with Covarrubaiz that Virginia Code § 46.2-1002 does not encompass optional lighting devices. Rather, the statute itself and Virginia state cases reveal that § 46.2-1002 only governs a "lighting device . . . for which approval is required by any provision of this chapter." Va. Code Ann. § 46.2-1002. Because the nonfunctioning amber side lights that Trooper Miller observed did not fall within the ambit of § 46.2-1002, they were not covered under § 46.2-1003.

---

[3] Trooper Miller testified that he stopped Covarrubaiz's truck on December 4, 2013 for a violation of Virginia Code § 46.2-1003 after observing several lights out on the truck. Transcript of July 17, 2014 Suppression Hearing, Dkt. No. 53, at 17-19. After a drug dog alerted, the truck was searched. No drugs were found, and Covarrubaiz was released without a citation. Id. at 23.

4

The court relied upon the decision of the Court of Appeals of Virginia in Commonwealth v. Gilbert, No. 0963098-3, 1998 Va. App. LEXIS 474, at *7 (Sept. 8, 1998), that a "non-functioning marker light, standing alone, did not [provide law enforcement] a basis for stopping defendant's automobile because the marker light was not required equipment." Accord Commonwealth v. Najera, 68 Va. Cir. 17, at *2 (Fairfax Cty. Cir. Ct. Feb. 1, 2005) (Traffic stop for non-functioning marker light invalidated because such lights "are not lighting devices governed by § 46.2-1002 and their defective condition is not prohibited by § 46.2-1003"); see also Commonwealth v. Snyder, No. 0234-07-02, 2007 WL 2301647, at *3 (Va. Ct. App. Aug. 14, 2007) (Defective passenger side mirror does not provide reasonable suspicion for traffic stop because it was not subject to approval under § 46.2-1002. "Thus, a defect in a mirror on a vehicle does not fall under the ambit of Code §§ 46.2-1002 or 46.2-1003."). The court concluded that "Covarrubaiz is correct that if he was stopped for a defective lighting device for which approval is not required the stop was unlawful." Dkt. No. 48, at 9. The opinion quoted dicta from another Court of Appeals of Virginia case, Otey v. Commonwealth, 61 Va. App. 346, 351 n.5, 735 S.E.2d 255, 258 n.5 (2012), for the proposition that "[o]nly 'device[s] [and] equipment mentioned in § 46.2-1002' are required to be kept in a non-defective condition under Code § 46.2-1003. As a result, assuming that some non-functioning *optional* equipment would cause a vehicle to fail state inspection, such defective optional equipment would not justify a stop under Code § 46.2-1003."

Because the government raised the issue in its August 4, 2014 brief that the lights noted by Trooper Miller may have been marker lights for which approval was required under a separate statute, Virginia Code § 46.2-1017, the court, acting out of an abundance of caution, took the motion to suppress under advisement and gave the parties an opportunity to submit additional briefs on the issue of whether the defective lights on Covarrubaiz's truck fell under § 46.2-1017. The court

noted that "[s]hould additional evidence or oral argument be necessary on the issue of § 1017's applicability, the parties should so advise the court." Dkt. No. 48, at 9.

In response to the court's inquiry regarding the applicability of Virginia Code § 46.2-1017, the government filed a thirteen page brief with sixty-three pages of attached exhibits. Most of the brief and all of the exhibits had nothing to do with whether the lights in question fell under Virginia Code § 46.2-1017. Instead, the government raised an entirely new justification for the traffic stop – that it was a carefully orchestrated stop directed by the Drug Enforcement Administration ("DEA") based on wiretap and other electronic evidence of a California-based drug trafficking organization. The government justified the late disclosure of this information "because the other members of the drug trafficking organization were not yet in custody; revealing this evidence or even the existence of the wiretap investigation earlier would have jeopardized the investigation and safety of those involved." United States' Second Memorandum in Response to Defendant's Motion to Suppress, Dkt. No. 52, at 1. The government requested another evidentiary hearing to present this evidence.

Covarrubaiz filed a motion in limine to bar reopening the suppression hearing beyond the § 46.2-1017 issue, arguing the government waived any argument that the traffic stop was justified for reasons other than defective lighting. Covarrubaiz took great issue with the government's timing, stating as follows:

> Nor did the United States allude to any other possible justifications for this stop at the hearing or in written submissions. Indeed, the United States consistently and exclusively relied upon the single basis for the stop described by Trooper Miller at the hearing and elicited from him as the only basis for stopping Mr. Covarrubaiz: the defective lights. It is one thing to have two justifications for a stop and present only one for tactical reasons explicitly leaving open the possibility of presenting the other theory. It is quite another thing to never mention the possibility of another theory and describe the theory presented as the sole basis for the stop. The former, though unusual, may be understandable; the latter smacks of gamesmanship.

Defendant's Opposition to the United States' Request to Reopen the Evidentiary Hearing to Allow Additional Evidence Beyond that Specified in this Court's Memorandum Opinion, Dkt. No. 55, at 3.

Covarrubaiz further noted that the government's explanation that it could not disclose information concerning the larger wiretap investigation earlier without alerting the target of the investigation rang hollow in light of the fact that the government never sought to postpone the suppression hearing nor asked that it be conducted in camera. Importantly, Covarrubaiz advised the court that a search warrant application detailing the California investigation, specifically naming the target of that investigation, Everardo Amador, Sr., and mentioning the wiretaps, had been a matter of public record and unsealed in the court records in the United States District Court for the Eastern District of Virginia since May 22, 2014, some two months before the July 17, 2014 suppression hearing. Covarrubaiz obtained a copy of the search warrant and application from the Eastern District's docket and attached it as Exhibit 1 to his opposition brief. Dkt. No. 55-1. Review of the unsealed search warrant application reveals that it specifically names Amador, identifies him as "a San Diego, California based trans-shipment coordinator responsible for the shipment of bulk quantities of illegal drugs and bulk drug proceeds," id., and refers to the wiretap and monitoring of calls to and from his cell phone. Id. at ¶ 15.

A subsequent hearing was scheduled for September 29, 2014. At the outset of the hearing, the government indicated that its witness as to the issue of the application of Virginia Code § 46.2-1017 was sick and unavailable. As such, the government presented no evidence on the applicability of that statute at the September 29, 2014 hearing. Instead, the hearing was devoted to evidence concerning the government's newborn contention that the traffic stop was justified as a directed stop based on the collective knowledge doctrine.[4] At the hearing, the court took Covarrubaiz's

---

[4] The government's failure to raise this collective knowledge argument earlier was noted in the court's August 28, 2014 memorandum opinion. There the court observed: "Importantly, the Government does not argue that Trooper Miller was directed to stop Covarrubaiz's vehicle on behalf of another law enforcement officer who independently possessed

motion to strike the presentation of this evidence under advisement and allowed the government to make a record on its new theory, given the fact that certain of the government's witnesses had travelled across the country for the hearing. Transcript of Excerpt of September 29, 2014 Suppression Hearing, Dkt. No. 67, at 6-7.

At the September 29, 2014 hearing, an entirely different picture emerged of the events leading up to the traffic stop. The government called four witnesses: Blanca Lopez, a DEA contract linguist; DEA Special Agent Gregg Mervis; DEA Task Force Officer Paul Loconti; and Trooper Miller. Blanca Lopez supervised the translation of wiretapped phone calls involving Amador, Covarrubaiz and others in California in late 2013 and early 2014. Lopez testified that she passed on information obtained from the wiretapped telephone calls to the DEA. DEA Special Agent Mervis testified that on January 29, 2014 he learned from Lopez of a potential drug shipment headed from California to the east coast. Mervis testified that DEA Task Force Officer Paul Laconti's role in the investigation was to provide updates from Covarrubaiz's cell phone provider as to his truck's location as it travelled east from California.

During the early morning hours of February 3, 2014, the DEA team met with Virginia State Police officers at a hotel in Harrisonburg. Mervis described the early morning meeting as follows:

> Q.      And what happened during the meeting with your team and the Virginia State Police?
>
> A.      Like I said, TFO Cutting was the primary point of contact between our team and Virginia State Police. He gave a briefing to the state police regarding the defendant heading east. He suspected him to be transporting narcotics. TFO Laconti provided the latest location update. We set up a plan for DEA, our team, to set up more or less a dragnet, for lack of a better word, on I-81. So we'd essentially set up surveillance. We'd pick up the defendant's truck and hand that off to the state police for them to conduct the traffic stop.

---

sufficient information to establish reasonable suspicion or probable cause." Memorandum Opinion, Dkt. No. 48, at 1 n.1.

Q.  During this meeting, did a member of your team or your team make a specific request or give instruction to the Virginia State Police troopers?

A.      Yes.

Q.      What was it?

A.      The request was to conduct a wall off stop.

Q.      What is a wall off stop?

A.      A wall off stop is basically – at the time, our investigation was ongoing.  We had other tractor trailers in play, as far as the overall organization, that we believed to be transporting bulk currency.  We didn't at the time want to reveal our entire investigation to the defendant because we didn't want it to be compromised as far as the other tractor trailers.  We also did not have Amador, Sr., in custody at the time, so we didn't want to jeopardize those angles.

Q.      Okay.  So those are the reasons for conducting a wall off stop.  How do you actually go about conducting a wall off stop?

A.      We asked the state police if they could develop their own probable cause to conduct the stop and pretty much, that's where we left it.

Transcript of Excerpt of September 29, 2014 Suppression Hearing, Dkt. No. 76, at 58-60.

On cross-examination, Mervis' testimony as to the actual impetus for the stop became more clouded.  Mervis first testified that the state police were "to develop their own probable cause to support the stop; . . . [a]nd then conduct the stop. . . . If they found drugs, yes, they would eventually call us in."  Id. at 68.  Mervis then testified:

Q.      But it was their – it was their province to develop the probable cause to stop and to stop the vehicle; correct?

A.      We asked them, yes, to use their probable cause to stop the vehicle.

Q.      So if they didn't have probable cause to stop the vehicle, if they didn't develop their probable cause, they were not empowered to stop the vehicle; correct?

A. I believe we said if they couldn't find probable cause, we believed based on our information from Los Angeles, there were drugs in that vehicle and they should stop it.

Q. So you directed them to stop or not?

A. What do you mean, directed?

Q. Did you direct them to stop the vehicle or not?

A. We provided them the information to stop, sure.

Q. So you told them to stop the vehicle?

A. Yes, as part of –

Q. When?

A. In the briefing.

Q. In the briefing at the hotel in the morning?

A. Correct.

Q. So this part about develop your own probable cause really was meaningless?

A. No. That was to set up the wall, as far as the wall off stop. If they could develop their own probable cause, that's the way we wanted the stop to take place.

Id. at 69-70. Mervis testified that no DEA reports memorialized that the state police had been directed to stop Covarrubaiz's truck. Id. at 70. Nor did Trooper Miller's written report indicate that the traffic stop was directed by the DEA.[5]

At the September 29, 2014 hearing, Trooper Miller testified for the first time that a meeting with the DEA had been held at a hotel in Harrisonburg at 4:00 a.m. on February 3, 2014. He stated:

---

[5] Trooper Miller's dictated narrative of the encounter with Covarrubaiz states: "On 02-03-14, I was given information from Special Agent D. P. Cutting with the DEA regarding a commercial vehicle possibly transporting a large amount of narcotics traveling Northbound on Interstate 81. . . . While watching Northbound traffic on Interstate 81 at the 258.7 mile marker, I observed a blue 2008 Kenworth W900 commercial vehicle . . . traveling Northbound in the left lane matching the information I was provided. As the vehicle passed me in the crossover I observed several lights out on the tractor." Dkt. No. 77-3.

Q.      And did the DEA agents communicate information to you and members of your team?

A.      They did.

Q.      Do you recall what was communicated to you?

A.      They provided us with a description of a tractor trailer that was supposed to be coming northbound and information we were provided was it was supposed to be carrying a large quantity of narcotics.  They also had advised us that they had a wire tap on the investigation.

* * * *

Q.      And did the DEA agents ask you during this meeting to do anything?

A.      They asked me to make a stop on the vehicle.  It was also discussed along with our, the members of my department, who is going to make the stop.  It was determined since I made the previous stop back in December that I would make this stop.

Q.      Was there discussion about the type of stop that you should conduct?

A.      My understanding was it was to be a directed stop.

Q.      A what?

A.      A directed stop.

Q.      What does that mean?

A.      Basically, the information provided to us from law enforcement to make a stop on the vehicle.

Transcript of Excerpt of September 29, 2014 Suppression Hearing, Dkt. No. 67, at 17-18.

When counsel for the government asked Trooper Miller to explain his testimony from the

July 17, 2014 hearing that the "only" and "sole" reason for the stop was the defective lights, Trooper

Miller explained as follows:

A.      I believed that the defense was asking me just about the traffic infraction, not about the other information coupled with the traffic stop.  I thought the defense attorney was asking me solely the

only reason you stopped the vehicle, the tractor trailer, was just for the traffic violation, just the lights being out. I didn't think he was asking me was that the only reason, meaning that that was the only reason not based on the information, not the totality of everything that I knew. I thought he was just referring to the traffic stop itself, just the traffic violation since that's the only violation that I actually stopped him for, was for the lights.

Id. at 24. Trooper Miller confirmed that he was told by the DEA to "find our own reasonable suspicion or probable cause to stop the tractor trailer" and that is what he thought he did. Id. at 26.

Upon further questioning by the court, Trooper Miller testified:

> THE COURT: Was it your understanding – did anybody from the DEA tell you, look, y'all go ahead and try to establish probable cause on your own? Did that issue come up in that meeting?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: What was said, if you will, Trooper Miller?
>
> THE WITNESS: If I recall, I asked Cutting, who is the actual – who I thought was the actual case agent in this case, if they wanted us to, in fact, do the directed stop and if I could provide my own reasonable suspicion or probable cause to stop the truck, if he wanted me to do that instead of the directed stop. That way, they didn't have to provide the information for the directed stop later. It was my understanding they wanted us to, if we could, find our own reasonable suspicion or probable cause to stop the tractor trailer.
>
> THE COURT: That's, in fact, what you thought you did.
>
> THE WITNESS: Yes, sir.
>
> THE COURT: That's why you answered the question from Mr. Cargill that way.
>
> THE WITNESS: Correct.
>
> THE COURT: You thought when you pulled over Covarrubaiz, just as you had done in December, that those lights provided you with sufficient probable cause to do that; right?
>
> THE WITNESS: Yes, sir.

> THE COURT:  In fact, you were acting that morning when you pulled him over on your own probable cause based on the lights; correct?
>
> THE WITNESS:  Correct.
>
> THE COURT:  You weren't acting pursuant to that direction, were you?
>
> THE WITNESS:  No sir.

Id. at 25-27.

At the September 29, 2014 hearing, counsel for the government described the July 17, 2014 suppression hearing as "a high wire act.  They were trying to do their jobs here, answer questions and present evidence of the stop while at the same time not disclosing that there's a bigger investigation that would alert the main target in Southern California and cause his flight."  Id. at 13. Counsel for the government asked "the Court to bear in mind that the opportunity that we had to introduce this evidence, the big target was still out.  If we introduced it, great chance the message would get back to him and he'd be gone.  That was the strategic decision we made at the time and we appreciated the risks at the time.  After he was arrested, we decided to present the additional evidence."  Id. at 14-15.[6]

Following the September hearing, additional briefs were filed on the propriety of reopening the suppression hearing.  That issue and the issues raised in Covarrubaiz's motion to suppress are now ripe for adjudication.

## II.

The court declines to reopen the suppression hearing for several reasons.  First, the government waived the directed stop argument.  At the first suppression hearing and in subsequent briefing on August 4, 2014, the government did not argue that the traffic stop was directed by the

---

[6] In fact, the same day Amador was arrested, August 22, 2014, the government revealed the existence of the California investigation, including Amador's identity and the existence of the wiretaps, to Covarrubaiz's counsel.  Dkt. No. 77-4.

DEA, relying exclusively on the basis afforded by the claimed lighting violation. While the government argues that Trooper Miller's report and testimony at the July 17, 2014 suppression hearing mention the fact that he had been given information that the Covarrubaiz vehicle could possibly be transporting a large quantity of narcotics, it is clear that the government did not argue that the stop was directed.

Indeed, instead of raising this argument, the government, engaged in what it deemed to be "a high wire act," Dkt. No. 67, at 13, made the "strategic decision," id. at 15, not to argue for a directed stop. Having made that strategic decision, the government may not now seek to reverse the field and take an inconsistent position.

The court accepts and understands that the government may, out of concern for officer and public safety and to avoid apprising targets of a pending investigation, play its cards close to its vest. At the same time, however, the government may not play fast and loose with evidence introduced in court. The court's concern with the manner in which the first suppression hearing was handled by the government does not stem from the fact that the government chose not to introduce evidence as to the wiretaps and the broader California investigation until after it had arrested Amador. The government's interest in making sure that Amador did not flee is certainly understandable, and the decision to put on certain evidence or not is the prerogative of every party.

Rather, the court's concern stems from the fact that the government allowed a misimpression to take root. In light of the government's subsequent argument that the traffic stop was directed by the DEA, Trooper Miller's testimony at the July 17, 2014 suppression hearing that the defective light violation was the "sole" and "only" basis for stopping Covarrubaiz's truck was, at best, mistaken, and, at worst, misleading. Given the knowledge possessed by the government at the time, such a misimpression ought not to have been allowed to remain on the record. To be sure, bits of testimony can be overlooked in the fray of trial or an evidentiary hearing. But nothing in the

14

government's brief filed on August 4, 2014 seeks to correct or clarify Trooper Miller's testimony that the "sole" or "only" reason for the stop was the defective lighting violation. Again, while the brief makes mention that "Trooper Miller had received information that the defendant may be travelling northbound on I-81 carrying a large shipment of narcotics," Dkt. No. 42, at 2, the government does not argue that there was any basis for the stop other than the claimed defective lighting. Rather, the brief reaffirms the position taken by the government that "Trooper Miller conducted the traffic stop on the defendant's vehicle based upon a suspected violation of Virginia traffic code, § 46.2-1003, which prohibits the use of defective equipment on motor vehicles." Id. at 3.

The government made the "strategic decision" to defend the suppression motion exclusively based on Trooper Miller's observation of nonfunctioning lights on Covarrubaiz's tractor. Satisfied that the perceived lighting violation sufficed, the government did not seek to justify the traffic stop based on the broader California investigation. In fact, later referring to its conduct as "a high wire act," the government deliberately determined not to defend the suppression motion based on the evidence from California. Having made the decision not to risk disclosure of the California investigation to rebut the suppression motion, the government is bound by the "strategic decision" it made. See United States v. Melendez, No. 2-10cr00145 KJN, 2010 WL 4323607 (E.D. Cal. Oct. 25, 2010) (Government waived reliance on plain view theory by belatedly raising it); United States v. Reyes, No. 91-CR-565, 1993 WL 8775, at *1 (W.D.N.Y. Jan. 13, 1993) (Following suppression ruling, government may not "change its premise . . . [and] argue in the alternative once a decision has been made. In so doing, the government has closed the barn door after the horse has already gone."); United States v. Ramos, 753 F. Supp. 75, 81 (W.D.N.Y. 1990) ("The government overlooked this argument [consent search] in the first instance. It chose to proceed on the basis of a valid stop and should not under Rule 12, be allowed to raise new arguments once it is determined that the stop was not valid.").

15

Second, the court did not intend its August 28, 2014 memorandum opinion to give the government carte blanche to present an entirely new defense to the suppression motion. Instead, focused exclusively on the issue of defective lighting raised by the government, the court only intended to take the government up on its offer to present argument, and, if necessary, evidence, that the lights on Covarrubaiz's tractor violated Virginia Code § 46.2-1017. The court did not ask for, and will not now allow, a general reopening of the suppression hearing to give the government a second bite at the apple to present new evidence or pursue an alternative theory.

Whether at trial or in a hearing such as a suppression hearing, courts are "extremely reluctant" to reopen the evidence in a criminal case. United States v. Billingsley, 474 F.2d 63, 67 (6th Cir. 1973); see United States v. Kithcart, 218 F.3d 213, 219 (3rd Cir. 1999). "Generally, absent any new evidence or evidence that was unobtainable before the original suppression hearing, or any new issues that became relevant since the hearing, the reopening of a suppression hearing is unwarranted." United States v. Mathis, 653 F. Supp. 2d 806, 810 (E.D. Tenn. 2009) (citing United States v. Watson, 391 F. Supp. 2d 89, 94-95 (D.D.C. 2005)).

Kithcart concerned the reopening of a suppression hearing following a remand from the court of appeals. In concluding that the district court abused its discretion in allowing the government to reopen the suppression hearing on remand, the Third Circuit noted that "[w]hen faced with a motion to reopen, the district court's primary focus should be on whether the party opposing reopening would be prejudiced if reopening is permitted." 218 F.3d at 220. Plainly, here, Covarrubaiz would be prejudiced by allowing the government to redo its presentation of evidence in opposition to Covarrubaiz's motion to suppress. Covarrubaiz's counsel structured his examination and argument based on the government's evidence, and to allow the government to assert a new basis for the stop at this point would be manifestly unfair to Covarrubaiz.

Kithcart further indicates that the court should evaluate the government's explanation for failing to present the evidence earlier and determined whether the explanation is reasonable and adequate. Certainly, the fact that Amador was at large in California and the government did not want to alert him of the investigation makes sense, but this explanation is a bit difficult to accept given the fact that (1) the details of the investigation, including the identity of Amador and the existence of the California wiretaps, was a matter of public record in an unsealed filing in the Eastern District of Virginia; (2) following his arrest in California on August 22, 2014, Amador was released on a relatively small bail bond and has subsequently appeared in court; and (3) no request was made by the government to address its concerns with the court in an in camera or sealed proceeding.

The Fourth Circuit addressed the reopening of a suppression hearing by the government in United States v. Dickerson, 166 F.3d 667 (4th Cir. 1999), rev'd on other grounds, 530 U.S. 428 (2000). In Dickerson, the Fourth Circuit identified the competing interests involved in considering such a motion. On the one hand, society has an interest in admitting all relevant evidence, while on the other hand the district court has an interest in controlling its docket and avoid piecemeal litigation. Id. at 679. In this case, the parties ask the court to focus on two other considerations. The government asks the court to excuse its failure to present the California evidence until after Amador had been arrested out of fear that he would flee. For his part, Covarrubaiz grounds his opposition in the duty of candor owed by parties and their counsel to the court. Given the particular facts of this case, and considering the specific evidence presented and arguments made by the government before the court issued its August 28, 2014 memorandum opinion, justice would be ill served by allowing the government to advance an argument of which it was previously aware but strategically chose not to pursue earlier. As the court stated in United States v. Head, 737 F. Supp. 1287, 1288 (W.D. N.Y. 1990), "[t]he government's present constitutional argument may well have

17

merit. But the fact remains that it was not raised before, and it would be exceptionally unfair to the defendant to allow the government, with the benefit of hindsight after having lost based on its original arguments, to use a motion for reconsideration to raise a new argument that should have been raised in the first instance."

At any rate, the court cannot credit the government's argument that the traffic stop was justified as a directed stop under the collective knowledge doctrine. Both Trooper Miller and DEA Special Agent Mervis testified at the September 29, 2014 suppression hearing that the DEA wanted the state police to develop their own probable cause for the stop, which Trooper Miller testified is what he did. To be sure, Trooper Miller also testified at the September 29, 2014 hearing for the first time that "[m]y understanding was it was to be a directed stop." Dkt. No. 67, at 18. But that is not how things played out. Trooper Miller testified at both hearings that he believed he had the lawful authority to execute a traffic stop based on a lighting violation and that was "in fact, what [he] thought [he] did." Dkt. No. 67, at 26; see Dkt. No. 67, at 27, 30; Dkt. No. 53, at 29, 71-72. In short, both Special Agent Mervis and Trooper Miller testified that the plan was for Trooper Miller to develop his own rationale for the stop, and Trooper Miller did so. As Trooper Miller made the stop based on what he thought was a defective lighting violation, the government cannot now argue that the stop was something that it was not. See United States v. Moore, No. 10-20078, 2010 WL 3341809, at *8-9 (E.D. Mich. July 14, 2010), adopted, 2010 WL 3341804 (E.D. Mich. Aug. 24, 2010) (Government's argument for reasonable suspicion based on collective knowledge doctrine rejected as being untimely and inconsistent with the evidence that the vehicle was stopped for defective equipment). Accordingly, the court declines to reopen the suppression hearing.

The court will not, however, do as Covarrubaiz urges and strike all of Trooper Miller's testimony as being not credible and inconsistent. The court had the opportunity to closely observe Trooper Miller's testimony on two occasions and questioned the witness itself. The court does not

believe that Trooper Miller intended to mislead the court with his July 17, 2014 testimony that the "sole" and "only" reason for the stop was the defective lighting violation. Although, as was later learned, Trooper Miller met with the DEA before the stop and the plan to stop Covarrubaiz's truck was hatched, Trooper Miller was asked to develop his own lawful basis for the stop, which, as it turned out, was what Trooper Miller thought he did upon observing the defective lights. See Transcript of Excerpt of September 29, 2014 Suppression Hearing, Dkt. No. 67, at 25-27. As such, the court will not strike Trooper Miller's testimony that he stopped Covarrubaiz's tractor trailer for a defective lighting violation.

### III.

The court is thus left with the issue raised at the July 17, 2014 suppression hearing and in associated briefing—whether the lights on Covarrubaiz's truck violated Virginia law, justifying the stop for defective equipment under Virginia Code §§ 46.2-1002 and 46.2-1003.

As the court's August 28, 2014 memorandum opinion indicated, the defective optional lights on Covarrubaiz's vehicle did not provide Trooper Miller with reasonable articulable suspicion of a violation of Virginia traffic laws sufficient to constitutionally stop Covarrubaiz's truck. Trooper Miller testified that the lights he observed not to be functioning were optional, and there is no evidence to establish that these lights were ones "for which approval is required" under Virginia Code § 46.2-1002. Thus, following the construction of the Virginia Code adopted by the Court of Appeals of Virginia in Commonwealth v. Gilbert, No. 0963098-3, 1998 Va. App. LEXIS 474, at *7 (Sept. 8, 1998), Trooper Miller could not conduct a traffic stop under Virginia Code § 46.2-1003 because certain optional lights, not subject to Virginia Code § 46.2-1002, were not functioning.

After the court issued its August 28, 2014 memorandum opinion, the United States Supreme Court issued its opinion in Heien v. North Carolina, 135 S. Ct. 530 (2014). Heien bears some resemblance to this case. There, Sergeant Matt Darisse, a North Carolina Sheriff's Deputy, stopped

a vehicle because it had only one operating brake light. The state trial court denied a motion to suppress, but the North Carolina Court of Appeals reversed, finding that the initial stop was not valid "because driving with only one working brake light was not actually a violation of North Carolina law." 135 S. Ct. at 535. The North Carolina Supreme Court reversed, holding that "[b]ecause Sergeant Darisse's mistaken understanding of the vehicle code was reasonable, the stop was valid." Id. The United States Supreme Court granted certiorari and affirmed the holding of the North Carolina Supreme Court, concluding that because Sergeant Darisse's "mistake of law was reasonable, there was reasonable suspicion justifying the stop." Id. at 540.

In this case, Trooper Miller testified that he believed that any non-functioning lights on Covarrubaiz's truck, optional or not, violated Virginia Code § 46.2-1003. On cross-examination, Trooper Miller agreed that his "view of the law is that if there's a light on the vehicle, on the outside of a vehicle, that light has to be fully functional." Dkt. No. 53, at 86. Given the language of Virginia Code § 46.2-1002 and the holding in Gilbert, Trooper Miller's view of Virginia law is mistaken. The question following Heien is whether his mistake is a reasonable one.

Careful evaluation of Trooper Miller's July 17, 2014 testimony makes plain that Trooper Miller conflated the requirements of Virginia Code §§ 46.2-1002 and 1003 with regulations promulgated by the Superintendent of State Police for state motor vehicle inspections. Consistent with Trooper Miller's testimony, Virginia State Police inspection regulations provide that while amber side marker lamps are not required, the lights must work or the vehicle will fail inspection. 19 VAC §§ 30-70-180(4) and 30-70-200(6). Also as Trooper Miller testified, for vehicles equipped with LED lights, as was Covarrubaiz's tractor, 50% of the bulbs must work. Trooper Miller testified that "[t]he law states that 51 percent of the actual LED lights has to be not operational for it to be – to write a defective ticket for that." Transcript of July 17, 2014 Suppression Hearing, Dkt. No. 53, at 87. In fact, no provision of Chapter 10 of Title 46.2 of the Virginia Code concerns LED lights on

vehicles. Instead, Virginia State Police inspection regulations provide that LED lights "will pass inspection if more than 50% of the diode lights are burning." 19 VAC §§ 30-70-180(3) and 30-70-200(C)(7).

In essence, Trooper Miller believed that if a vehicle's lighting would cause it to fail state inspection he could stop a vehicle and write a ticket for defective equipment under Virginia Code § 46.2-1003. At the time of Trooper Miller's stop, however, the Court of Appeals of Virginia had spoken to this issue and expressly rejected the view, apparently held by Trooper Miller, that state inspection regulations were congruent with the "approval" requirement of Virginia Code § 46.2-1002. Commonwealth v. Snyder, No. 0234-07-2, 2007 WL 2301647 (Va. Ct. App. Aug. 14, 2007). Snyder concerned the legality of a traffic stop for a defective passenger side mirror. Investigation following the traffic stop led to more serious charges. The Commonwealth argued that mirrors fell under the approval requirement of Virginia Code § 46.2-1002 because they were subject to annual inspection of motor vehicles pursuant to Virginia Code § 46.2-1157. The Court of Appeals disagreed, finding that "there is a marked difference between the 'approval' requirement and 'inspection' of vehicles pursuant to Code § 46.2-1157." Snyder, 2007 WL 2301647, at *2.

Trooper Miller's subjective rationale notwithstanding, the issue following Heien is whether Trooper Miller's mistake of law is objectively reasonable. "The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes – whether of fact or of law – must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved." Heien, 135 S. Ct. at 539. For two reasons, the court concludes that Trooper Miller's mistake of law was objectively reasonable.

First, the statute in question, Virginia Code § 46.2-1002, is hardly a model of clarity. Although the trial court in Gilbert invalidated the traffic stop because the lights in question were not subject to Virginia Code § 46.2-1002, it observed:

> When you go back and read the Code Section[,] it's almost impossible to determine whether that marker light is required. It looks to me, that being the case, it's not required, but I don't say that with a whole lot of assurance except I can find nothing there that requires . . . this vehicle to have a marker light, and that being the case I don't think the officer had a right to stop this vehicle.

Gilbert, 1998 Va. App. Lexis 474, at *3-4. The court agrees with the above-quoted passage from Judge William N. Alexander, II, of the Circuit Court of Pittsylvania County, that Virginia Code § 46.2-1002 is difficult to parse, understandably engendering confusion by those trained in principles of statutory construction and those lacking such training.

Second, although the 2007 decision of the Court of Appeals of Virginia in Snyder rejected the notion that merely failing a state inspection rendered equipment unapproved under Virginia Code § 46.2-1002, thus authorizing a stop under Virginia Code § 46.2-1003 for defective equipment, two other Court of Appeals of Virginia decisions suggest the issue may not be quite so settled. For instance, in the 2012 Otey decision, the Court of Appeals of Virginia stated that "[i]t certainly would be odd for a vehicle's malfunctioning rear light to cause the vehicle to fail the state inspection but at the same time not be 'defective.'" 61 Va. App. at 351, 735, S.E.2d at 258. Further, in Reel v. Commonwealth, 31 Va. App. 262, 268, 522 S.E.2d 881, 884 (2000), the court held that the mere presence of an inspection rejection sticker on a vehicle "provides reasonable suspicion for the officer to conduct an investigatory stop of the vehicle to determine whether the defective equipment has been repaired."[7]

---

[7] It is a bit difficult to square the decisions in Gilbert and Snyder with Reel. Take for example, the nonfunctioning optional amber side marker lights on Covarrubaiz's truck. Gilbert holds that an officer may not stop the truck because these lights are not those for which approval is required under Virginia Code § 46.2-1002. Snyder teaches that reasonable articulable suspicion does not arise simply because these nonfunctioning optional lights would cause the truck to fail state inspection. But suppose that Covarrubaiz's truck was subject to inspection under Virginia law and that the failure of these very same lights caused the placement of an inspection rejection sticker on the windshield of his truck. In that case, Reel holds that the presence of the rejection sticker – placed on the truck for the same optional lighting failure that would not justify a stop under Gilbert and Snyder – would provide reasonable articulable suspicion of a defective equipment violation under Virginia Code § 46.2-1003.

In short, given the opacity of Virginia Code § 46.2-1002 and the various decisions of the Court of Appeals of Virginia on the subject, the court concludes that Trooper Miller's mistake of law as to his ability to stop Covarrubaiz's truck for non-functioning amber side marker lights was objectively reasonable. As such, there was reasonable suspicion justifying the stop.[8] Heien, 135 S. Ct. at 540.

## IV.

For these reasons, the court will **GRANT** Covarrubaiz's motion in limine and declines to consider the evidence presented by the government at the September 29, 2014 hearing, finding that the manner in which the government presented its evidence and arguments at the July 17, 2014 suppression hearing and in the briefs filed on July 15, 2014 and August 4, 2014, Dkt. Nos. 36 and 42, constitutes a waiver of its later argument that the traffic stop was directed by the DEA based on wiretap evidence from California.

---

[8] Given this conclusion, the court need not reach the issue of whether the non-functioning lights were dimension or marker lights required under Virginia Code § 46.2-1017. In any event, the government cannot rely on Virginia Code § 46.2-1017 to justify the traffic stop in light of its failure of proof. The text of § 46.2-1017 suggests that the non-functioning amber lights seen on the side of the tractor by Trooper Miller are not dimension or marker lights as defined in that statute. Virginia Code § 46.2-1017 provides as follows:

> All motor vehicles, trailers, or semitrailers exceeding seven feet in width or the widest portion of which extends four inches beyond the front fender extremes shall be equipped with amber lights mounted at the extreme right and left front corners of such vehicle. Each such light shall be visible in clear weather for a distance of at least 500 feet to the front of such vehicle. Such vehicles shall also be equipped with red lights mounted at the extreme right and left rear top corners of such vehicle. Each such light shall be visible in clear weather for at least 500 feet to the rear of such vehicle.

Dimension or marker lights are located at the front and rear of the vehicle, not on the side as Trooper Miller observed. Plainly, the lights observed by Trooper Miller do not meet this definition. The statute goes on to provide: "If the front or rear of such vehicle is not the widest portion of the vehicle, the dimension or marker lights required in this section shall be mounted on the widest portions of the vehicle with the amber lights herein required visible from the front as herein required and the red lights herein required visible from the rear as herein required." Va. Code § 46.2-1017. The government introduced no evidence nor made any argument that this portion of the statute applied to this case.

Additionally, the government's reliance on Virginia Code § 46.2-1017 is untenable because it contradicts Trooper Miller's testimony. While Trooper Miller occasionally referred to the defective lights as marker lights, he clearly testified that the lights on Covarrubaiz's truck that were defective were optional and could be switched on and off at will from the cab. Plainly, the optional marker lights Trooper Miller described are not the required dimension or marker lights referenced in Virginia Code § 46.2-1017.

Nevertheless, the court will **DENY** the motion to suppress. Following the Supreme Court's decision in <u>Heien</u>, the court finds there was reasonable suspicion justifying the stop because Trooper Miller's mistake of law regarding the nonfunctioning optional lighting on Covarrubaiz's truck was objectively reasonable.

An appropriate Order will be entered this day.

Entered: January 16, 2015

*Michael F. Urbanski*

Michael F. Urbanski
United States District Judge